## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDOLLAH ABDOLLAHI,<br>Telmashki Village, NoorAbad<br>Shiraz, Iran<br><br>ALIASGHAR BAHARI HASHAKVAYEE,<br>No 206, Montazeri Alley, Sandy Area<br>Rasht, Iran<br><br>AMENEH ROKNI,<br>Ashouri Alley, Sangi St,<br>Boushehr, Iran<br><br>SIAVAH EYDI ZAMANI,<br>Modaress 3rd, Toutestan Alley<br>Mamasani, Iran<br><br>NILOUFAR BARDESTANI ,<br>6 Fereshtegan St, APT 1,Hasht Jannat St.<br>Shahin Shahr, Iran<br><br>SEYEDYEH TAHEREH MIRNASIR,<br>No 22, Golestan St #1, Shahid Ojaghi St<br>Bandar Anzali, Iran<br><br>SEDIGHEH SAADATJOU,<br>Aghaghia Buliding,2N, Shahid Nik Kar Alley,<br>Tehran, Iran<br><br>HAMID NAJAFIFAR,<br>35 Sayyad Hojabr Manesh Alley, Taleghani St,<br>Bandar Anzali, Iran<br><br>FATEMEH SHOJAIE,<br>78 Ahamd Goudarzi Alley, Etesami St,<br>Bourojerd, Iran<br><br>AND<br><br>MOKHTAR ROUMIANI<br>Boustan 15th, Roumiani Village<br>Roumeshkan, Iran<br><div align="center">Plaintiffs,</div><div align="center">Vs</div><br>NATIONAL IRANIAN TANKER CO.,<br>East Shahid Atefi Street 35, Africa Boulevard, P.O. Box<br>19395-4833,<br><div align="center">Tehran, Iran</div>ALI RABIEI, and<br>Office of the Presidnet, Pasteur St., Pasteur Sq., Tehran, Iran<br><br>ALAEDDIN BOROUJERDI<br>Majlis, Mojaheddin Eslam Ave, Tehran, Iran<br><br><div align="center">c/o Ministry of Foreign Affairs<br>Emam Khomeini Ave<br>Tehran, Iran</div><br><div align="center">Defendants.</div> | **Case Number:  1:19-cv-3688** |

## COMPLAINT

1. F Plaintiffs Abdollah Abdollahi, Aliasghar Bahari Hashakvayee, Ameneh Rokni, Siavah

   Eydi Zamani, Niloufar Bardestani, Seyedyeh Tahereh Mirnasir, Sedigheh Saadatjou,

   Hamid Najafifar, Fatemeh Shojaie, Mokhtar Roumiani ("Plaintiffs"), are family members

   of the crew of the *Sanchi* Oil Tanker ("*Sanchi*"), bring suit against Defendants the

   National Iranian Tanker Company ("NITC"), Mr. Ali Rabiei, and Alaeddin Boroujerdi

   under the Alien Tort Claim Act, 28 U.S.C. § 1350 ("ATS"), and the Torture Victims

   Protection Act of 1991, 28 U.S.C. ch. 85 § 1350 ("TVPA"), for severe personal injuries

   and other irreparable harm suffered as a result of Defendants' unlawful acts of hostage

   taking, extrajudicial execution, piracy, torture, and other torts against Plaintiffs family

   members, the crew of the *Sanchi* Oil Tanker.

2. Plaintiffs bring this complaint in order to help locate and release of Sanchi's crewmen

   and also recover for the actions of the National Iranian Tanker Company, Mr. Ali Rabiei,

   and Alaeddin Boroujerdi in the aftermath of a collision between the Iranian owned,

   Panamanian flagged *Sanchi* Oil Tanker and a Hong Kong owned and flagged ship, the

   *CF Crystal.*

3. The *Sanchi* had a full cargo of 111,510 tons of natural-gas condensate oil and was sailing

   from Assaluyeh, Iran to Daeson, Republic of Korea (South Korea) at the time of the

   accident. The *CF Crystal* was loaded with 63,997.817 tons of sorghum in bulk and was

   sailing from Kalama, Washington State in the United States to Dongguan, China. While

   the crew of the *CF Crystal* was rescued from the wreckage of the two ships and brought

   safely back to China, the thirty-two members crew of the *Sanchi* was not rescued and

   largely remain missing. Rescuers at the scene of the accident were only able to recover

   three bodies from the wreckage of the *Sanchi* and while the government of Iran has

   declared the entire crew dead, Plaintiffs contest the validity of this declaration, and

   believe that crew members are held hostage.

## JURISDICTION AND VENUE

4. This Honorable Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331

   (federal question jurisdiction), 28 U.S.C. § 1350 (ATS) and 28 U.S.C. § 1350 (TVPA).

   ATS provides federal jurisdiction for "any civil action by an alien for a tort only,

committed in violation of the law of nations or a treaty of the United States." TVPA

supplements and confirms ATS by providing federal jurisdiction for acts of torture, as

defined by 28 U.S.C. ch. 85 § 1350.

