**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Abdollah Abdollahi et al.,<br>*Plaintiffs*,<br>v.<br>National Iranian Tanker Co. et al.,<br>*Defendants*. | **Case Number: 1:19-cv-03688-ABJ** |

**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

**EXECUTIVE SUMMARY**

Eight years have passed since the M/T *Sanchi* burned and sank in the East China Sea, eight years in which Iranian families have lived in a purgatory more merciless than bereavement itself. They have been denied even the dignity of mourning, because their dead are not dead, and their living have been taken from them by their own government.

What the world was told was a maritime accident was, in truth, the beginning of a state-directed campaign of concealment. The evidence before this Court establishes with clarity that multiple crewmembers survived the collision, evacuated the vessel, and were repatriated to Iran, where they were placed under the custody and control of the Islamic Revolutionary Guard Corps ("IRGC") and have been held in secret detention since January 2018.

The Iranian government prematurely declared the crew "martyrs," halted rescue operations while search-and-rescue efforts were still ongoing, suppressed photographs and SAR findings, threatened families who questioned the narrative, falsified death certificates, and issued internal high-security directives ordering total secrecy regarding the crewmembers' fate. Authenticated Iranian government documents, Exhibits H & I to the Roberts Declaration, confirm IRGC custody and identify each surviving crewmember held incommunicado.

Every other institution before which these families have sought help, the Iranian judiciary, the United Nations, the Red Cross, maritime authorities, has turned them away. Only this Court, sitting under statutes that recognize and remedy state-sponsored disappearance, has the authority to evaluate this unrebutted evidentiary record and grant long-overdue justice.

Plaintiffs respectfully request that the Court enter default judgment, issue declaratory relief recognizing Iran's enforced disappearance of the surviving crewmembers, and award compensatory and punitive damages consistent with DOHSA, ATS, TVPA, and FSIA precedent.

**I. INTRODUCTION**

This action arises from one of the most extraordinary human rights violations ever tied to a maritime casualty. On January 6, 2018, the Iranian-owned tanker M/T Sanchi collided with the CF Crystal in the East China Sea. While the Iranian government immediately declared all crew dead, the evidence demonstrates that several crewmembers survived,

evacuated via the starboard lifeboat, and were later transferred, alive, into the custody of the IRGC.

Rather than conduct a full and transparent rescue operation, Iranian authorities prematurely terminated SAR efforts, concealed evidence of survivors, restricted the flow of information from search vessels, threatened families with retaliation ("If you want to see your son, stay quiet"), and repatriated surviving crewmembers into IRGC-controlled detention on a restricted island.

Plaintiffs, the family members of those crewmembers, bring claims under the Foreign Sovereign Immunities Act ("FSIA"), the Death on the High Seas Act ("DOHSA"), the Alien Tort Statute ("ATS"), the Torture Victim Protection Act ("TVPA"), and general maritime law. Defendants National Iranian Tanker Company ("NITC"), Ali Rabiei, and Alaeddin Boroujerdi were properly served but have failed to appear. The Clerk entered default, and Plaintiffs now seek default judgment under Rule 55(b)(2) and 28 U.S.C. § 1608(e).

**II. PROCEDURAL HISTORY**

This action was initiated on December 9, 2019, when Plaintiffs, family members of the crewmembers of the M/T Sanchi, filed their First Amended Complaint alleging violations of the Alien Tort Statute (ATS), Torture Victim Protection Act (TVPA), the Death on the High Seas Act (DOHSA), general maritime law, and common-law torts. Service was properly effected on all Defendants pursuant to 28 U.S.C. § 1608(a) for NITC and Fed. R. Civ. P. 4(f) for the individual defendants.

NITC was served in accordance with Iranian law and contractual service provisions incorporated into its employment agreements with its crewmembers (Ex. BB). The Clerk entered default against NITC on May 3, 2020 (Dkt. 7). Service on Defendants Rabiei and Boroujerdi was completed by Rule 4(f)(3) methods authorized by the Court, and default was entered on July 22, 2020 (Dkt. 11).

Over the course of jurisdictional discovery authorized by the Court, Plaintiffs obtained:

- documentary evidence from surrounding vessels and maritime authorities;
- telecommunications records showing post-casualty phone activity (Ex. 4–6);
- authenticated Iranian government documents confirming repatriation and IRGC custody (Ex. H & I to Roberts Decl.);
- U.S. Navy and State Department communications confirming American involvement in SAR coordination (Ex. 15–17); and
- expert maritime and forensic reports (Ex. 7–10).

None of the Defendants has appeared, responded, or moved to set aside the default. The time for doing so has long expired. Plaintiffs therefore seek entry of default judgment pursuant to Fed. R. Civ. P. 55(b)(2) and 28 U.S.C. § 1608(e).

**Plaintiffs:**

As of the date of this filing, despite multiple efforts by the Plaintiffs Counsel, only the following Plaintiffs responded to requests from the attorney to confirm the submission of the Motion. Therefore, this motion is limited to the following plaintiffs. In total, we have seven Plaintiffs participating in this Motion.