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a), (b), and (c).

## PARTIES

6. Plaintiffs are family members of Sanchi crewmen who are either in captivity or killed.

7. Plaintiff ABDOLLAH ABDOLLAHI is the father of Sadjad Abdollahi.

8. Plaintiff ALIASGHAR BAHARI HASHAKVAYEE is the father of Hamed Bahari
   Hashakvayee.

9. Plaintiff AMENEH ROKNI is the wife of Abozar Nezami.

10. Plaintiff SIAVAH EYDI ZAMANI is the father of Pour Eydipour.

11. Plaintiff NILOUFAR BARDESTANI is the wife of Milad Aravi, whose body discovered
    three days after the accident.

12. Plaintiff SEDIGHEH SAADATJOU is the wife of Seyed Javad Heidari.

13. Plaintiff HAMID NAJAFIFAR is the father of Alireza Najafifar.

14. Plaintiff FATEMEH SHOJAIE is the mother of Mohammad Piriayee.

15. Plaintiff MOKHTAR ROUMIANI on behalf of Hassan Romiayee.

16. Plaintiff SEYEDYEH TAHEREH MIRNASIR is the wife of Omid Rezei.

17. At the time of the accident these crewmen were operating on Sanchi Oil Tanker, working
    for National Iranian Tanker Company. Plaintiffs believe that in contrast to the official
    claim, their family crewmen were not died at the time of the accident, but they have been
    part of a cover up, and currently in captive or killed.

18. Defendant National Iranian Tanker Company ("NITC"). NITC is the biggest tanker
    company in the Middle East. The company transports Iranian crude oil to export markets
    and also engages in cross-trading of crude oil cargoes for some 150 oil majors
    worldwide. NITC was the operator and manager of the Sanchi Oil Tanker at the time of
    its collision with the CF Crystal and eventual sinking in the East China Sea.

19. Defendant Ali Rabiei is an Iranian politician and former intelligence officer. He served as
    the labor minister of Iran from 2013 to 2018. At the time of the Sanchi disaster, Mr.
    Rabiei was the Iranian Minister of Cooperatives, Labor and Welfare and was in China

during the aftermath of the collision serving as the head of an *ad hoc* committee tasked with following up on the condition of the tanker and its crew.

20. Defendant Alaeddin Boroujerdi is a member of Iranian parliament and former Chairman for the Committee for Foreign Policy and National Security of the Islamic Consultative Assembly of Iran (Majilis). Mr. Boroujerdi works with Mr. Rabiei during the course of investigation and cover up of the facts of the accident.

## STATEMENT OF FACTS

21. The Sanchi Oil Tanker collision occurred on January 6, 2018 when the Panamanian-flagged, Iranian-owned tanker *Sanchi*, collided with the Hong-Kong flagged cargo ship *CF Crystal* in the East China Sea.[1]

22. The *Sanchi* had a full cargo of 111,510 tons of natural-gas condensate oil[2] and was sailing from Assaluyeh, Iran to Daeson, Republic of Korea (South Korea) at the time of the accident.[3] The *CF Crystal* was loaded with 63,997.817 tons of sorghum in bulk[4] and was sailing from Kalama, Washington in the United States to Dongguan, China.[5]

23. The collision breached the cargo tanks of the *Sanchi*, resulting in the leakage of a large amount of condensate oil.[6]

24. The collision occurred 160 nautical miles off Shanghai, China with the *Sanchi* catching fire shortly after the collision with multiple explosions to follow.[7] After burning and drifting for over a week, the *Sanchi* sank on January 14, 2018.[8] The CF Crystal sustained extensive structural damage to its bow and burn damage to other areas but did not sink and was able to be salvaged.[9]

---

1. CHINA MARITIME SAFETY ADMINISTRATION ET AL., REPORT ON THE INVESTIGATION OF THE COLLISION BETWEEN M.T. SANCHI AND M.V. CF CRYSTAL IN EAST CHINA SEA ON 6 JANUARY 2018 1 (2018).

2. *Id* at 23.

3. *Id* at 1.

4. *Id* at 24.

5. *Id* at 1.

6. *Id.*

7. *Sanchi oil tanker disaster: how spills and accidents can make ships safer*, THE CONVERSATION (Jan. 29, 2018), http://theconversation.com/sanchi-oil-tanker-disaster-how-spills-and-accidents-can-make-ships-safer-90207.

8. *Id.*

9. CHINA MARITIME SAFETY ADMINISTRATION ET AL., REPORT ON THE INVESTIGATION OF THE COLLISION BETWEEN M.T. SANCHI AND M.V. CF CRYSTAL IN EAST CHINA SEA ON 6 JANUARY 2018 1 (2018).