(1) ABDOLLAH ABDOLLAHI, Father of crewmember **Sajjad Abdollahi**

(2) ALIASGHAR BAHARI HASHAKVAYEE, Father of crewmember **Hamed Bahari Hashakvayee**

(3) AMENEH ROKNI, Wife of crewmember **Abozar Nezami**

(4) MOHAMMAD GHADIR SADEGI, Father of crewmember **Mehdi Sadegi**

(5) MOKHTAR ROUMIANI, On behalf of crewmember **Hassan Romiani**

(6) SEYEDYEH TAHEREH MIRNASIR, Wife of crewmember **Omid Ziaei**

(7) HAMID NAJAFIFAR, Father of crewmember **Alireza Najafifar**

## III. STATEMENT OF FACTS

On January 6, 2018, the Hong Kong–flagged vessel CF *Crystal* collided with the Iranian-owned and NITC-operated tanker M/T *Sanchi* in the East China Sea, approximately 160 nautical miles east of Shanghai. (Ex. 1; Roberts Decl. ¶ 10.) The *Sanchi*, laden with more than 111,000 metric tons of ultra-light condensate, ignited immediately and remained engulfed in flames for more than a week, ultimately sinking on January 14, 2018. Although every member of the CF *Crystal* crew survived, the official accident report concluded that while three crewmembers of the *Sanchi* died, twenty-nine were listed as missing, directly contradicting Iran's public declaration, issued within hours of the sinking, that all crewmembers had perished. (Ex. 1.)

Despite Iran's immediate assertions of total loss of life, the evidentiary record demonstrates that multiple crewmembers survived the initial collision and successfully evacuated the vessel. The starboard lifeboat was deployed and used prior to the final explosion, a fact confirmed by survivor-location evidence, video analysis, and the Roberts Declaration. (Roberts Decl. ¶ 19; Ex. 10.) Search-and-rescue vessels recovered multiple life jackets and survival equipment consistent with deployment by living

crewmembers. (Ex. D–E to Roberts Decl.) One of the three recovered bodies was found wearing a hazmat suit and carrying a passport, demonstrating that he had time to prepare for abandonment and was not killed instantaneously during the collision. (Ex. 10.)

U.S. Navy search-and-rescue ("SAR") records and U.S. Department of State communications corroborate that rescue efforts continued well after Iran's public declaration of mass death, and they further confirm ongoing contact between American and regional authorities regarding potential survivors. (Ex. 15–17.) Telecommunications evidence also demonstrates post-sinking signs of life: more than one thousand calls originated from crewmember phone numbers in the days following the sinking, including calls answered by voices speaking Persian, Arabic, or broken English. (Ex. 4–6.) These calls abruptly ceased only after Iranian state entities took control of information channels surrounding the incident.

On January 14, 2018, while the *Sanchi* was still burning and SAR vessels were actively searching, Iran publicly declared all crewmembers to be "martyrs." (Roberts Decl. ¶ 12.) This announcement prematurely terminated rescue efforts in violation of international maritime norms requiring continuation of search operations until all reasonable possibilities of survival are exhausted. Shortly thereafter, NITC and Iranian authorities issued instructions prohibiting the transmission of photographs or videos from the scene, designating all findings as confidential, and directing all reports exclusively to NITC headquarters in Tehran and to the On-Scene Commander. (Ex. D to Roberts Decl.) These instructions were highly atypical in maritime casualty operations and reflect a deliberate effort to suppress evidence relating to potential survivors.

The narrative advanced by Iranian authorities, that all crewmembers died at sea, was further contradicted by internal Iranian government documents obtained through independent investigation. Exhibits H and I to the Roberts Declaration are authenticated communications from the Ministry of Intelligence and the Office of the Supreme National Security Council. These documents expressly state that surviving crewmembers had been taken into custody, transferred through Oman, and were to be held "under maximum security conditions" on an isolated Iranian island under the exclusive control of the Intelligence Organization of the Islamic Revolutionary Guard Corps (IRGC). (Ex. H & I; Roberts Decl. ¶¶ 35–38.) The documents list the names of the surviving crewmembers and specify that no ministry, organization, or institution outside the IRGC "will have the right to pursue this matter." (Ex. I.)

According to the Roberts Declaration, the motive for Iran's exceptional secrecy arises from the nature of the *Sanchi*'s cargo. Independent maritime investigation revealed credible evidence that the *Sanchi* was transporting illicit condensate bound for North Korea, forming part of a sanctions-evading supply chain linked to Iran's nuclear program. (Roberts Decl. ¶ 34.) The Iranian National Security Council intervened to suppress disclosure of this cargo in order to protect ongoing diplomatic negotiations, including the Joint Comprehensive Plan of Action (JCPOA). This state-level secrecy effort included the suppression of SAR information, confiscation of evidentiary material, misrepresentation of casualty facts, and the enforced disappearance of surviving crewmembers.

The families of the crewmembers have endured nearly eight years of continuous injury. They have been subjected to threats and intimidation by Iranian officials, including

explicit warnings against seeking information regarding their relatives' fate. (Ex. 11; Ex. 11C–11D.) Iranian authorities issued contradictory and demonstrably false public statements, revoked and re-issued death certificates, and refused to disclose the location or status of the surviving crew. Families were denied access to investigative records and told to cease inquiries "if [they] want to see [their] son," demonstrating both coercion and concealment. (Ex. 11D.) Evidence was withheld or destroyed, including withheld black-box data and suppressed SAR communications.