25. The owner of the *Sanchi* was Bright Shipping, Ltd.[10] The operator and management company of the Sanchi was the National Iranian Tanker Company located at East Shahid Atefi Street 35, Africa Boulevard, P.O. Box 19395-4833, Tehran, Iran.[11] The owner and operator of the *CF Crystal* was Changhong Group (Hong Kong) Co., Ltd.[12] The management company of the *CF Crystal* was Shanghai CP International Ship Management & Broker Co., Ltd.[13]

26. The cause of the collision between the *Sanchi* and the *CF Crystal* has been subject to debate between the countries involved and remains unclear.[14]

27. All 21 crewmembers aboard the *CF Crystal* were rescued and reported as safe, however the 32 crewmembers aboard the Sanchi were originally reported as missing.[15] Three crewmen body were discovered. Currently 29 crewmen are missing. The crew of the Sanchi was comprised of 30 Iranian and two Bangladeshi seamen.[16]

28. Despite surviving the accident and witnessing the collision firsthand, the crew members of the *CF Crystal* were forbidden from speaking with anyone besides the government agencies tasked with investigating the accident.

29. At the time of the accident, the *Sanchi*'s owner claimed that the crew could still be alive after the collision and called on the Chinese authorities working at the scene to prioritize a rescue attempt.[17] Mohsen Bahrami, a spokesman for the National Iranian Tanker company stated that "there is still hope" and that rescuers would "likely" find survivors as "the engine room is not directly affected by the fire and is about 14 meters under water."[18]

---

10. *Id* at 21.

11. *Id* at 22.

12. *Id.*

13. *Id* at 23.

14. *Iranian tanker goes down in flames, leaves mess at sea*, CBS NEWS (Jan. 15, 2018), https://www.cbsnews.com/news/iran-oil-tanker-sanchi-sinks-oil-slick-fire-collision-china-freighter/.

15. *Id.*

16. Ge Mingning et al., *The 'Almost Impossible' Crash of the Oil Tanker Sanchi*, CAIXIN (Jan. 29, 2018), https://www.caixinglobal.com/2018-01-29/the-almost-impossible-crash-of-the-oil-tanker-sanchi-101204183.html.

17. Golnar Motevalli, *Crew Aboard Blazing Iranian Oil Tanker May Be Alive, Owner Says*, BLOOMBERG NEWS (Jan. 10, 2018), https://www.bloomberg.com/news/articles/2018-01-10/crew-aboard-blazing-iranian-oil-tanker-may-be-alive-owner-says.

18. *Still Hope 'Some Crew Members Alive' On Burning Iranian Tanker*, RADIO FARDA (Jan. 10, 2018), https://en.radiofarda.com/a/still-hope-crew-members-alive-burning-iranian-oil-tanker-sanchi-east-china-sea-shanghai/28966386.html.

**30.** After the initial collision between the *Sanchi* and the *CF Crystal*, there were several phone calls made from phones located on the *Sanchi* to the NITC where the captain of the *Sanchi* informed the NITC of the status of the *Sanchi* and the crew. The captain and crew were instructed to retrieve life vests and leave the *Sanchi* on a lifeboat.

**31.** There were reports in Iranian media that crewmen of Sanchi have left the oil tanker on a lifeboat. In pictures taken of the *Sanchi* after the collision it appears that one of the lifeboats is no longer attached to the boat and is missing from the wreckage with the mechanism that attaches the lifeboat to the tanker having been released. However, this lifeboat has never been found and is still missing.

**32.** Iranian Student News Agency ("ISNA") initially reported that a lifeboat had been released from the *Sanchi* Oil Tanker.

**33.** On January 8, 2018 , rescuers recovered one body of a crew member from the waters surrounding the Sanchi.[19] On January 13, 2018, members of the Chinese rescue and salvage team boarded the *Sanchi* in an attempt to reach the crew, the salvage team was able to recover the bodies of two crew members from the deck of the *Sanchi*, as well as the voyage data recorder, or "black box", from the bridge of the ship before being forced to leave the vessel less than half an hour after boarding due to the temperatures and toxic smoke.[20]

**34.** After the recovery of the three bodies, the Iranian Student News Agency ("ISNA") reported that the three deceased crew members had been identified as Milad Aravi, Majid Naqian and Mohammed Kavousi.[21] On January 14, the Ports and Maritime Organization of Iran issued a statement declaring that no crew members from the Sanchi had survived.[22]

---

19. Javier C. Hernandez, *Hope Fades for Missing Crew Members as Iranian Oil Tanker Sinks*, NEW YORK TIMES (Jan. 14, 2018), https://www.nytimes.com/2018/01/14/world/asia/iran-oil-tanker-china-sea.html.

20. *Two bodies recovered from burning oil tanker adrift off China coast*, THE GUARDIAN (Jan. 13, 2018), https://www.theguardian.com/world/2018/jan/13/burning-oil-tanker-sanchi-china-two-bodies-recovered.