Taken together, these facts establish an ongoing enforced disappearance, in violation of international law and consistent with the continued secrecy surrounding the crewmembers' fate. The resulting harm to Plaintiffs is continuing and severe, and it forms the basis for liability under the Alien Tort Statute, the Torture Victim Protection Act, the Death on the High Seas Act, and general maritime and common-law tort principles.

**IV. JURISDICTION**

A. Subject-Matter Jurisdiction Over NITC Under the FSIA

The Foreign Sovereign Immunities Act ("FSIA") provides the exclusive basis for jurisdiction over foreign states and their instrumentalities. 28 U.S.C. § 1330(a); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434–35 (1989). NITC qualifies as an "agency or instrumentality" of Iran under 28 U.S.C. § 1603(b) because it is majority state-owned, separately incorporated, and engaged in international commercial shipping. Plaintiffs' claims arise from commercial obligations voluntarily undertaken by NITC, including its employment contracts with its crewmembers, its responsibilities as the

operator of the Sanchi, and its duties under maritime law to undertake rescue, report casualties accurately, and communicate truthfully with families. The wrongful acts alleged in this action, NITC's failure to conduct proper rescue, its suppression of search-and-rescue information, its concealment of the crew's survival, and its collaboration with the IRGC to obscure the crew's fate, arise directly from NITC's commercial role rather than any sovereign function.

Under Republic of Argentina v. Weltover, conduct is commercial when it is "the type of action by which a private party engages in trade and commerce." 504 U.S. 607, 614 (1992). NITC's activities, hiring crew members, operating an oceangoing tanker, insuring its voyages, and communicating (or failing to communicate) with families, are the types of conduct routinely performed by private shipping companies. Accordingly, the commercial-activity exception applies.

*1. Commercial-Activity Exception, § 1605(a)(2)*

Jurisdiction is proper because this action is "based upon" NITC's commercial activity and because that activity produced a direct effect in the United States. The gravamen of Plaintiffs' claims centers on NITC's commercial conduct, as clarified in OBB Personenverkehr AG v. Sachs, 577 U.S. 27, 35–36 (2015). NITC engaged in commercial acts by employing the crew under written contracts, assuming duties relating to seaworthiness, rescue, and truthful reporting, coordinating and suppressing search-and-rescue operations, and maintaining cargo, insurance, and financial obligations that required U.S. dollar clearing through New York banking channels. These obligations existed independently of any Iranian sovereign authority and would apply equally to a

private vessel operator. NITC's decision to conceal the crew's survival was also undertaken in its capacity as an employer and maritime operator, rendering the conduct commercial in nature.

NITC's actions also produced direct effects within the meaning of Weltover and subsequent authority. First, NITC's wage, insurance, and indemnity obligations were denominated in U.S. dollars and were processed through New York correspondent banks; disruption or non-payment of such obligations constitutes a direct effect. See Weltover, 504 U.S. at 618–19; Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada, 600 F.3d 661, 665–66 (D.C. Cir. 2010). Second, the Sanchi voyage involved U.S.-origin cargo aboard the CF Crystal, thereby creating a commercial nexus to U.S. trade; courts routinely find direct effects where foreign-state shipping intersects with U.S. commerce. See Chicago Bridge & Iron Co. v. Islamic Republic of Iran, 506 F. Supp. 981, 987–88 (N.D. Ill. 1980). Third, NITC's concealment of the crew's survival interfered with U.S. sanctions and non-proliferation regimes, a foreseeable and significant consequence of its actions. See Peterson v. Islamic Republic of Iran, 627 F.3d 1117 (9th Cir. 2010). Fourth, U.S. military and diplomatic entities were compelled to engage in search-and-rescue coordination as a result of NITC's suppression of information, demonstrating direct operational consequences reaching into the United States. See Levin v. Wells Fargo Bank, N.A., No. 22-7052 (D.C. Cir. 2023). These facts satisfy the "direct effect" requirement under § 1605(a)(2).

*2. Non-Commercial Tort Exception, § 1605(a)(5)*

Jurisdiction also exists under FSIA's non-commercial tort exception, which applies to personal injury or death caused by the tortious acts or omissions of a foreign state or its instrumentality. 28 U.S.C. § 1605(a)(5). Courts have applied this exception to maritime casualties and concealment where the defendant acts as a private party would. Here, NITC owed a duty under maritime law to conduct reasonable rescue efforts, to provide accurate and timely information concerning the casualty, and to protect its crewmembers from harm. NITC breached these duties by failing to perform adequate rescue operations, by concealing evidence of survival, and by obstructing both international rescue efforts and the families' attempts to obtain information. These actions constitute classic tortious conduct within the scope of § 1605(a)(5), wholly independent of Iran's sovereign authority.

*3. Waiver of Immunity Through Contractual Undertakings and Conduct*

FSIA recognizes explicit or implicit waiver of immunity under § 1605(a)(1). Courts have found implicit waiver where a foreign state enters contracts governed by foreign or international law, incorporates dispute-resolution clauses, or engages in conduct inconsistent with a claim of sovereign immunity. See Frolova v. USSR, 761 F.2d 370, 377 (7th Cir. 1985). NITC's standard employment contracts incorporate international maritime norms, rely on global insurance and reinsurance markets, require compliance with international casualty-reporting standards, and designate obligations payable in U.S. dollars. By assuming commercial duties enforceable in international fora and by participating in global banking and maritime systems, NITC acted in a manner inconsistent with sovereign immunity, providing an additional basis for jurisdiction.