21. *Bodies of three crew members from Sanchi identified*, REUTERS (Jan. 27, 2018), https://www.reuters.com/article/us-iran-china-sanchi/bodies-of-three-crew-members-from-sanchi-identified-idUSKBN1FG0VU.

22. *Sanchi oil tanker sinks, all crew presumed dead*, MEHR NEWS AGENCY (Jan. 14, 2018), https://en.mehrnews.com/news/131232/Sanchi-oil-tanker-sinks-all-crew-presumed-dead.

35. Immediately after the *Sanchi* sank on January 14, 2018, Ali Rabiei wrote a letter to Iranian President Hasan Rohani in which he stated that the crew of the *Sanchi* had been "martyred for a resistant economy." He further stated that "without a doubt all crewmen died at the time of the accident due the fire and explosion."

36. This announcement was very meaningful, because a "resistance economy" was the term used by Iran's Supreme Leader, when he order the government to use any measure to resist the pressure from the world, a resistance economy is a way to circumvent sanctions against a country or region experiencing sanctions, in this case Iran. This type of economy can involve increasing resilience by substituting local inputs for imported inputs, the smuggling of goods and an increase in barter trade. In addition, using the term "Martyred" is important and carries significant implications. Martyred are those who died in the path of Allah, or basically higher fighting the evil. No one, in regular accidents, ever called Martyred unless there was an important mission for the country or religion.

37. Additionally, after the *Sanchi* sank in the East China Sea, there were no further attempts to recover the bodies of the crew, despite the fire caused by the collision and leak of condensate oil being put out and the wreck of the *Sanchi* coming to rest in area of the East China Sea that is accessible to divers as it is not too deep.

38. Despite the *Sanchi*'s "black box" being recovered from the wreckage of the tanker, the "black box" of the *CF Crystal* was somehow corrupted and unable to be read after the *CF Crystal* was brought back to port. As a result, the information contained on the "black box" of the *CF Crystal* was never reported and remains a mystery to this day.

39. After declaring that the entire crew of the *Sanchi* had perished in the aftermath of the collision, the government of Iran attempted to force family members of the crew, including Plaintiffs, to accept that the seamen were dead. When the government faced resistance by family members, they offered to hire one family member from each of the families to begin working for NITC and further offered to continue paying the deceased's death benefits. While some of the families accepted this offer for various reasons, including a need for continued financial stability, several families refused to accept Iran's offer, which cause termination of their benefits by NITC.

40. Finally, the NITC does not agree the claim that crewmen may be alive, and only agreed to pay the damages under the employment agreements to those families that agreed to

accept the death of their family member who was a member of the *Sanchi* crew. However, despite ongoing litigation in Hong Kong concerning the cause of the accident, which is attempting to determine the "at fault party" in the collision, NITC has failed to make personal injury claims against the Chinese parties for the wrongful deaths of the crew even though NITC has made other claims for damages including the cost of the *Sanchi* and its cargo at the time of the accident.

41. Since the accident, the Iranian government has forced other family members of the *Sanchi* crew to accept the government's story and sign a waiver that their relative is dead. Yet, Plaintiffs refused to sign such waivers and have remained steadfast in refusing to accept the governments version of events.

42. Indeed, more than a year after the *Sanchi* sank in the East China Sea, the families of the Iranian victims of the collision received mysterious telephone call from their supposedly dead relatives that were then abruptly cut off.[23] Many of the relatives of the *Sanchi* crew report that their family members attempted to contact them through repeated telephone calls, spreading doubt among the families about the official story on the disaster.[24]

43. Noushin Najafifar, the sister of one of the Sanchi crew, insists that her brother has been calling her morning, noon, and night with most of the calls ending quickly and abruptly.[25] Ms. Najafifar stated that she reported the frequent calls to the president's office in Tehran and that when the calls were disconnected, the family attempted to call back immediately with an Arabic speaking male answering the phone.[26]

44. Further, another plaintiff, reports that her daughter-in-law has had fifty missed calls within a month, presumably from her son. She stated that they had attempted to return the calls, but they were disconnected after a single ring, "Nevertheless, we tried and tried, and ultimately a woman who spoke Persian mixed with English words answered the phone, telling is that there was someone around attempting to communicate with his family. Then the line was disconnected, and we never succeeded to get through again."[27]

---

23. *Families Of Crew Killed In Oil Tanker Disaster Say They Received Mysterious Calls*, RADIO FARDA (Feb. 1, 2019), https://en.radiofarda.com/a/families-of-iran-tanker-victims-sanchi-say-relatives-alive/29745988.html.

24. *Id.*

25. *Id.*

26. *Id.*

27. *Id.*

**Evidence Contradicting the Official Story**

45. NITC's official report, similar to Mr. Rabiei's report to President Rohani, believe that Sanchi crewmember died right after the accident because either due to the heat from the explosion or their exposure to the toxic gas from the explosion of condensate oil, killed them and then they burned. The alternative theory is that the crew went to the engine room, in hope that they will be rescued, but they locked out and burned in the engine room.