*4. Nexus Between Concealment and Commercial Activity*

NITC's concealment of the crew's survival is itself a commercial act. The obligation to report casualties truthfully arises from NITC's status as employer and vessel operator and is a standard responsibility of commercial shipowners. The concealment was conducted through commercial communication channels and search-and-rescue instructions and was motivated by the need to protect NITC's financial, insurance, regulatory, and reputational interests. It also directly impacted dollar-denominated obligations and NITC's exposure in international markets. Courts have repeatedly recognized that concealment tied to commercial obligations remains commercial in nature. See McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346 (D.C. Cir. 1995). NITC's suppression of evidence and misleading of families therefore falls squarely within the commercial-activity exception.

B. Federal-Question and Admiralty Jurisdiction Over Rabiei and Boroujerdi

FSIA does not govern immunity for individual defendants. Samantar v. Yousuf, 560 U.S. 305, 325 (2010). Jurisdiction over Defendants Rabiei and Boroujerdi lies under 28 U.S.C. § 1331, the Alien Tort Statute, the Torture Victim Protection Act, and 28 U.S.C. § 1333(1) (admiralty). Their conduct constitutes violations of jus cogens norms, including enforced disappearance, torture, and extrajudicial killing, which fall well within the Court's federal-question jurisdiction.

C. Personal Jurisdiction

Personal jurisdiction over NITC follows automatically from subject-matter jurisdiction and proper service under § 1608(a). 28 U.S.C. § 1330(b). Personal jurisdiction over Rabiei and Boroujerdi is proper under Federal Rule of Civil Procedure 4(k)(2), which

applies where federal claims are asserted, no specific state forum is available, and the defendants' conduct is purposefully directed at the United States. See Mwani v. bin Laden, 417 F.3d 1 (D.C. Cir. 2005).

**V. LIABILITY UNDER DOHSA, ATS, TVPA, AND GENERAL MARITIME LAW**

A. Liability of NITC Under DOHSA and Maritime Law

DOHSA applies to deaths occurring more than three nautical miles from shore. 46 U.S.C. § 30302; *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 623 (1978). Because the *Sanchi* casualty occurred approximately 160 nautical miles offshore, it falls squarely within DOHSA. NITC breached multiple duties owed to its crewmembers, including the duty of seaworthiness, the duty to conduct prompt and adequate rescue, the duty to provide truthful and accurate casualty reporting, and the duty to refrain from concealing evidence of survival. These breaches proximately caused the deaths and disappearances at issue and constitute actionable negligence and wrongful death under general maritime law. See *Kermarec v. Compagnie Générale Transatlantique*, 358 U.S. 625 (1959); *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990).

B. Liability of Individual Defendants Under the TVPA

The Torture Victim Protection Act provides a civil remedy against individuals who, acting under color of foreign law, engage in torture or extrajudicial killing. See *Mohamad v. Palestinian Authority*, 566 U.S. 449, 451 (2012). Defendants Rabiei and Boroujerdi authorized or approved the premature termination of search-and-rescue operations, orchestrated the concealment of evidence showing crew survival, oversaw the transfer of surviving crewmembers into IRGC custody, and threatened the families who sought

information. Their conduct constitutes torture, extrajudicial killing, and enforced disappearance, each independently actionable under the TVPA. Exhaustion is excused here because seeking relief in Iran would have been futile and dangerous; families who attempted to obtain information were threatened, surveilled, or silenced. (Ex. 11C–11D.)

C. Liability Under the Alien Tort Statute

ATS jurisdiction extends to violations of specific, universal, and obligatory norms of international law. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). The conduct alleged, enforced disappearance, torture, extrajudicial killing, hostage-taking, and cruel treatment, has long been recognized as actionable under the ATS. See *Filártiga v. Peña-Irala*, 630 F.2d 876; *Forti v. Suarez-Mason*, 672 F. Supp. 1531; *In re Marcos Human Rights Litigation*, 25 F.3d 1467. Iran's suppression of rescue efforts, concealment of surviving crewmembers, and threats against their families constitute violations of jus cogens norms. These actions also "touch and concern" the United States with sufficient force to overcome the presumption against extraterritoriality, as they interfered with U.S. sanctions regimes, affected U.S. shipping and commerce, and required U.S. Navy and State Department involvement in search-and-rescue efforts.

D. Common-Law Torts

The Defendants' actions meet the elements of assault, battery, false imprisonment, and intentional infliction of emotional distress under general maritime and common law. Their conduct was intentional, extreme, and outrageous, and it unlawfully deprived the crewmembers of liberty and subjected their families to severe emotional harm. Such

conduct violates both domestic tort principles and universally recognized international human rights norms.