46. Defendant Rabie was rushed to provide report to President Rohani, stating the crewmen martyred for resistance economy.

47. There are reports in first two days of the accident that the right left boat has been released and was seen in the water. Pictures from Sanchi confirmed that there is no lifeboat, and the arms holding the lifeboat are opened and released the boat.

48. The voice recording from Sanchi's Black Box, clearly indicate that the Capitan of Sanchi ordered its crew to leave the Tanker right after the accident, which is clearly against the official theory.

49. Plaintiffs received the call records made and received by mobile number associated to the Sanchi Capitan and main crews, the call records show that there were conversations between NITC and those number for days after the accident, both before the Sanchi sank and after it sank. These calls clearly indicate that the crew didn't die right after the accident.

50. NITC's refusal to release the full recording available from the Blackbox, in particular extended recording after the accident to give information about the action of the crew after the accident.

51. Plaintiffs received in total more than 1200 miss calls from numbers unknown to them. The area codes indicate that those calls are initiated form Eastern Asian countries. Unfortunately, those calls made late at night and family members were not be able to talk to anyone. When they tried to call those numbers back, they had no success. It seems those calls made from burned phones.

52. Iranian telecom company refused to provide detail technical explanation of those miss calls.

53. NITC, despite its claim that every Sanchi's crewmen are death, has failed to bring an
    action for Personal Injury or loss of life against insurance companies the Tanker was
    insured under their policy or against CF Cristal and its insurance policy. It shows that
    they don't believe those crewmen are death.

54. NITC failed to hire diving companies or salvage companies to either bring out the bodies
    or the salvage of the Sanchi from the deep water. NITC brought excuses however based
    on experts' opinions, it is possible to use divers or robot divers because the depth of the
    water is not deep, and the structure of the Tanker is not destroyed as claimed by the
    NITC.

55. There was one crewman body recovered from the water. The crewman had the special
    hazmat suit on, and his body had no sign of burning. In addition, he has his passport with
    him, he was working at the engine room, so he had to go to special locker to have his
    hazmat suit on, then go the Capitan cabin to recover his passport. It indicates that he had
    enough time to change and have the life jacket on and leave the tanker. If one person
    could find a time to change and leave, more crewmen could.

56. There were two crewmen discovered from the deck of the Tanker by Chinese crew one
    day before Sanchi sank. Those bodies burned but their bones were intact. It means it was
    not expose to very high temperature for long hours. However, the ship was burning for at
    least seven days at the time of the discovery. It shows that the temperature from the place
    of explosion was significantly reduced at the deck of the Sanchi. Consequently, it
    indicates that the temperature was not enough to damage the solid structure of the deck.
    Therefore, NITC claim that they could not send divers to recover bodies due to
    deformation of the structure is not valid. Also, the video from the discovery shows that
    one day before Sanchi's sinking, the structure was solid to the point that the crew use its
    steps, and hallways to access the Blackbox.

57. After the phone calls were received, about thirty of the families began protesting in front
    of Iran's Ministry of Foreign Affairs, Iranian President Hassan Rouhani's office, and the
    Chinese embassy in Tehran, demanding a full and transparent investigation into the
    disaster.[28]

---

28. *Id.*

58. The families of the reportedly deceased crew members claim that they do not trust the Iranian authorities and theorize that their relatives may have been taken hostage for some reason after the collision.

59. They never allowed us to attend any sessions of the investigations. They just said we don't have the right.

DOMESTIC VENUES ARE EXCUSTED

60. From early dates after the accident, Plaintiffs didn't accept the official story presented to them, stating that their family members are died. They asked NITC to use its resources to recover bodies, however NITC failed to do that.

61. Plaintiffs asked to have access to the Black Box of Sanchi, unfortunately, what presented to them was incomplete and did not cover the more than 2 minutes after the accident. Plaintiff demanded to receive the recording of all room after the accident for extended times, however that request has been denied.

62. Plaintiffs filed action in Iranian courts to force NITC ad different government agencies to investigate the accident, provide them with reports about the miss calls received, find means to search the Sanchi Tanker under water for bodies, and release the content of the Sanchi Black box in its entirety.

63. Iran's Prosecutor Office has issued orders to Iran Foreign Minister office to use its channels to pursue the Plaintiffs' demands. There is no answer provided to those demands as of the date of this Complaint.

64. Iran's Prosecutor Office also requested for reports from Iran's Intelligent Ministry, and Iran Revolutionary Guard Corp's Intelligence Agency to provide reports about the challenges brought by Plaintiffs, however to report has been provided, and it seems Plaintiffs are stonewalled throughout the process.