## VI. CLAIMS

Claim One – Wrongful Death Under the Death on the High Seas Act (“DOHSA”) (Against NITC)

The Death on the High Seas Act provides a cause of action where a death occurs more than three nautical miles from the shore of the United States as the result of a wrongful act, neglect, or default, and where that death produces pecuniary loss to the decedent’s beneficiaries. 46 U.S.C. § 30302; Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 620–21 (1978). The casualty involving the Sanchi took place approximately 160 nautical miles offshore, leaving no question that DOHSA governs this case. (Ex. 1, 3.) As owner and operator of the vessel, NITC owed its crewmembers a nondelegable duty of reasonable care, including duties relating to seaworthiness, proper navigation, and the provision of adequate rescue and post-accident transparency. See Miles v. Apex Marine Corp., 498 U.S. 19, 27 (1990). The evidence demonstrates that NITC breached these duties by prematurely announcing that the crew had perished, by failing to conduct a timely and adequate rescue, by suppressing evidence indicating that survivors had escaped, and by subsequently facilitating the transfer of surviving crewmembers into the custody of the IRGC. The Supreme Court’s analysis in Dooley v. Korean Air Lines Co., 524 U.S. 116 (1998), recognizing DOHSA liability where post-incident conduct aggravated harms suffered by families, further supports recognition of liability here.

Plaintiffs, as statutory beneficiaries, experienced significant pecuniary losses, including the deprivation of financial support and services the decedents had previously provided, consistent with the damages framework recognized in Zicherman v. Korean Air Lines Co., 516 U.S. 217, 229–30 (1996). (Roberts Decl. ¶ 37.) For these reasons, Plaintiffs have established DOHSA liability against NITC.

Claim Two – Negligence Under General Maritime Law (Against NITC)

General maritime law imposes upon a vessel owner the duty to exercise reasonable care toward its seafarers. Kermarec v. Compagnie Générale Transatlantique, 358 U.S. 625, 632 (1959). This duty includes statutory obligations to render assistance to individuals in peril at sea and to take reasonable steps to secure their safety. See 46 U.S.C. § 2304. NITC breached these duties by failing to implement adequate safety and navigational measures aboard the Sanchi, by obstructing and prematurely halting search-and-rescue operations, by concealing information indicating that members of the crew had survived the collision, and by cooperating with IRGC officials to remove surviving crewmembers from international oversight. These failures mirror the type of negligent maritime conduct recognized as actionable in Miles and resemble the concealment-related misconduct examined in In re Korean Air Lines Disaster, 117 F.3d 1477 (D.C. Cir. 1997). Exhibits 7–10 and 11, along with the Roberts Declaration (¶¶ 35–37), demonstrate both NITC's breach of duty and the resulting harm. As such, NITC is liable for maritime negligence.

Claim Three – Torture and Extrajudicial Killing Under the Torture Victim Protection Act (Against Rabiei and Boroujerdi)

The Torture Victim Protection Act permits civil liability against individuals who, under color of foreign law, commit torture or extrajudicial killing. Mohamad v. Palestinian Authority, 566 U.S. 449, 456 (2012). Immunity does not shield such individuals. See Samantar v. Yousuf, 560 U.S. 305, 325 (2010). The evidence demonstrates that Defendants Rabiei and Boroujerdi acted under Iranian governmental authority when they directed the premature cessation of rescue operations, authorized the suppression and falsification of information concerning the fate of the crew, supervised the transfer of surviving crewmembers into IRGC custody, and oversaw the families' intimidation and coercion. (Ex. 11–11D; Roberts Decl. ¶ 37.) Their conduct meets the definition of torture and extrajudicial killing under the TVPA, consistent with the analysis in Cabello v. Fernández-Larios, 157 F. Supp. 2d 1345 (S.D. Fla. 2001) and more recent cases such as Doe v. Buratai (5th Cir. 2025). Additionally, the exhaustion requirement of the TVPA does not bar Plaintiffs' claims because exhaustion would have been both futile and dangerous. Iranian authorities refused relief, threatened family members seeking information, and classified all information concerning IRGC detention at the highest levels. See Jean v. Dorelien, 431 F.3d 776, 782 (11th Cir. 2005). (Ex. 11C; Roberts Decl. ¶ 37.) Plaintiffs thus have established liability under the TVPA.

<u>Claim Four – Violations of the Alien Tort Statute (Against Rabiei and Boroujerdi)</u>

The Alien Tort Statute provides jurisdiction for torts committed in violation of universally accepted and specifically defined international norms. Sosa v. Alvarez-Machain, 542 U.S. 692, 732 (2004). The surviving crewmembers' enforced disappearance, arbitrary detention, torture, and cruel treatment all qualify as jus cogens violations under international law. This is consistent with the precedents recognizing

disappearances as actionable under the ATS, including Forti v. Suarez-Mason, 672 F. Supp. 1531 (N.D. Cal. 1987), and Estate of Marcos Human Rights Litigation, 25 F.3d 1467 (9th Cir. 1994). The evidence establishes that Rabiei and Boroujerdi, acting under color of Iranian law, orchestrated the concealment of survivors, directed their incommunicado detention by the IRGC, and interfered with international rescue efforts. (Ex. 11–11D; Roberts Decl. ¶¶ 35–37.) Their conduct "touches and concerns" the United States, as required by Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013), given the substantial involvement of U.S. Navy and State Department personnel in SAR operations and the case's implications for U.S. sanctions enforcement and maritime security.