65. Iran's Prosecutor's Office find that the Plaintiffs family members received more than 1200 miss calls originated from numbers associated to South Asian Countries, and asked from Iran's Telecom provider for a through investigation. In reply, the telecom company denied any access to those records.

66. Overall, the Mr. Rabiei and Boroujerdi were controlling the investigation and blocking any inquiries into the discovery of the truth related to the accident. They have continued to deny the families' allegations. Mohammad Mehdi Boroumandi, the chairman of the

government committee formed to investigate the Sanchi disaster continues to deny that the crew members of the Sanchi are alive. Boroumandi stated, "The claims about telephone calls and the Sanchi crew being taken hostage are totally unfounded and based on hearsay."[29]

67. In addition to the evidence of phone calls made to family members of the *Sanchi* crew, several of the cellphones that were on board have remained active. One crewmember's family has continued to pay for the cellular plan for their family member's phone and have received records that the phone was on and working at various points in time after the accident, actively connecting to cellular towers. This evidence contradict statements made by the authorities that the crew of the *Sanchi* had not survived the accident and had gone down with the ship along with any personal belongings, including cellular phones, that were on board the ship at the time of the collision.

68. Overall, Plaintiffs are at present under constant pressure from the Iranian government to accept the government's depiction of the events and are risking their lives by refusing to agree with the government.

69. Defendants have been working in concert to cover up the truth and they were aiding and abetting the torturous acts and violation of International law against Sanchi crewmen and Plaintiffs.

## **CAUSES OF ACTIONS**

70. Plaintiffs' causes of action arise under and violate the following laws, agreements, conventions, resolutions, and treaties:

(a) Alien Tort Statute, 28 U.S.C. § 1350;

(b) Torture Victim Protection Act of 1991, 28 U.S.C. ch. 85 §1350;

(c) Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987;

(d) United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 397.

(e) International Convention against the Taking of Hostages, G.A. res. 146 (XXXIV), U.N. GAOR, 34th Sess., Supp. No. 46, at 245, U.N. Doc. A/34/46 (1979), *entered into force* June 3, 1983;

---

29. *Id.*

(f) Universal Declaration of Human Rights (1948) G.A. res. 217A (III), U.N. Doc A/810 at 71;

(g) Charter of the United Nations (1945), **adopted** June 26, 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153 (*entered into force* October 24, 1945);

## FIRST CLAIM

### (Hostage Taking, a Violation of International Law

### for which the Alien Tort Statute Provides Relief)

71. Plaintiffs repeat and re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

72. Under Article 1 of the International Convention Against the Taking of Hostages, hostage taking is defined as follows:

1. Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking hostages ("hostage-taking) within the meaning of this Convention.
2. Any person who:
   a. attempts to commit an act of hostage-taking, or
   b. participates as an accomplice of anyone who commits or attempts to commit an act of hostage-taking likewise commits an offence for the purposes of this Convention.

73. Because the acts described herein violated the prohibitions against hostage-taking including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against hostage-taking, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against hostage-taking, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s]…committed in violation of the law of nations or a treaty of the United States" under ATS, 28 U.S.C. §1350.

74. Defendants knowingly aided and abetted and/or ratified these acts of hostage-taking, and did not act to prevent or punish these violations of human rights as embodied in international law.

75. Defendants are liable for aiding and abetting and/or ratification of the commission of these abuses under this cause of action.

76. The Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## SECOND CLAIM

### (Extrajudicial Execution, a Violation of International Law

### for which the Alien Tort Statute Provides Relief)

77. Plaintiffs repeat and re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

78. Article 3 of the Universal Declaration of Human Rights states: "Everyone has the right to life, liberty and security of person." These rights are violated when "disappearances" and extrajudicial executions are perpetrated. Extrajudicial executions clearly violate the right to life. "Dissapearances" violate the right to liberty and security of person as well as the right not to be subjected to torture or cruel, inhuman or degrading treatment as provided under Article 5 of the Universal Declaration.

79. Because the acts described herein violated the prohibitions against extrajudicial execution including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against extrajudicial execution, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against extrajudicial execution, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s]…committed in violation of the law of nations or a treaty of the United States" under ATS, 28 U.S.C. §1350.

80. Defendants knowingly aided and abetted and/or ratified these acts of extrajudicial execution, and did not act to prevent or punish these violations of human rights as embodied in international law.

81. Defendants are liable for aiding and abetting and/or ratification of the commission of these abuses under this cause of action.

82. The Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## THIRD CLAIM

## (Piracy, a Violation of International Law

## for which the Alien Tort Statute Provides Relief)

83. Plaintiffs repeat and re-allege and incorporate herein by reference the allegations set forth

    in the foregoing paragraphs of this Complaint as if fully set forth herein.