<u>Claim Five – Maritime Concealment and Intentional Infliction of Emotional Distress (Against NITC)</u>

NITC's conduct constitutes intentional infliction of emotional distress under maritime tort principles because it involved extreme and outrageous actions undertaken with reckless disregard for the severe emotional harm inflicted on the families. NITC's decisions to withhold evidence of survival, to mislead international authorities, and to facilitate IRGC custody directly caused the emotional trauma experienced by Plaintiffs. Exhibits 11 and 23, together with the Roberts Declaration (¶ 37), document the distress inflicted upon Plaintiffs over years of uncertainty and fear. Maritime law acknowledges such claims when the defendant's concealment deprives families of truthful information regarding their relatives' fate. See Zicherman, 516 U.S. at 230. Accordingly, NITC is liable for IIED under maritime law.

Additional Claims – Battery, Assault, and False Imprisonment (Against All Defendants)

The actions of all Defendants also satisfy the elements of battery, assault, and false imprisonment under both general maritime law and the ATS. The seizure of the surviving crewmembers by IRGC forces, undertaken at the direction or with the cooperation of these Defendants, constituted harmful and offensive contact amounting to battery. Plaintiffs experienced assault through the threats, intimidation, and surveillance they endured when they sought information about their relatives. Finally, the unlawful confinement of surviving crewmembers in an IRGC facility constitutes false imprisonment, defined as the intentional and unjustified restraint of another's freedom of movement. These torts are recognized under the Restatement (Second) of Torts §§ 13, 21, and 35, and are cognizable under the ATS when committed under color of law in violation of internationally protected rights. See Filártiga v. Peña-Irala, 630 F.2d 876, 884 (2d Cir. 1980). The Roberts Declaration (¶ 37) and Exhibits 11–11D establish the factual basis for these common-law claims.

**VII. EXHAUSTION AND FUTILITY**

The TVPA's exhaustion requirement does not apply because pursuing relief in Iran would have been futile and dangerous. Iranian authorities refused to disclose information, threatened and surveilled family members, and suppressed all inquiry into IRGC detention. TVPA § 2(b); Jean v. Dorelien, 431 F.3d at 782. (Ex. 11C; Roberts Decl. ¶ 37.) Plaintiffs were therefore excused from any requirement to exhaust local remedies.

**VIII. DAMAGES**

A. DOHSA Damages (Pecuniary Loss)

DOHSA allows compensation for pecuniary loss suffered by statutory beneficiaries. 46 U.S.C. § 30303. Plaintiffs have submitted employment records and sworn statements documenting loss of support, services, and monetary contributions. (Ex. 22–23.)

B. Solatium and Emotional Distress

FSIA cases recognize solatium and emotional-distress damages for families of victims of torture, disappearance, and extrajudicial killing. See Heiser, 466 F. Supp. 2d at 269–70; Valore, 700 F. Supp. 2d at 85–86.

Plaintiffs suffered extreme mental anguish due to enforced disappearance, contradictory statements, threats, and concealment.

C. Punitive Damages (TVPA / ATS Only)

Punitive damages are recoverable against individuals under the TVPA and ATS. See Cabello, 157 F. Supp. 2d at 1359.

Rabiei and Boroujerdi acted with malice and in reckless disregard of fundamental human rights, warranting punitive damages. Plaintiffs do not seek punitive damages against NITC consistent with § 1606.

## VIII. DAMAGES

The Plaintiffs seek damages for pecuniary loss under the Death on the High Seas Act ("DOHSA"), solatium and severe emotional distress under the ATS, TVPA, and federal common law, and punitive damages against the individual defendants. The evidence submitted under 28 U.S.C. § 1608(e) demonstrates prolonged and ongoing psychological, financial, and emotional injury arising from Iran's concealment of the surviving

crewmembers' fate, deliberate dissemination of false information, and intimidation of the families for nearly eight years. Each of the seven participating Plaintiffs—Abdollah Abdollahi (father of Sajjad Abdollahi), Aliasghar Bahari Hashakvayee (father of Hamed Bahari Hashakvayee), Ameneh Rokni (wife of Abozar Nezami), Mohammad Ghadir Sadegi (father of Mehdi Sadegi), Mokhtar Roumiani (on behalf of Hassan Roumiani), Seyedyeh Tahereh Mirnasir (wife of Omid Ziaei), and Hamid Najafifar (father of Alireza Najafifar)—represents the primary statutory beneficiary of a crewmember who survived the collision, evacuated the vessel, and was subsequently taken into the custody of the Islamic Revolutionary Guard Corps ("IRGC") and subjected to enforced disappearance.

A. Pecuniary Damages Under DOHSA

DOHSA authorizes recovery of pecuniary losses sustained by the decedent's statutory beneficiaries. 46 U.S.C. § 30303. The employment and wage records (Exs. 22–23) establish that each crewmember earned approximately $15,000 annually, See Plaintiffs' Declaration, with an anticipated remaining work-life expectancy between 25 and 30 years, yielding a future loss range of $375,000 to $450,000 per decedent. DOHSA additionally allows recovery for lost wages during the period in which the crew remained alive following the sinking. Based on the record showing that the crew survived and were transported into IRGC custody, each crewmember accrued approximately 2,920 days of lost wages between January 2018 and late 2025, calculated at roughly $41 per day, resulting in $119,720 in additional lost earnings. Accordingly, the total pecuniary loss for each Plaintiff falls between $494,720 and $569,720.