84. Under Article 101 of the United Nations Convention on the Law of the Sea, piracy

    consists of any of the following acts:

    (a) any illegal acts of violence or detention, or any act of depredation, committed for
        private ends by the crew or the passengers of a private ship or a private aircraft, and
        directed:
        (i) on the high seas, against another ship or aircraft, or against persons or property on
        board such ship or aircraft;
        (ii) against a ship, aircraft, persons or property in a place outside the jurisdiction of any
        State;
    (b) any act of voluntary participation in the operation of a ship or of an aircraft with
        knowledge of facts making it a pirate ship or aircraft;
    (c) any act of inciting or of intentionally facilitating an act described in subparagraph (a)
        or (b).

85. Because the acts described herein violated the prohibitions against piracy including: (1)

    treaties binding on the United States, (2) statutes adopted by the Congress of the United

    States implementing those treaty obligations, (3) international and domestic judicial

    decisions applying and interpreting the prohibition against piracy, (4) administrative

    regulations and international and domestic judicial decisions applying and interpreting

    the prohibition against piracy, and (5) a number of specific, universal, and obligatory

    standards that are recognized to be part of customary international law, these acts

    constitute "tort[s]…committed in violation of the law of nations or a treaty of the United

    States" under ATS, 28 U.S.C. §1350.

86. Defendants knowingly aided and abetted and/or ratified these acts of piracy, and did not

    act to prevent or punish these violations of human rights as embodied in international

    law.

87. Defendants are liable for aiding and abetting and/or ratification of the commission of

    these abuses under this cause of action.

88. The Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages

    in amounts to be established at trial, and to such other declaratory and/or injunctive relief

    as may be deemed appropriate.

## FOURTH CLAIM

**(Torture, a Violation of International Law**

**for which the Alien Tort Statute and**

**the Torture Victim Protection Act Provide Relief)**

89. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

90. The Defendants' acts described in this Complaint caused direct and severe physical and mental pain and suffering to the Plaintiffs and placed them at severe risk of personal injury and/or death in connection with their participation in, and support of, the peaceful exercise of their rights of free speech and communication, free association, and the right to hold, exercise and express their political beliefs.

91. Defendants' acts constitute torture in violation of the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350.

92. Because Defendants' acts described herein violated multiple provisions prohibiting torture on an absolute basis including: (1) treaties binding on the United States, (2) statutes adopted by the United States Congress implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman, or degrading treatment or punishment, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against torture, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s]…committed in violation of the law of nations or a treaty of the United States" under Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.

93. Defendants aided and abetted and/or ratified these acts of torture in violation of international, federal, and state law. These violations and actions meet the definition of torture under the meaning of the TVPA, the ATS, and international treaties and U.S. laws and regulations, as well as customary international law, which condemn torture on an absolute basis, irrespective of the reasons why the abuses are inflicted.

94. The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

**<u>FIFTH CLAIM</u>**

**(Cruel, Inhuman or Degrading Punishment or Treatment or Punishment,**

**Violations of International Law**

**for Which the Alien Tort Statute Provides Relief)**

**95.** Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

**96.** Acts of cruel, inhuman, or degrading treatment or punishment suffered by the Plaintiffs designated in this Claim, including physical injury and the severe physical and mental suffering associated therewith, were inflicted upon them by the joint and collusive actions of the Defendants and Iranian government officials acting under color of law, through unlawful or unauthorized actions prohibited by international law.

**97.** These acts had the intent and the effect of grossly humiliating, debasing, intimidating, and punishing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and seeking to break their physical and/or moral resistance.

**98.** These acts of cruel, inhuman, or degrading treatment and punishment were inflicted on the Plaintiffs for purposes that include, among others, preventing them from exercising their free speech and free association rights, and punishing them for exercising their right to have and communicate political beliefs.

**99.** Because the acts described herein violated the prohibitions against cruel, inhuman, or degrading punishment or treatment including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman, or degrading treatment or punishment, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman or degrading treatment or punishment, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s]…committed in violation of the law of nations or a treaty of the United States" under ATS, 28 U.S.C. §1350.

**100.** Defendants knowingly aided and abetted and/or ratified these abuses, and did not act to prevent or punish these violations of human rights as embodied in international law.

**101.** Defendants are liable for aiding and abetting and/or ratification of the commission of these abuses under this cause of action.

102. The Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

**SIXTH CLAIM**

**(Arbitrary Arrest and Prolonged Detention,**

**A Violation of International Law for Which the Alien Tort Statute and**

**the Torture Victim Protection Act Provide Relief)**

103. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

104. These acts of arbitrary arrest and long-term detention suffered by the Plaintiffs designated in this Claim, including arrest and detention for an unlawful purpose in violation of the rights to freedom of speech, association, and assembly, were inflicted upon them by the joint and collusive actions of the Defendants and Iranian government officials acting under color of law, albeit through unlawful or unauthorized actions and for unlawful and unauthorized purposes.