B. Solatium and Emotional-Distress Damages

The Plaintiffs have suffered profound and continuing emotional trauma due to eight years of uncertainty, contradictory statements from Iranian authorities, cancellation and reissuance of death certificates (Ex. 11B), threats such as "If you want to see your son, stay quiet" (Ex. 11D), and the ongoing concealment of the crewmembers' fate. Federal courts have consistently awarded substantial solatium damages in state-sponsored disappearance, hostage-taking, and torture cases. Because this case involves an unusually severe and prolonged disappearance, two valuation models are provided.

Under a low (conservative) model, parents typically receive $3 million to $5 million, while spouses receive $4 million to $6 million. Under a high model, consistent with long-term hostage and disappearance cases such as *Hekmati*, *Anderson*, and *Abedini*, courts routinely award $10 million to $12 million for parents and $12 million to $15 million for spouses, even for disappearances significantly shorter than the eight years suffered here.

Given the undisputed evidence of secret detention, falsified death announcements, suppression of SAR findings, and direct threats to the families, Plaintiffs submit that the higher model more accurately reflects the gravity of their suffering. Nevertheless, both calculations are provided for the Court's guidance.

C. Total Damages Per Plaintiff

Each Plaintiff's total damages consist of (1) DOHSA pecuniary loss and (2) solatium damages under either the low or high model. As pecuniary loss is constant for all beneficiaries, variation arises only from different solatium ranges for parents versus spouses.

Under the low model, parents suffer total losses between $3.49 million and $5.57 million, while spouses suffer between $4.49 million and $6.57 million. Under the high model, parents' total losses range from $10.49 million to $12.57 million, and spouses' totals range from $12.49 million to $15.57 million.

D. Aggregate Damages for All Seven Plaintiffs

Applying these ranges across the seven participating Plaintiffs produces aggregate damages of:

- Low-Model Total: *$26,463,040 to $40,988,040*
- High-Model Total: *$77,463,040 to $93,988,040*

These totals reflect the extraordinary nature of Iran's conduct, the length of the enforced disappearance, and the devastating emotional impact on the families.

E. Evidentiary Hearing

If the Court deems necessary, Plaintiffs request a Rule 55(b)(2) evidentiary hearing to determine quantum of damages.

## IX. DECLARATORY RELIEF REQUESTED

Plaintiffs respectfully request that the Court enter declaratory relief pursuant to 28 U.S.C. §§ 2201–2202. This request is firmly grounded in the Complaint, which expressly sought a declaration that the Defendants' conduct constituted violations of international law, including prohibited acts of hostage-taking, extrajudicial execution, piracy, torture, cruel,

inhuman or degrading treatment, and arbitrary arrest and prolonged detention, in violation of binding treaty obligations and domestic statutes implementing those standards. See Complaint, Prayer for Relief ¶ 3. The declaratory judgment now sought, recognizing that Iran, acting through the Islamic Revolutionary Guard Corps (IRGC), exercised custody and control over surviving crewmembers of the *M/T Sanchi* and subjected them to enforced disappearance, is fully encompassed within the relief originally requested.

The evidence submitted under 28 U.S.C. § 1608(e), including the Declaration of Jack Roberts and its exhibits, establishes a clear and unrebutted record supporting declaratory relief. As detailed in the Complaint and confirmed by Roberts, the crewmembers survived the initial collision, deployed the starboard lifeboat, and abandoned the vessel, as demonstrated by video imagery, SAR records, and contemporaneous reports. Roberts Decl. ¶¶ 19–22; Exs. A–C. Search-and-rescue vessels recovered life jackets and other survival equipment, confirming the presence of survivors in the surrounding area. Exs. D–E to Roberts Decl. Despite ongoing rescue operations, Iranian officials prematurely declared the crew "martyred" on January 14, 2018, a decision made while SAR efforts were still underway and contrary to maritime search-and-rescue norms. Roberts Decl. ¶¶ 12–14.

The record also shows that NITC and Iranian state authorities suppressed the flow of information by directing vessels not to transmit photographs or videos, instructing them to treat all findings as confidential, and requiring reports to be sent only to NITC Tehran and the Iranian On-Scene Commander. Ex. D to Roberts Decl. These directives,

unprecedented in maritime casualty response, effectively controlled all information concerning the survival and location of the crew.

Most critically, Exhibits H and I to the Roberts Declaration contain authenticated Iranian government documents confirming that surviving crewmembers were repatriated to Iran and placed under the authority of the IRGC. The documents specify that the "tanker personnel" were to be held under "maximum security conditions" on a remote and infrequently accessed island in the Persian Gulf, under the exclusive control of the IRGC Intelligence Organization, with no other governmental body permitted to inquire into their status. Roberts Decl. ¶¶ 35–38. These documents identify the surviving crewmembers by name and confirm the IRGC's custody. Iran has never acknowledged their detention or disclosed their fate or whereabouts, and families who sought answers were threatened, including warnings that "If you want to see your son, stay quiet." Complaint ¶¶ 95–140; Ex. 11D. The record thus reflects a continuous concealment spanning nearly eight years.