105. These acts caused direct physical and mental pain and suffering upon the Plaintiffs, caused loss of their liberty and property, and placed them at severe risk of personal injury in connection with their participation in, and support of, the peaceful exercise of their rights of free speech and free association, and their rights to hold, exercise and express their political beliefs.

106. Because the acts described herein violated provisions prohibiting arbitrary arrest and prolonged detention, including: (1) treaties binding on the United States, (2) statutes adopted by the United States Congress implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against arbitrary arrest and prolonged detention, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against arbitrary arrest and prolonged detention, and and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s]…committed in violation of the law of nations or a treaty of the United States" under ATS, 28 U.S.C. § 1350.

107. Defendants are liable for aiding and abetting and/or ratifying these abuses, as specified in this cause of action.

108. Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## SEVENTH CLAIM

### (Battery)

109. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

110. Upon information or belief, Defendants intentionally committed acts that resulted in harmful or offensive treatment of Plaintiffs' persons, and produced bodily harm. Plaintiffs did not consent to the contact and treatment that caused injury, damage, loss or harm to Plaintiffs.

111. Defendants' conduct constitutes battery and is actionable under the laws, standards, and causes of action as set forth in this complaint.

112. Defendants are liable for aiding and abetting and/or ratifying these abuses, as specified in this cause of action.

113. Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## EIGHTH CLAIM

### (Assault)

114. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this complaint as if fully set forth herein.

115. Upon information or belief, Defendants' conduct caused Plaintiffs to be subjected to numerous batteries and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendants had a present ability to subject Plaintiffs to immediate, intentional, offensive and harmful touching.

116. Defendants' conduct constitutes assault and is actionable under the laws, standards, and causes of action as set forth in this complaint.

117. Defendants are liable for aiding and abetting and/or ratifying these abuses, as set forth in this cause of action.

118. Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## NINTH CLAIM

### (False Imprisonment)

119. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

120. Upon information or belief, Defendants intentionally committed acts that resulted in the Iranian government's exercise of force restraining, detaining and confining Plaintiffs on an arbitrary and unlawful basis. The restraint, detention or confinement compelled Plaintiffs to stay or go somewhere against their will for some appreciable time. Plaintiffs did not consent to this restraint, detention or confinement.

121. Defendants' conduct constitutes false imprisonment and is actionable under the laws, standards, and causes of action as set forth in this complaint.

122. Defendants are liable for aiding and abetting and/or ratifying these abuses as specified in this cause of action.

123. Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## TENTH CLAIM

### (Intentional Infliction of Emotional Distress)

124. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

125. Upon information or belief, Defendants, by providing Monitoring Centers to Iran, engaged in conduct adversely affecting Plaintiffs with reckless disregard of the high probability that it would cause Plaintiffs to suffer severe abuses and emotional distress. Plaintiffs were present at the time the outrageous conduct and these results occurred and the Defendants knew or should have known that Plaintiffs were present and would be adversely affected.

126. Plaintiffs suffered severe abuse and emotional distress as a result of the conduct of the Defendants.

127. Defendants' conduct constitutes intentional infliction of emotional distress and is actionable under the laws, standards, and causes of action as set forth in this complaint.

128. Defendants are liable for aiding and abetting and/or ratifying these abuses as set forth in this cause of action.

129. Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## ELEVENTH CLAIM

### (Negligence)

130. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

131. Upon information or belief, Defendants failed to use ordinary or reasonable care in order to avoid supplying the oppressive Iranian authorities with monitoring technology. Defendants' negligence was a cause of injury, damage, loss or harm to Plaintiffs.

132. As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the causes of action as set forth in this complaint.

133. Defendants are liable for aiding and abetting and/or ratifying these abuses as specified in this cause of action.

134. Plaintiffs are therefore, entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants and respectfully request the following relief:

135. For actual and compensatory damages to each of the Plaintiffs according to proof to be established at trial;

136. For punitive and exemplary damages according to proof to be established at trial;

137. For declaratory relief determining that the actions of the Defendants constituted

violations of international law, specifically, that such violations included prohibited acts

of hostage-taking, extrajudicial execution, piracy, torture, cruel, inhuman or degrading

treatment, and arbitrary arrest and prolonged detention in violation of the Convention

Against the Taking of Hostages, the Convention Against Torture, the Convention on the

Law of the Sea, numerous other international treaty obligations binding on the United

States, and domestic laws and regulations implementing such standards, including the

Torture Victim Protection Act, and other enumerated causes of action in this Complaint;

138. For affirmative action by the Defendants to secure the release of the detainees if

possible;

139. For costs of the litigation, including, attorneys' fees; and

140. For such other relief as the Court deems just and proper.

Dated: December 9, 2019

Respectfully submitted,

_____/s/_____

Ali Herischi, Esq. (MD0024)
Herischi & Associates LLC
7201 Wisconsin Ave., Suite 450
Bethesda, Maryland 20814
Phone: 301-363-4540
Fax: 301-363-4538
*Attorney for Plaintiffs*