Taken together, these facts satisfy every element of enforced disappearance under the International Convention for the Protection of All Persons from Enforced Disappearance, which requires (1) a deprivation of liberty by state agents; (2) a refusal to acknowledge the deprivation or disclose the fate or whereabouts of the detained persons; and (3) placement of the victims outside the protection of the law. The Complaint alleged, and continues to assert, that Plaintiffs believe their family members "were not died at the time of the accident, but… are currently in captive or killed." Complaint ¶ 31. Iran's actions, unlawful detention by the IRGC, false death declarations, suppression of survivor

evidence, and threats to families, constitute a textbook violation of this international norm and fall squarely within the scope of the declaratory relief originally requested.

Accordingly, Plaintiffs ask the Court to declare that the surviving crewmembers of the *M/T Sanchi* were and remain under the custody, control, and authority of the Islamic Republic of Iran, acting through the IRGC; that Iran's conduct, including detention, concealment, termination of rescue efforts, and suppression of evidence, constitutes enforced disappearance under the Convention and under customary international law; that these actions violate the specific international-law norms identified in the Complaint, including arbitrary detention, torture, cruel and inhuman treatment, and hostage-taking; and that Iran's refusal to disclose the fate or whereabouts of the crew constitutes a continuing international wrong.

Even if the Court were to conclude that traditional personal-jurisdiction concerns create obstacles to the issuance of coercive or monetary relief, declaratory relief remains independently available. The Declaratory Judgment Act authorizes federal courts to declare the rights and legal relations of parties in actual controversy, 28 U.S.C. § 2201(a), and courts may issue such declarations even where enforcement cannot be directed at an absent or foreign defendant, so long as the declaration concerns legal status, factual determinations, or violations of federal or international law and does not compel the defendant to act. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); Restatement (Second) of Judgments § 6. Federal courts have routinely issued declaratory judgments in cases involving missing or disappeared persons, determinations of death, citizenship status, and violations of jus cogens norms, even without personal jurisdiction sufficient for coercive relief. Furthermore, in FSIA cases, personal jurisdiction follows

automatically from proper service and subject-matter jurisdiction, 28 U.S.C. § 1330(b), and Defendants here, foreign sovereign actors duly served under § 1608, cannot defeat declaratory relief by refusing to appear. At the very least, the Court possesses the authority to enter a declaratory judgment recognizing that the surviving crewmembers of the *Sanchi* were unlawfully taken into IRGC custody and subjected to enforced disappearance, both to clarify their legal status and to vindicate the significant federal and international interests implicated by these events.

## X. RELIEF REQUESTED

For the foregoing reasons, Plaintiffs respectfully request that the Court:

1. Enter default judgment in favor of Plaintiffs and against Defendants National Iranian Tanker Company, Ali Rabiei, and Alaeddin Boroujerdi on all claims asserted in the operative complaint.

2. Find that the evidence submitted, including the Roberts Declaration and supporting exhibits, is satisfactory under 28 U.S.C. § 1608(e) to establish Defendants' liability.

3. Award Plaintiffs compensatory damages for pecuniary losses, emotional distress, and solatium consistent with DOHSA, general maritime law, the ATS, the TVPA, and FSIA precedent.

4. Award punitive damages against Defendants Rabiei and Boroujerdi under the TVPA and ATS.

5. Award prejudgment and post-judgment interest as permitted by law.

6. Declaratory Judgment. Plaintiffs respectfully request that the Court enter a Declaratory Judgment consistent with Section X above, declaring that the surviving crewmembers of the M/T Sanchi were repatriated to Iran, placed under the custody and control of the IRGC, and subjected to enforced disappearance through Iran's concealment of their fate and whereabouts, in violation of international law and the rights asserted in the Complaint.

7. Grant such other and further relief as the Court deems just and proper, including convening an evidentiary hearing on damages if the Court finds one appropriate.

Respectfully Submitted,

December 9, 2025

____/s/ Ali Herischi_______

Ali Herischi, Esq.
Counsel for Plaintiffs
Herischi & Associates LLC
11300 Rockville Pike, Suite 712
North Bethesda, Maryland 20852
Phone: (301) 363-4540
Fax: (301) 363-4538
Email: ali.herischi@ibhlaw.com

# EXHIBIT INDEX

Exhibit 1. Official casualty timeline and accident report for *M/T Sanchi*.

Exhibit 2. Photographs and video stills showing fire and wreck location.

Exhibit 3. Crew List

Exhibit 4. Telecommunication records showing crew phone activity after collision.

Exhibit 5. Plaintiffs Affidavits

Exhibit 6. Plaintiffs and Crewmen IDs

Exhibit 7. Reserved

Exhibit 8. Reserved

Exhibit 9. Reserved

Exhibit 10. Redacted Witness Report by Jake Robers with Attached Exhibits

Exhibit 11. Official orders canceling death certificates issued by Iranian authorities.

Exhibit 12. *CF Crystal* Information About U.S. Cargo (confirming American shipment origin).

Exhibit 13. Sanchi Cargo Report

Exhibit 14. OFAC Reports and NITC Entity Designation.

Exhibit 15. U.S. Navy Search-and-Rescue Activity Report.

Exhibit 16. U.S. Embassy Beijing Audio Transcript (Ali_ Recording).

Exhibit 17. DOS/CENTCOM Coordination Emails Regarding Sanchi Incident.

Exhibit 18. RESERVED

Exhibit 19. OFAC Sanction Record – National Iranian Tanker Company (NITC).

Exhibit 20. OFAC Sanction Record – *M/T Sanchi* Vessel.