IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDOLLAH ABDOLLAHI, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL IRANIAN TANKER COMPANY,<br><br>ALI RABIEI, and ALAEDDIN BOROUJERDI,<br><br>Defendants. | Case No. 1:19-cv-03688-ABJ |

**PLAINTIFFS' RESPONSE TO THE COURT'S ORDER OF SEPTEMBER 2, 2026 AND SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 3

WHAT THIS CASE IS ABOUT ..... 4

I. THE COURT'S ORDER: PLAINTIFFS ARE AWARE OF NO AUTHORITY SUPPORTING § 1605(a)(5) ..... 6

A. Amerada Hess forecloses the exception on materially identical facts ..... 6

B. This Circuit requires the entire tort to occur in the United States ..... 7

C. Doe v. Ethiopia forecloses the electronic-transmission theory ..... 7

D. Section 1605(a)(5)(B) independently excludes a concealment claim ..... 8

E. The decisions applying the exception confirm the limit ..... 9

II. NITC IS NOT A FOREIGN STATE, AND THE FSIA DOES NOT GOVERN THE CLAIMS AGAINST IT ..... 9

A. Under Dole Food, only direct majority ownership by the state itself confers instrumentality status ..... 9

B. NITC's shares are held by three pension and social-security bodies, not by the state ..... 11

C. The consequences ... 12

III. THE CLAIMS PLEADED AGAINST NITC ARE WITHIN THE ADMIRALTY JURISDICTION 12

A. The counts against NITC on which Plaintiffs seek judgment ... 12

B. The failure to search for and rescue the crew is a maritime tort ... 13

C. The families' own claims are within the supplemental jurisdiction ... 15

IV. PERSONAL JURISDICTION OVER NITC UNDER RULE 4(k)(2) ... 15

A. The elements of Rule 4(k)(2) ... 16

B. The constitutional inquiry ... 16

C. Service ... 23

V. IN THE ALTERNATIVE, IF NITC IS AN INSTRUMENTALITY, § 1605(a)(2) AND § 1330(b) APPLY ... 24

A. The pleaded torts are based upon NITC's commercial activity as an employer ... 24

B. Direct effect in the United States ... 25

C. Personal jurisdiction under § 1330(b) and the Fifth Amendment ... 27

VI. DEFENDANTS RABIEI AND BOROUJERDI ... 28

A. Jurisdiction and the aim of the conduct ... 28

B. The real parties in interest: Rule 17(a)(3) ... 31

C. The TVPA claims ... 31

D. The ATS claims and the high seas ... 33

VII. NO OTHER FORUM EXISTS: JURISDICTION BY NECESSITY, PRESERVED IN THE ALTERNATIVE ... 34

VIII. THE EVIDENCE ... 36

IX. DAMAGES ... 38

X. CANDOR TO THE COURT ... 39

XI. THE RELIEF THE FAMILIES ASK ... 40

A. A declaration that these men survived and are held ... 40

B. An order directed to the Defendants ... 40

C. Findings that can be carried to those who can act ... 41

CONCLUSION ... 42

## PRELIMINARY STATEMENT

By Order of September 2, 2026, the Court directed Plaintiffs to provide citations supporting the statement on page 11 of their Motion for Default Judgment that "[c]ourts have applied this exception to maritime casualties and concealment where the defendant acts as a private party would," if such authority exists.

Plaintiffs have conducted that research and report candidly: they are *not* aware of authority supporting the invocation of 28 U.S.C. § 1605(a)(5) on the facts of this case. The sentence overstated the law and should not have appeared without citation. Counsel accepts responsibility for it. Plaintiffs **withdraw their reliance on § 1605(a)(5)** and do not ask the Court to rest jurisdiction on that exception. Part I sets out the governing authority in full so that the Court need not revisit the question.

The withdrawal does not affect the Motion, and Plaintiffs take this occasion to place the jurisdictional basis of the Motion on the footing the First Amended Complaint pleads. The Complaint sues NITC as the operator and manager of the Sanchi. It does not plead that NITC is a foreign state, and it is not one: under *Dole Food Co. v. Patrickson* only direct majority ownership by the foreign state itself makes a corporation an instrumentality, and NITC's shares have been held since 2009 by three Iranian pension and social-security bodies. The earlier Motion's invocation of the Foreign Sovereign Immunities Act proceeded on a different assumption, and Plaintiffs withdraw it. NITC stands before the Court as a private shipowner. The claims pleaded against it — negligence in failing to search for and rescue its own crew after a casualty on the high seas, and the intentional torts by which it told the families their relatives were dead while the state's

own records showed them alive — are within the admiralty and supplemental jurisdiction, and personal jurisdiction over NITC rests, as it does over any foreign company, on its own deliberate contacts with the United States: six years of settling its dollar obligations, including its obligations to these seafarers, through correspondent banks in New York.

Part I answers the Court's Order. Part II establishes that NITC is not a foreign state. Parts III and IV establish subject-matter and personal jurisdiction over the claims pleaded against NITC. Part V sets out, in the alternative and only should the Court conclude that NITC is an instrumentality, why the commercial-activity exception and § 1330(b) would then apply. Part VI addresses the individual Defendants. Part VII preserves the question of necessity. Parts VIII and IX address the evidence and damages, which Plaintiffs ask to submit on written submissions. Part XI sets out the declaratory and equitable relief the Complaint seeks, and why it matters now. Plaintiffs also ask in this brief that the Court treat the Complaint's jurisdictional statement as conformed to Parts III and IV under 28 U.S.C. § 1653, which adds no claim for relief, and permit the family Plaintiffs to proceed under Rule 17(a)(3) as next friends of the detained crew on the claims that belong to the crew. Neither requires re-service under Rule 5(a)(2). The supplemental declarations and exhibits cited herein are identified in the accompanying Notice of Filing; any declaration not executed as of today will be filed within seven days.

## WHAT THIS CASE IS ABOUT

Before the law, the facts. On the night of 6 January 2018 thirty-two men were aboard a tanker that caught fire in the East China Sea. The other ship's crew were rescued. Of the Sanchi's crew, three bodies were recovered. The remaining twenty-nine were declared dead by their government within eight days, while ships and aircraft from four nations were still searching for

them and life jackets were still being pulled from the water. Their families were given death certificates. Some were given money; most were asked first to sign a paper agreeing that their sons and husbands were dead and promising never to sue anyone, anywhere, about it.

Then the telephones began to ring. More than twelve hundred calls, at night, from numbers in East Asia, cut off when answered. One mother kept paying for her son's mobile line, and the carrier's records showed the handset connecting to the network months after it was supposed to be at the bottom of the sea. Families who asked questions were told, by officials, that if they wanted to see their sons again they should be quiet. (FAC ¶¶ 42, 51, 67–68.) A prosecutor who asked the telephone company for the call records was refused. (FAC ¶ 65.)

The families were right. Two letters of the Ministry of Intelligence of the Islamic Republic of Iran, classified Top Secret and now before this Court with certified translations, record what happened to the men. On 27 January 2018 the Minister reported that thirteen of them — Majid Ghasab Orouji, the master; Bahram Pouriani; Farid Mohebi; Milad Enayati; Abouzar Nezami; Alireza Najafifar; Bahram Etehad; Ehsan Aboli Ghasemabadi; Seyed Javad Heydari; Hassan Romiyani; Hossein Jahani Helabad; Yavar Afshari; and Abdolghani Sameri — had been handed to his ministry by Oman after being detained by China, and that it had been agreed, at a meeting attended by the head of the Supreme Leader's office, to hold them on an island in the Persian Gulf under the control of IRGC Intelligence, "without any leniency," under a protocol of "isolation-detention-security," and that "[n]o other ministry, organization, or institution will have the right to pursue this matter." On 3 June 2018 the Minister reported that "the last group" — Abdolkarim Besharatipour; Ali Heydariyeh Kohan; Hamed Bahari Hashkavayi; Mohammadreza Rezazadeh Masouleh; Ayoub Mozafari Abdgah; Sajad Abdollahi; Moslem Alizadeh Nodehi; and Pouria Eydipour — had been handed to the IRGC's representative on 3 March 2018. (Exs. H & I to

Roberts Decl.) Several of those names belong to the sons and husbands of the Plaintiffs before this Court. (FAC ¶¶ 7–16.)

That was more than eight years ago. The men have not been seen since. No charge has been announced, no court has been named, no family has been permitted a visit, a letter or a call. NITC, their employer, paid the benefits its collective agreement fixes only to families who would accept that their relatives were dead and sign away any claim; from those who refused, it withheld everything. (FAC ¶ 40; Abdollahi Decl. ¶¶ 11–12.)

This is a case about an enforced disappearance that is still going on. It is the first case in which the documents proving it have been placed before any court. Plaintiffs ask the Court to read what follows with that in mind: the jurisdictional questions are real, and Plaintiffs address them with the candor the Court's Order calls for, but behind each of them is a family that has waited eight years for one institution, anywhere, to say what the state's own papers say.

## I. THE COURT'S ORDER: PLAINTIFFS ARE AWARE OF NO AUTHORITY SUPPORTING § 1605(a)(5).

### A. Amerada Hess forecloses the exception on materially identical facts.

Section 1605(a)(5) withdraws immunity only where money damages are sought for "personal injury or death, or damage to or loss of property, *occurring in the United States* and caused by the tortious act or omission of that foreign state." 28 U.S.C. § 1605(a)(5) (emphasis added).

In *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), the Supreme Court rejected the precise proposition that § 1605(a)(5) reaches a maritime tort on the high seas.

Argentine aircraft bombed a Liberian-flag tanker in international waters, and the shipowners invoked this exception. The Court held it "covers only torts occurring within the territorial jurisdiction of the United States," *id.* at 441, because the provision is "limited by its terms . . . to those cases in which the damage to or loss of property occurs in the United States," *id.* at 439. Congress's "primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States." *Id.* The Court further observed that § 1605(a)(5), unlike § 1605(a)(2), contains no "direct effect" language. *Id.* at 441.

Plaintiffs can identify no ground of distinction. The collision occurred approximately 160 nautical miles east of Shanghai. The suppression of search-and-rescue information occurred aboard vessels at sea and in Tehran. The detention has occurred in Iran. Plaintiffs further state, so that the record is clear, that **each of the seven Plaintiffs is a citizen of Iran residing in Iran**. (Ex. 5.) No Plaintiff resides in the United States and no Plaintiff was injured here. No element of the alleged tort occurred within United States territory.

Plaintiffs acknowledge that *Amerada Hess* is cited in their own Motion at page 10, for the proposition that the FSIA supplies the exclusive basis of jurisdiction over a foreign state, 488 U.S. at 434–35. The Motion should have recognized that the same decision forecloses the theory advanced one page later.

**B. This Circuit requires the entire tort to occur in the United States.**

The D.C. Circuit requires that "the entire tort" — "including not only the injury but also the act precipitating that injury" — occur in the United States. *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014) (citing *Asociación de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984) (Scalia, J.)); *Asociación de Reclamantes*, 735 F.2d at 1525 (the

tortious act or omission itself must occur within the United States); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 842 (D.C. Cir. 1984) (the United States Embassy compound in Tehran is not "the United States" for these purposes); *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 169 (D.C. Cir. 1994); *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014) (continuing injury suffered in the United States from acts committed abroad does not satisfy the exception); *accord McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588–89 (9th Cir. 1983).

**C. Doe v. Ethiopia forecloses the electronic-transmission theory.**

Plaintiffs considered and reject as unsupportable a theory that NITC's suppression instructions and the false declaration of death satisfy the territorial requirement because they were transmitted by electronic communication into a search-and-rescue effort in which United States personnel participated. That theory is squarely foreclosed in this Circuit.

In *Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7 (D.C. Cir. 2017), Ethiopia infected a Maryland resident's computer with spyware and intercepted his communications in the United States. The D.C. Circuit affirmed dismissal, holding that § 1605(a)(5) did not apply because the tortious intent and the act initiating the tort lay abroad; excising the foreign conduct would leave only "the bare fact of FinSpy sitting on his computer." The court declined to read the exception to require only that the *injury* occur here.

Applying the reasoning of Doe: if a tort executed by transmission into a computer physically located in Maryland, injuring a United States resident, fails the territorial requirement, then instructions transmitted from Tehran to vessels at sea, injuring Iranian nationals in Iran, cannot satisfy it.

**D. Section 1605(a)(5)(B) independently excludes a concealment claim.**

Even if the situs requirement could be met, § 1605(a)(5)(B) provides that the exception "shall not apply to . . . any claim arising out of . . . misrepresentation [or] deceit." Courts construe that proviso by reference to its analogue in the Federal Tort Claims Act, 28 U.S.C. § 2680(h), applying it to the gravamen rather than the label and extending it to omissions and non-disclosure. *See Dorking Genetics v. United States*, 76 F.3d 1261, 1264 (2d Cir. 1996); *JBP Acquisitions, LP v. United States ex rel. FDIC*, 224 F.3d 1260, 1266 (11th Cir. 2000).

In *Cabiri v. Government of the Republic of Ghana*, 165 F.3d 193, 200 & n.3 (2d Cir. 1999), the Second Circuit confronted a claim materially identical to the one Plaintiffs had advanced: a wife's suit for the emotional distress inflicted when Ghanaian officials concealed from her the whereabouts of her secretly detained husband. The court held both that the exception "covers only torts occurring within the territorial jurisdiction of the United States," (quoting Amerada Hess, 488 U.S. at 441), and that because "the wrongful acts alleged to have caused the injury are misrepresentations . . . concerning her husband's whereabouts," the claim fell within the § 1605(a)(5)(B) proviso and "outside the non-commercial tort exception." The court added that "the FSIA is not an enforcement mechanism for global freedom of information." *Id.*

**E. The decisions applying the exception confirm the limit.**

The cases in which a foreign state acting as a private party has been denied immunity under § 1605(a)(5) are cases in which the tort was committed on United States soil. *See Usoyan v. Republic of Turkey*, 6 F.4th 31 (D.C. Cir. 2021) (Turkish security officers assaulting protesters at Sheridan Circle in Washington, D.C.); *Letelier v. Republic of Chile*, 488 F. Supp. 665, 671–74 (D.D.C. 1980) (assassination in Washington, D.C.); *Olsen ex rel. Sheldon v. Government of*

*Mexico*, 729 F.2d 641, 645–46 (9th Cir. 1984) (aircraft crash in California); *Liu v. Republic of China*, 892 F.2d 1419, 1424–26 (9th Cir. 1989) (murder in California).

Plaintiffs note candidly that *Olsen* articulates a "one entire tort" formulation more permissive than this Circuit's rule, and that *Asociación de Reclamantes* is controlling here. Plaintiffs do not ask the Court to follow *Olsen* over binding Circuit precedent. Plaintiffs are aware of no decision applying § 1605(a)(5) to a maritime casualty outside United States territorial waters, and *Amerada Hess* holds that none could.

## II. NITC IS NOT A FOREIGN STATE, AND THE FSIA DOES NOT GOVERN THE CLAIMS AGAINST IT.

The earlier Motion invoked the FSIA out of caution, on the assumption that NITC, which the Executive Branch treats as an entity of the Government of Iran for sanctions purposes, would be treated as an instrumentality of Iran under the FSIA. The two questions are different, and the FSIA's answer is no. Because the point determines which body of jurisdictional law governs the claims against NITC, Plaintiffs address it first and in full.

### A. Under Dole Food, only direct majority ownership by the state itself confers instrumentality status.

A corporation is an "agency or instrumentality of a foreign state" only if, among other things, "a majority of [its] shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). In *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), the Supreme Court held that the provision means what it says: "only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement," *id.* at 474, and a

corporation whose shares are held by another entity — even one wholly owned by the state — is not an instrumentality, because "[a] corporation and its shareholders are distinct entities" and the statute "speaks of ownership," not control, *id.* at 474–77. The Court rejected the argument that the state's control of the intermediate owner should be attributed downward: "Control and ownership . . . are distinct concepts," and Congress chose ownership. *Id.* at 477. Status is determined as of the time the complaint is filed. *Id.* at 478–80.

Applying *Dole Food*, courts have held that corporations majority-owned by a state's own agencies and instrumentalities are not instrumentalities themselves, because the agency, not the state, holds the shares. *Filler v. Hanvit Bank*, 378 F.3d 213, 217–20 (2d Cir. 2004) (banks majority-owned by the Korea Deposit Insurance Corporation, a government-created entity, were not instrumentalities of Korea; the state itself owned no shares); *USX Corp. v. Adriatic Insurance Co.*, 345 F.3d 190, 205–09 (3d Cir. 2003).

Nor is NITC an "organ" of Iran under the alternative prong of § 1603(b)(2). Courts ask whether the entity was created for a national purpose, is actively supervised by the government, employs civil servants whom the state pays, holds exclusive rights in the country, and is treated as governmental under domestic law. *Filler*, 378 F.3d at 217; *USX*, 345 F.3d at 209. The record shows none of those characteristics: NITC was privatized in 2009 and its shares are held by pension and social-security funds (Ex. HS-3); it employs its seafarers under a collective agreement negotiated with a trade union (Ex. S-1); it earns its revenue under charters with counterparties that owe it demurrage like any other owner (Ex. J); and nothing in the record suggests that its employees are civil servants, that it holds exclusive rights under Iranian law, or that Iranian law treats it as part of the state. Plaintiffs address below the one respect in which Iranian or United States law treats

NITC as part of the government — its sanctions designation under Executive Order 13599 — and show that it rests on a control test the FSIA does not use.

**B. NITC's shares are held by three pension and social-security bodies, not by the state.**

NITC was privatized in 2009. Since then its shares have been held by three bodies: the Civil Servants Pension Fund (also rendered the Iranian State Retirement Fund), the Social Security Organization, and the Oil Industry Employees' Retirement and Savings Fund. (Herischi Supp. Decl. ¶ 21 & Ex. HS-3.) That is how the Council of the European Union described NITC's ownership when it re-listed the company in 2015 — as an entity whose shareholders are those three funds — after the General Court of the European Union had annulled its earlier listing on the ground that the Council's assertion that NITC was "[e]ffectively controlled by the Government of Iran" was unsubstantiated. *National Iranian Tanker Co. v. Council*, Case T-565/12, ECLI:EU:T:2014:608 (Gen. Ct. July 3, 2014); *National Iranian Tanker Co. v. Council*, Case C-600/16 P, ECLI:EU:C:2018:966, ¶¶ 19–21 (CJEU Nov. 29, 2018). Each of the three shareholders is a legal person distinct from the Iranian state: the Social Security Organization is classified under Iranian law as a public non-governmental institution, and the two pension funds are separate legal entities administering the retirement assets of their members. (Herischi Supp. Decl. ¶ 21.) None is "the foreign state or political subdivision thereof." At most, each is itself an agency or instrumentality — the very tier of ownership *Dole Food* and *Filler* hold does not count.

The Executive Branch's treatment of NITC as "Government of Iran" for purposes of Executive Order 13599 does not alter the analysis. The regulations implementing that order define the Government of Iran to include any entity "owned or controlled" by it, 31 C.F.R. § 560.304(b)

— a control test that *Dole Food* holds is not the FSIA's test. 538 U.S. at 477. The FSIA asks who holds the shares. The state does not.

Plaintiffs acknowledge that a court must satisfy itself of its jurisdiction and that the FSIA, where it applies, is the sole basis of jurisdiction over a foreign state. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493–94 (1983). The burden of establishing that a defendant is a foreign state rests, in the first instance, on the party claiming that status. *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). NITC has not appeared to claim it, and the record forecloses it.

### C. The consequences.

Because NITC is not a foreign state, four things follow. It has no immunity under 28 U.S.C. § 1604, and no exception under § 1605 need be established. Service on it is governed by Rule 4(h)(2) and 4(f), not by § 1608, and that is how Plaintiffs served it in February 2020. (Part IV.C.) The evidentiary standard of § 1608(e) does not apply; the ordinary law of default does. And personal jurisdiction over NITC is governed by Rule 4(k)(2) and the Fifth Amendment, on NITC's own contacts with the United States (Part IV.A), rather than by § 1330(b).

## III. THE CLAIMS PLEADED AGAINST NITC ARE WITHIN THE ADMIRALTY JURISDICTION.

### A. The counts against NITC on which Plaintiffs seek judgment.

Plaintiffs are candid about the Complaint. Its First through Sixth Claims are pleaded under the Alien Tort Statute and the Torture Victim Protection Act. Those statutes do not reach NITC: the TVPA's reference to "[a]n individual" means a natural person, *Mohamad v. Palestinian*

*Authority*, 566 U.S. 449, 453–56 (2012), and foreign corporations are not subject to suit under the ATS, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 271–72 (2018). Plaintiffs therefore do not seek judgment against NITC on the First through Sixth Claims. They seek judgment against NITC on the Ninth Claim (false imprisonment), the Tenth Claim (intentional infliction of emotional distress) and the Eleventh Claim (negligence), each of which "repeat[s], re-allege[s] and incorporate[s] herein by reference the allegations set forth in the foregoing paragraphs." (FAC ¶¶ 119, 124, 130.)

Plaintiffs also acknowledge that one sentence in each of the Tenth and Eleventh Claims (FAC ¶¶ 125, 131) refers to "Monitoring Centers" and "monitoring technology." Those phrases do not describe this case and should not have appeared; they were carried into the pleading in error. The counts do not rest on them. What the counts rest on are the incorporated allegations: that NITC operated and manned the Sanchi (¶¶ 17–18, 25); that when she collided and burned, her crew were not rescued although the other vessel's were (¶ 27); that NITC and the state declared the crew dead within days and ended the search, and that no recovery from the wreck was attempted (¶¶ 35, 37, 45); that NITC conditioned the benefits it owed on the families' accepting their relatives' deaths and signing releases (¶ 40); that the families received calls from their relatives' numbers and were pressured and threatened for refusing the official account (¶¶ 42, 51, 67–68); and that Defendants acted in concert to conceal the truth (¶ 69). Under Rule 8 it is the facts alleged, not the label or a stray sentence, that determine whether a claim is stated. *Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per curiam). Those facts state the claims addressed below. Should the Court nonetheless consider either count deficient by reason of the errant sentences, Plaintiffs ask that it say so, and they will seek leave to amend and will re-serve as Rule 5(a)(2) requires.

**B. The failure to search for and rescue the crew is a maritime tort.**

The district courts have original jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). A tort is within that jurisdiction where it occurs on navigable waters, is of a type with a potentially disruptive impact on maritime commerce, and bears a substantial relationship to traditional maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). A shipowner's failure to search for and rescue its crew after a casualty on the high seas is the archetype: the injury is sustained at sea, and no activity is more traditionally maritime than the rescue of those in peril upon it. *See Gardner v. National Bulk Carriers, Inc.*, 310 F.2d 284, 286–87 (4th Cir. 1962) (shipowner's duty to attempt rescue of a seaman lost overboard; failure to do so is actionable negligence); *Kermarec v. Compagnie Générale Transatlantique*, 358 U.S. 625, 630–32 (1959) (general maritime law governs the duties owed aboard vessels on navigable waters). The Eleventh Claim, read with the facts it incorporates, alleges exactly that tort: NITC had three vessels on scene under the On-Scene Commander; on the third day of the search it instructed their masters to keep all information confidential and to report findings about the missing crew only to NITC's own centre in Tehran (Ex. D-2 to Roberts Decl.); it thereby withheld from the multinational search the information on which it depended, at the moment life jackets were being sighted and the lifeboat was in the water (Exs. D-1, D-2; Roberts Decl. ¶¶ 19–28); and six days later it adopted a declaration that every crewman was dead, after which no search or recovery was attempted. (FAC ¶¶ 35, 37, 45.) The survivors were meanwhile taken into secret custody, where they remain. (Exs. H, I to Roberts Decl.)

The Complaint's jurisdictional statement invokes 28 U.S.C. §§ 1331 and 1350 and does not cite § 1333. That omission is not fatal. Subject-matter jurisdiction depends on the facts alleged, not on the statute cited, and "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653. Plaintiffs ask the Court, under § 1653, to treat

the jurisdictional statement as conformed to Parts III and IV, and will file an amended jurisdictional statement in whatever form the Court directs. An amendment of jurisdictional allegations asserts no new claim for relief and does not require service under Rule 5(a)(2).

Jurisdiction and choice of law are distinct. Which law governs the merits of a foreign seafarer's claim against a foreign shipowner is determined by weighing the flag, the allegiance of the parties, the place of the wrongful act and the like, *Lauritzen v. Larsen*, 345 U.S. 571, 583–92 (1953); *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306 (1970), but jurisdiction exists whenever the case is maritime. On the duty at issue the candidate laws do not differ: a shipowner owes its crew reasonable efforts at rescue under the general maritime law, under Iranian law, and under Panamanian law, and the duty of every master to render assistance to persons in danger of being lost at sea is fixed by the Safety of Life at Sea Convention, ch. V, reg. 33, to which Iran, Panama and the United States are parties. Plaintiffs have given notice under Rule 44.1. (Herischi Supp. Decl. ¶¶ 20–21.)

**C. The families' own claims are within the supplemental jurisdiction.**

The Ninth and Tenth Claims, insofar as they seek recovery for the families' own injury — being told for eight years that their relatives were dead, given and then stripped of death certificates, offered money for silence and threatened for refusing — derive from the same nucleus of operative fact as the maritime claim and the federal claims against the individual Defendants. They are within the Court's supplemental jurisdiction. 28 U.S.C. § 1367(a). On the merits they state a claim under any candidate law: under Article 1 of Iran's Civil Liability Act of 1339 (1960), which makes anyone who intentionally or negligently causes material or moral injury to another's life, health, liberty, reputation or other legal right liable to compensate it, and under the District of

Columbia's tort of intentional infliction of emotional distress, *Ortberg v. Goldman Sachs Group*, 64 A.3d 158, 163 (D.C. 2013). (Herischi Supp. Decl. ¶ 21 & Ex. HS-4.) Telling a mother for eight years that her son is dead, while the state that controls the employer holds him, is that conduct under any law.

## IV. PERSONAL JURISDICTION OVER NITC UNDER RULE 4(k)(2).

Although a defendant may forfeit an objection to personal jurisdiction by failing to appear, Plaintiffs do not ask the Court to rest on forfeiture. A default judgment entered without personal jurisdiction is void and subject to attack under Rule 60(b)(4) without regard to the passage of time, including in the enforcement proceedings in which Plaintiffs will seek to reach blocked assets. *See Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 & n.5 (D.C. Cir. 1987). Findings made now protect the judgment later.

Absent an evidentiary hearing, Plaintiffs' burden is to make a prima facie showing of personal jurisdiction, and they "are not limited to evidence that meets the standards of admissibility"; they "may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).

### A. The elements of Rule 4(k)(2).

Rule 4(k)(2) establishes personal jurisdiction over a defendant on a claim arising under federal law where the defendant is not subject to jurisdiction in any state's courts of general jurisdiction and the exercise of jurisdiction is consistent with the Constitution. Each element is met.

**1. Federal claims.** Claims within the admiralty jurisdiction arise under federal law for purposes of Rule 4(k)(2). *World Tanker Carriers Corp. v. MV Ya Mawlaya*, 99 F.3d 717, 721–23 (5th Cir. 1996). The TVPA and ATS claims, though pleaded against the individuals, arise under federal law and are joined in the same action; and the families' supplemental claims may be heard on pendent personal jurisdiction once jurisdiction over NITC is established on the federal claims. *See Oetiker v. Jurid Werke, GmbH*, 556 F.2d 1, 4–5 (D.C. Cir. 1977).

**2. No state of general jurisdiction.** NITC is an Iranian company with its seat in Tehran, no office, agent or registration in any state, and no state in which it is "at home." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). This Circuit places the burden on the defendant to name a state where suit would lie; a defendant that has defaulted has named none, and Plaintiffs' counsel so certifies. *Mwani*, 417 F.3d at 11; Herischi Supp. Decl. ¶ 7.

**B. The constitutional inquiry.**

**3. Consistent with the Constitution.** The constitutional inquiry under Rule 4(k)(2) is the Fifth Amendment's, and it looks to the defendant's contacts with the United States as a whole. *Mwani*, 417 F.3d at 11. In *Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 15–19 (2025), the Supreme Court held that the Fifth Amendment does not incorporate the Fourteenth Amendment's minimum-contacts standard and calls instead for "a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority," and upheld, as consistent with due process, a statute that "ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns," while leaving the Fifth Amendment's outer limits open. Plaintiffs' showing satisfies the standard Fuld applied and would satisfy the stricter one this Circuit applied before *Fuld* in *Livnat v. Palestinian Authority*, 851 F.3d

45, 54–58 (D.C. Cir. 2017). Plaintiffs note candidly that *Fuld* construed a statute invoked under Rule 4(k)(1)(C), and that some courts have questioned whether its standard governs where jurisdiction rests on Rule 4(k)(2). See *Enhanced US LLC v. World Aquatics*, No. 25-cv-7096 (JMF), 2025 WL 3206662, at *5 n.3 (S.D.N.Y. Nov. 17, 2025) (collecting cases); *Hafez v. Vidino*, 2025 U.S. Dist. LEXIS 193423 (D.D.C. Sept. 30, 2025) (applying *Mwani* under Rule 4(k)(2) after *Fuld*). This Circuit treats the Fifth and Fourteenth Amendment inquiries as "generally analogous" in the Rule 4(k)(2) setting, *Lewis v. Mutond*, 62 F.4th 587, 592 (D.C. Cir. 2023), and the showing that follows is made under that standard as well: purposeful contacts, relatedness and reasonableness, with the foreign-policy dimension added because *Fuld* makes it relevant.

*(a) Purposeful contacts.* For six years, before and after the casualty, NITC settled its dollar obligations through correspondent banks in New York: it ran its dollar treasury through a single account, in the name of a Malta subsidiary managed from Sharjah, into which its charter revenue was paid and out of which its operating obligations were discharged, and its dollar payments were routed, in the ordinary course, through New York. (Roberts Supp. Decl. ¶¶ 5–15 & Exs. J, K.) The Second Circuit has held that a foreign bank's repeated, deliberate use of a New York correspondent account to effect dollar transfers is purposeful availment of the forum sufficient for due process. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168–74 (2d Cir. 2013); *accord Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 137–38 & n.15 (2d Cir. 2014). This Circuit has not addressed correspondent-account contacts; Licci's reasoning is persuasive and has been widely followed. And the contact is NITC's own, not merely its subsidiary's: the Maltese registry records NITC as ALP's shareholder (with the Iranian national who served as ALP's director), the account was controlled by NITC's Financial Director, its credits were NITC's

charter revenue and its debits NITC's obligations, and NITC conducted its dollar business in ALP's name because its own name is on the sanctions lists. (Roberts Supp. Decl. ¶¶ 6–8; Ex. HS-2.) NITC did not use the dollar system by accident: it structured access to it, under an unlisted name, so that its business could continue. That is the "deliberate" contact with the United States that *Walden v. Fiore*, 571 U.S. 277, 284–86 (2014), requires — the defendant's own conduct, not the plaintiffs'.

*(b) Relatedness.* The claims against NITC "arise out of or relate to" those contacts. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359–62 (2021). *Ford* requires a relationship between the contacts and the controversy, not a causal link. The contacts are NITC's conduct of its tanker business in dollars, through New York. The controversy is what NITC did, as the operator of one of those tankers, with the crew it employed aboard her. The two are one relationship: NITC's charter revenue was paid into the same account (Ex. J), and the wages, repatriation and benefits NITC owed these seafarers — obligations it undertook in dollars under the agreement discussed in Part V.A, on which Plaintiffs rely for jurisdiction and not as a claim — were obligations of the same treasury. The suit-related conduct — the decision not to search for this crew, the declaration of their deaths, and the eight-year concealment — concerned the same seafarers, employed under the same dollar-denominated agreement whose obligations that New York channel existed to discharge; the forum contacts and the conduct sued upon share the employment relationship as their common subject. Plaintiffs plead no contract claim; the pleaded torts relate to the contacts in the sense *Ford* describes: the same commercial relationship, conducted through the same channel.

*(c) Conduct closely related to the United States that implicates foreign-policy concerns.* The concealment was conduct directed at the United States in three respects. NITC's suppression instruction was transmitted into a rescue operation in which United States forces were participating under treaty obligations the United States shares — the Safety of Life at Sea and Search and Rescue Conventions — and withheld from every participant, the United States among them, the information on which the search depended. (Ex. D-2; Exs. 15 & 15A to the Motion.) The survivors were diverted from that rescue into secret custody. (Exs. H, I.) And on the sworn record the concealment was ordered to protect Iran's nuclear agreement with the United States from disclosure of what the vessel carried. (Roberts Decl. ¶ 34.) The Executive Branch has since designated NITC under Executive Order 13224 for supporting the IRGC-Qods Force. (Exs. S-9, S-10.) These are the foreign-policy concerns *Fuld* identified, and they are the United States' own.

*(d) Reasonableness.* NITC has declined to articulate any burden, and none of substance appears: it was served at its head office in February 2020 and has had six years to appear; the claims rest on documents and sworn declarations; and NITC is no stranger to litigation abroad, having carried its challenge to the European Union's listing through the General Court and the Court of Justice (Ex. HS-3). The forum's interest is set out above, and the admiralty courts of the United States have always regarded seafarers as "emphatically the wards of the admiralty." *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 246 (1942) (quoting Harden v. Gordon, 11 F. Cas. 480 (C.C.D. Me. 1823) (No. 6,047) (Story, J.)). Plaintiffs' interest is at its maximum: the contractual forum, the courts of Iran, is closed by the decree that "[n]o other ministry, organization, or institution will have the right to pursue this matter," (Ex. I), families who asked were threatened, and no court in Panama, China

or Hong Kong could hear the claims against these Defendants for what they did in Iran. A defendant resisting jurisdiction on reasonableness grounds "must present a compelling case." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). None has been presented.

*(e) The foreign-policy concerns, in detail.* The United States is a party to the International Convention for the Safety of Life at Sea, 1974, under which the master of a ship in a position to do so "is bound to proceed with all speed" to the assistance of persons in distress at sea, SOLAS ch. V, reg. 33.1, and to the International Convention on Maritime Search and Rescue, 1979, under which contracting States coordinate rescue, render assistance to persons in distress "regardless of the nationality or status of such a person," and cooperate so that survivors are delivered to a place of safety. United States forces were performing those obligations in this incident. The declassified Navy messages already in the record show how. On 7 January 2018 the Iranian Maritime Rescue Coordination Centre asked United States Naval Forces Central Command for help; the request was relayed to the Seventh Fleet, which directed Task Force 72 to launch its ready aircraft from Kadena Air Base in support of "the Iranian SAR in the ECS." That aircraft, call sign "Fighting Tiger 801," found the Sanchi "and surrounding water ablaze," tried without success to check in with the on-scene commander, detected possible emergency strobe lights in the water and relayed them to the nearest surface vessels, including a Chinese police boat, and searched "over 3600 sq. nm" before returning to base that night. The same day the State Department's Iran Regional Presence Office asked the Navy for any information on Iran's request and on "the status of the sailors." (Exs. 15 & 15A to the Motion (messages of 7 January 2018 declassified by U.S. Indo-Pacific Command and produced by the Department

of the Navy on 8 July 2022); Ex. 17 to the Motion; Herischi Supp. Decl. ¶ 13.) The record indicates that crewmembers survived the casualty and were thereafter placed not in a place of safety but in incommunicado detention. (Exs. H & I to Roberts Decl.) The integrity of a multinational rescue operation in which United States forces participated, and the diversion of its object into secret custody, are matters of direct concern to the political branches — as is the conduct of an entity the Executive Branch has since designated under Executive Order 13224 on findings that it "materially assisted, sponsored, or provided . . . support for" the IRGC-Qods Force and that it and the National Iranian Oil Company "provide both the oil and tankers for the sale of Iranian oil by the IRGC-QF." (Exs. 19–20; Ex. S-9 (Treasury press release, 26 October 2020); Ex. S-10 (OFAC SDN List entry for NITC, programs IRAN, IFCA, IFSR and SDGT, noting "Linked To: ISLAMIC REVOLUTIONARY GUARD CORPS (IRGC)-QODS FORCE").) Each of NITC's designations rests on the President's declaration of an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Plaintiffs do not suggest that a designation is itself a finding of contacts with the United States or of a direct effect here. They cite it as the political branches' own assessment of the foreign-policy interest *Fuld* asks the Court to weigh.

The foreign-policy concern extends to what the Sanchi carried. As to the cargo, what follows is the declarant's account of what a source told him, offered under Mwani's prima facie standard and not as a fact Plaintiffs ask the Court to find; the limits of that evidence are stated at the end of this section. Plaintiffs' declarant — a former senior NITC employee of more than fifteen years, a licensed tanker master, whose identity is withheld for his safety and that of his sources — states from his own experience that for at least three

years before the casualty Iranian security forces used NITC tankers to carry twenty-litre containers described as oil samples, offloaded to tugboats between the Strait of Malacca and Singapore, in a quantity and with a regularity that sampling does not explain; that the Sanchi had carried such containers on earlier voyages; and that a former colleague now in NIOC's security division told him the Sanchi was carrying two such containers when she was struck, that they were destined for North Korea and related to Iran's nuclear program, and that the Supreme National Security Council intervened to keep the matter secret because exposure "could have undermined the Joint Comprehensive Plan of Action . . . nuclear agreement with the United States." (Roberts Decl. ¶¶ 5, 7, 31–34; Exs. F–G to Roberts Decl.)

The transfer to North Korea of items related to nuclear programs has been prohibited to every Member State since S.C. Res. 1718, ¶ 8(a)–(b) (Oct. 14, 2006), and is sanctionable under the Iran, North Korea, and Syria Nonproliferation Act, 50 U.S.C. § 1701 note, Executive Order 13382, and 22 U.S.C. § 9214(a). The President has barred from United States ports any vessel that engaged in a ship-to-ship transfer with a vessel that had called in North Korea within the preceding 180 days. Exec. Order No. 13810, § 2(b), 82 Fed. Reg. 44,705 (Sept. 20, 2017). Circumstances in the public record are consistent with the declarant's account. By a contemporaneous report, the Sanchi's automatic identification system had transmitted nothing for almost twenty-four hours before the collision. (Ex. S-6 (Caixin Global, 29 January 2018).) Disabling that system is the first deceptive practice the Departments of the Treasury and State and the United States Coast Guard identified the following month in their joint advisory on North Korean shipping. (Ex. S-7 (North Korea

Sanctions Advisory, *Sanctions Risks Related to North Korea's Shipping Practices* (23 February 2018)).)

Plaintiffs are candid about what this evidence is. As to the cargo aboard the Sanchi it is the declarant's account of what a source told him, offered under Mwani's prima facie standard, and no Defendant is present to test it. Plaintiffs do not ask the Court to find what the containers held or where they were going. The point is narrower and does not depend on that finding. The crewmembers who survived the collision were the witnesses to it. Iran declared them dead within eight days and placed them in incommunicado custody under a directive classified at the highest level, adopted at a meeting attended by the head of the Supreme Leader's office, that forbade any other institution to pursue the matter. (Exs. H & I to Roberts Decl.) On the declarant's account the object of that concealment was to protect Iran's nuclear agreement with the United States from disclosure of a nuclear-related transfer to North Korea. Whether that account is right is a question of first-order concern to the national security of the United States, and it is a question the concealment was designed to keep from the United States. Conduct undertaken for that purpose is conduct "closely related to the United States" that "implicates important foreign policy concerns" in the most direct sense.

Because this evidence bears on matters committed to the Executive Branch, Plaintiffs are serving this brief on the Attorney General and on the Legal Adviser of the Department of State. Plaintiffs would welcome an invitation from the Court to the United States to state its views. *See* 28 U.S.C. § 517.

**C. Service.**

Service on a foreign corporation outside the United States may be made by any method permitted by Rule 4(f), Fed. R. Civ. P. 4(h)(2), and the same methods apply to individuals abroad, Rule 4(f). No international agreement on service is in force between the United States and Iran, so the methods of Rule 4(f)(2) are available without order of court. Plaintiffs served each Defendant in Tehran in February 2020 — NITC and Boroujerdi on 17 February 2020 and Rabiei on 23 February 2020 — under Rule 4(f)(2) and (f)(3), by the means reflected in the returns of service, which Plaintiffs filed on 20 April 2020 (ECF No. 4) and reproduce in Exhibit HS-1. No Defendant responded; the last date to respond was 15 March 2020. On 30 April 2020 Plaintiffs requested entry of default on counsel's declaration, which stated then, as Plaintiffs state now, that NITC "is a private company" and that the individual Defendants were sued in their personal capacities (ECF Nos. 5–6, ¶ 3). (Herischi Supp. Decl. ¶¶ 2–6 & Ex. HS-1.) Service abroad under Rule 4(f) need only be reasonably calculated to give notice, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); delivery to NITC's head office and to the Defendants' official addresses, evidenced by signed receipt, was.

The Clerk entered NITC's default on 3 May 2020 (ECF No. 7), reciting service on 17 February 2020, and entered the defaults of Rabiei and Boroujerdi on 22 July 2020 (ECF No. 11). Plaintiffs note, in candor, that the earlier Motion described service on NITC by reference to § 1608; because NITC is not a foreign state, the governing provision is Rule 4(f), under which Plaintiffs in fact proceeded and on which the Clerk entered NITC's default. Each Defendant has been in default for more than six years and has had notice of this proceeding, of the Motion and of the Court's Order of September 2, 2026 throughout.

## V. IN THE ALTERNATIVE, IF NITC IS AN INSTRUMENTALITY, § 1605(a)(2) AND § 1330(b) APPLY.

Plaintiffs' position is that NITC is not a foreign state. Should the Court conclude otherwise, the FSIA would supply the sole basis of jurisdiction, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–39 (1989), and the commercial-activity exception would apply. Plaintiffs set out that alternative concisely, anchored to the claims the Complaint pleads.

**A. The pleaded torts are based upon NITC's commercial activity as an employer.**

The commercial character of an activity turns on "the nature of the course of conduct . . . rather than . . . its purpose," 28 U.S.C. § 1603(d), and the question is whether the state has exercised "powers that can also be exercised by private citizens." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993). Employing staff who exercise no sovereign power is commercial activity, *El-Hadad v. United Arab Emirates*, 496 F.3d 658, 662–67 (D.C. Cir. 2007) (embassy accountant); H.R. Rep. No. 94-1487, at 16 (1976) ("employment or engagement of laborers, clerical staff or public relations or marketing agents" is commercial), and a merchant crew exercises none. NITC employed the Sanchi's crew under a collectively bargained agreement, drawn up on the basis of the Maritime Labour Convention, that fixes wages, repatriation, insurance and death benefits and lists the Sanchi among the vessels it covers. (Ex. S-1, Annex 3, item 35; Ex. S-1A.) An action is "based upon" commercial activity where that activity supplies "those elements of a claim that, if proven, would entitle a plaintiff to relief." *Nelson*, 507 U.S. at 357. The Nelsons failed that test because they sued for torture by the Saudi police — an exercise of sovereign power — and their employment "entitle[d] the Nelsons to nothing under their theory of the case." *Id.* at 358.

The torts pleaded against NITC are the opposite case. Plaintiffs do not sue NITC for the IRGC's detention of the crew. They sue NITC for what NITC did as employer: failing to search for its crew, declaring them dead, conditioning the benefits it owed under the collective agreement

on releases, withholding salary and insurance from families who refused, and maintaining the falsehood for eight years. (FAC ¶¶ 27, 35, 37, 40, 45, 69.) Each of those is an act a private shipowner can commit and, in this record, did commit in the ordinary administration of a seafarers' employment relationship. (Abdollahi Decl. ¶¶ 11–12; Abdollahi Supp. Decl. ¶¶ 5–8.) Strip the employment relationship from the Nelsons' case and their torture claim survives unchanged; strip it from this one and NITC has no relationship to these Plaintiffs at all. That is the distinction *Nelson* drew, and it runs the other way here. *See also OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33–35 (2015). And Article 30.1 of the agreement, which designates the courts of Iran, is a forum-selection clause, not a jurisdictional bar, *Atlantic Marine Construction Co. v. United States District Court*, 571 U.S. 49, 55–61 (2013); it is waivable, NITC has not appeared to invoke it, and the designated forum is closed by the state's own decree. (Ex. I to Roberts Decl.)

**B. Direct effect in the United States.**

The third clause of § 1605(a)(2) withdraws immunity where the action is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." An effect is "direct" if it follows "as an immediate consequence of the defendant's . . . activity"; it need not be substantial or foreseeable. *Weltover*, 504 U.S. at 618. Plaintiffs acknowledge the limit this Circuit has placed on that standard where the effect is financial. The denomination of an obligation in United States dollars, or the possibility that it might have been paid from a United States account, does not by itself suffice; there must be a place of performance in the United States where the money was "supposed" to have been paid. *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146–47 (D.C. Cir. 1994). A "longstanding consistent customary practice" of payment through United States accounts may also suffice. *Id.* at 1147 (Wald, J., concurring).

NITC's obligations to these seafarers were denominated in United States dollars. Article 10.5 provides that part of a permanently employed seafarer's wage is paid in rials against a guaranteed dollar floor and that "[t]he other portion of the wage is paid in United States dollar currency"; Annex 4, the wage schedule, is expressed entirely in United States dollars, as are the death, disability and personal-effects benefits fixed by Annexes 1 and 2.

The record now shows more than denomination. It shows performance in dollars and the channel through which NITC performed. First, thirteen payment confirmations issued by the International Affairs division of the National Iranian Oil Company to NITC's Financial Director, spanning December 2014 to November 2019, record NITC's dollar treasury in operation: a single dollar account in the name of NITC's Malta-registered subsidiary, ALP Shipping Enterprise Limited, managed from NITC's Sharjah office, into which NITC's charter revenue was paid (two credits of US$127,975.50 and US$312,009.00 for demurrage) and from which NITC's operating obligations were discharged (eleven telegraphic transfers to its classification society, invoiced in dirhams and paid in dollars, totalling US$166,611.77). (Exs. J & K to Roberts Supp. Decl.; Roberts Supp. Decl. ¶¶ 6–12.) The practice is continuous before, during and after the casualty. Second, Plaintiffs' declarant, who for years was responsible at NITC for issuing invoices and monitoring the receipt of payments, testifies from his own review of the payment advices that NITC's dollar payments were routed through correspondent banks in New York, and identifies them. (Roberts Supp. Decl. ¶¶ 13–15; *see also* Roberts Decl. ¶ 6.)

That is the showing *Goodman Holdings* found absent. The obligations to these seafarers were not merely denominated in dollars; they sat inside a dollar treasury whose settlements ran through New York as a matter of course, which supports the inference that New York was where NITC's dollar obligations, these among them, were in the ordinary course "supposed" to be paid.

The crew obligations were not held apart from that treasury: the agreement denominates them in dollars, and the ALP account was the account through which NITC paid its dollar obligations in these years. (Roberts Supp. Decl. ¶¶ 7–8.) 26 F.3d at 1146–47; *id.* at 1147 (Wald, J., concurring). On the prima facie showing that suffices at this stage, *Mwani*, 417 F.3d at 7, the repudiation of those obligations produced a direct effect in the United States: the dollars that were supposed to move through New York to these seafarers did not move. *See Weltover*, 504 U.S. at 618–19; *Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada*, 600 F.3d 661, 664–66 (D.C. Cir. 2010).

The payment messages themselves are held by the New York banks, not by Plaintiffs; Plaintiffs have identified each transaction by date, amount, reference and beneficiary, and the inference that follows from a six-year practice of dollar settlement, from the declarant's first-hand testimony on routing, and from the absence of any contrary showing by a Defendant who has chosen not to appear, is the inference *Mwani* permits at this stage. 417 F.3d at 7.

**C. Personal jurisdiction under § 1330(b) and the Fifth Amendment.**

If NITC is an instrumentality, personal jurisdiction exists under 28 U.S.C. § 1330(b) upon subject-matter jurisdiction and service, and the Fifth Amendment inquiry is the one set out in Part IV.B: § 1330(b) is a federal statute authorizing jurisdiction within Rule 4(k)(1)(C), which brings NITC within the holding of *Fuld*, and the contacts, relatedness, foreign-policy and reasonableness showings are the same. *GSS Group Ltd. v. National Port Authority*, 680 F.3d 805, 814–17 (D.C. Cir. 2012), holds that an instrumentality entitled to the presumption of separate juridical status may invoke the Fifth Amendment; it does not alter the standard that *Fuld* has since articulated. Service on an instrumentality is governed by § 1608(b), which, unlike § 1608(a), is satisfied by

substantial compliance coupled with actual notice, *Magness v. Russian Federation*, 247 F.3d 609, 615–17 (5th Cir. 2001); see *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153–54 (D.C. Cir. 1994) (contrasting the strict compliance § 1608(a) demands with the flexibility of § 1608(b)); the February 2020 delivery to NITC's head office in Tehran, reflected in the return of service (ECF No. 4; Ex. HS-1), is a method "reasonably calculated to give actual notice" within § 1608(b)(3), and NITC has had actual notice of this action for more than six years. (Herischi Supp. Decl. ¶¶ 2–6.)

## VI. DEFENDANTS RABIEI AND BOROUJERDI.

### A. Jurisdiction and the aim of the conduct.

The FSIA does not govern the immunity of foreign officials sued in their personal capacity. *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010). The United States has filed no suggestion of immunity, and neither Defendant has appeared to claim one. Conduct-based immunity does not in any event extend to acts violating jus cogens norms. *See Yousuf v. Samantar*, 699 F.3d 763, 775–77 (4th Cir. 2012).

Immunity aside, personal jurisdiction over each individual must be established on his own contacts. Plaintiffs rely on Rule 4(k)(2); each Defendant was served in Tehran in February 2020 by the means described in Part IV.C, and the Clerk entered their defaults on 22 July 2020 (ECF No. 11). Rule 4(k)(2) applies where the claim arises under federal law, the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and jurisdiction is consistent with the Constitution. *Mwani v. bin Laden*, 417 F.3d 1, 10–11 (D.C. Cir. 2005). Plaintiffs' ATS and TVPA claims satisfy the first element. As to the second, this Circuit places the burden on the defendant: "[a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in

which the suit could proceed." *Id.* at 11 (quoting ISI International, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001)). Neither Defendant has appeared or named one, and counsel so certifies. The inquiry runs to the United States as a whole; the District of Columbia long-arm statute and its government-contacts doctrine are not implicated.

As to the third element, Plaintiffs recognize that the analysis turns on each Defendant's own conduct and its connection to this country, not on where Plaintiffs were injured. *Walden v. Fiore*, 571 U.S. 277, 284–91 (2014).

This Circuit requires more than foreseeable effects in the United States. The particular conduct at issue must be linked to activity aimed at this country; a general pattern of conduct hostile to United States interests is not enough if the conduct sued upon is not connected to it. *Livnat*, 851 F.3d at 56–58. *Mwani* met that standard because the bombing was aimed at the United States embassy and formed part of "an ongoing conspiracy to attack the United States." 417 F.3d at 13.

**Rabiei.** Ali Rabiei served as Minister of Cooperatives, Labour and Social Welfare from 15 August 2013 until 8 August 2018, and so held that office throughout the casualty and its aftermath. He had previously served as the Minister of Intelligence's representative and as head of the executive committee of the Supreme National Security Council. (Herischi Supp. Decl. ¶¶ 14–15.) As the minister responsible for the workforce, he directed the government's response to the loss of a merchant crew, and wrote to President Rouhani declaring every crewman dead and a martyr — the act that ended the multinational search then underway, in which United States forces were participating. (Abdollahi Decl. ¶ 10; FAC ¶ 35; Exs. 15 & 15A to the Motion.) The link *Livnat* requires is supplied by the object of that conduct. On the declarant's sworn account, the

concealment was undertaken specifically to prevent disclosure to the United States of a cargo shipment structured to evade a United States sanctions regime, at a time when Iran was protecting an agreement negotiated with the United States (Roberts Decl. ¶ 34) — on the sworn account described in Part IV.B, a nuclear-related transfer to North Korea concealed specifically so that the JCPOA, Iran's agreement with the United States, would survive. Conduct undertaken to terminate a rescue operation in which United States forces were engaged, and to keep from the United States the facts bearing on its own sanctions regime, is not the "random, fortuitous, or attenuated" contact *Walden* excludes.

**Boroujerdi.** Alaeddin Boroujerdi chaired the National Security and Foreign Policy Committee of the Islamic Consultative Assembly from 2004 until 2018, and so chaired it when the decision recorded in Exhibit I was taken. (Herischi Supp. Decl. ¶¶ 16–17.) That committee exercises parliamentary oversight of the Supreme National Security Council, to whose Secretary Exhibit I is addressed, and of the conduct of foreign relations, including relations with the People's Republic of China. Exhibit I records that the survivors reached the Ministry of Intelligence "by the Kingdom of Oman . . . after being detained by China." The survivors were thus transferred, state to state, from Chinese custody through Oman into secret detention in Iran, rather than repatriated openly, returned to the flag State, or reported to the rescue coordination centre that was still directing a search for them in which United States forces were participating. Plaintiffs' declarant states, on the account of his sources within NITC and NIOC, that Boroujerdi conducted the communications with the Chinese side by which that transfer was arranged. (Roberts Supp. Decl. ¶ 17.) In December 2019, after this action was filed, Boroujerdi publicly rejected the families' claims and affirmed that every crewman had died — eighteen months after the Ministry of Intelligence had recorded the last of them alive in IRGC custody. (Herischi Supp. Decl. ¶ 18.)

Plaintiffs state candidly that this showing is thinner than the showing as to Rabiei, and why. Rabiei's act — the death declaration that ended the search — had United States recipients; Boroujerdi's communications were with China. The link *Livnat* requires is supplied, as to him, by the object of the arrangement he made: to remove the surviving witnesses from a multinational rescue in which United States forces were engaged, for the purpose the declarant's sources describe — protecting Iran's agreement with the United States from disclosure of a nuclear-related transfer to North Korea. (Roberts Decl. ¶ 34.) His public affirmation of the death narrative in answer to this proceeding is continuing participation in the same concealment, directed at a United States court. If the Court concludes that this does not satisfy *Livnat*, Plaintiffs ask that the claims against Boroujerdi be dismissed without prejudice rather than that the deficiency be held against the motion as a whole.

**B. The real parties in interest: Rule 17(a)(3).**

The Fourth, Fifth and Sixth Claims — torture, cruel treatment and prolonged arbitrary detention — are, in the first instance, the crew's own claims, and the TVPA makes a torturer liable "to that individual." TVPA § 2(a)(1). The crew cannot bring them: they are held incommunicado. Plaintiff Roumiani sues expressly "on behalf of" his relative (FAC ¶ 15); the other Plaintiffs sue as parents and spouses. Rule 17(a)(3) provides that an action may not be dismissed for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for ratification, joinder or substitution, and that the action then proceeds as if originally brought by the real party. Plaintiffs ask leave in this brief to proceed under that Rule, on those claims, as next friends of their detained relatives. The showing "next friend" standing requires — that the real party cannot appear, and that the next friend is dedicated to his interests and has a significant relationship with him, *Whitmore v. Arkansas*, 495 U.S. 149, 163–64 (1990)

— is made on this record by the custody letters and by the relationships the Complaint pleads. (Exs. H, I; FAC ¶¶ 7–16.) A Rule 17(a)(3) ratification adds no claim for relief and requires no service under Rule 5(a)(2); the claims, the Defendants and the relief are those the Complaint has pleaded since 2019. The families' claims in their own right — the Ninth and Tenth Claims, and the ATS claim for the injury the disappearance was designed to inflict on them — are unaffected.

**C. The TVPA claims.**

**1. Elements.** The TVPA imposes liability on an individual who, under actual or apparent authority or color of law of a foreign nation, subjects an individual to torture, or to extrajudicial killing. TVPA § 2(a). "Torture" includes any act by which severe mental pain or suffering is intentionally inflicted on a person in the offender's custody or control for purposes including intimidation or coercion, and "mental pain or suffering" includes prolonged mental harm caused by the threat of imminent death or by the threat that another person will imminently be subjected to death or severe pain. § 3(b). A claimant must first exhaust "adequate and available remedies in the place in which the conduct occurred." § 2(b). The limitations period is ten years. § 2(c).

**2. The crew.** Twenty-one named crewmembers have been held, for more than eight years, in isolation at a secret location, under a protocol of "isolation-detention-security," cut off from every contact, on the orders of the state's security apparatus, while the state tells the world they are dead. (Exs. H, I; Roberts Decl. ¶¶ 35–37.) Prolonged incommunicado detention of that character, with its inherent and continuing threat, is the intentional infliction of severe mental suffering on persons in the offender's custody for the purpose of intimidation and concealment. It is torture within § 3(b). *See Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1345–47 (N.D. Ga. 2002); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1316–19 (N.D. Cal. 2004). The crew cannot sue for themselves; they

are held incommunicado. Plaintiffs, their parents and spouses, sue on their behalf as next friends, having shown the detainees' inability to appear and their own dedication to the detainees' interests. *Whitmore v. Arkansas*, 495 U.S. 149, 163–64 (1990); FAC ¶¶ 6–17.

**3. Color of law and personal participation.** Rabiei acted as a minister of the Islamic Republic; Boroujerdi as chairman of a standing committee of its legislature exercising oversight of the security council that ordered the detention. Each acted under actual authority of a foreign nation. The TVPA reaches those who order, direct or knowingly participate in the conduct, not only those whose hands perform it. *See Chavez v. Carranza*, 559 F.3d 486, 498–99 (6th Cir. 2009) (command responsibility and participation). Rabiei's declaration of death was the act that ended the search and enabled the transfer into custody; the well-pleaded allegations and the sworn record establish that he and Boroujerdi controlled the investigation, blocked inquiry, and maintained the concealment. (FAC ¶¶ 35, 66, 69; Roberts Supp. Decl. ¶ 19; Herischi Supp. Decl. ¶ 18.)

**4. Exhaustion.** The requirement to exhaust local remedies is satisfied where none is adequate or available. The state's own directive provides that no institution of Iran "will have the right to pursue this matter." (Ex. I.) Families who inquired were threatened. (FAC ¶ 68.) The prosecutor's office that asked the telephone company for the call records was refused. (FAC ¶ 65.) Iranian courts issued death certificates on the state's say-so. Remedies that the state has by decree placed beyond the reach of every one of its institutions are not available, and the burden of showing otherwise rests on the defendant. *See* S. Rep. No. 102-249, at 9–10 (1991); *Jean v. Dorélien*, 431 F.3d 776, 781–82 (11th Cir. 2005). None has appeared to carry it.

**D. The ATS claims and the high seas.**

Prolonged arbitrary detention and the causing of disappearance are violations of norms of the law of nations that are specific, universal and obligatory, and are actionable under the ATS. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732–38 (2004); *Forti v. Suarez-Mason*, 694 F. Supp. 707, 710–11 (N.D. Cal. 1988); *Xuncax v. Gramajo*, 886 F. Supp. 162, 184–85 (D. Mass. 1995). Plaintiffs recognize that the ATS does not apply extraterritorially and that its claims must "touch and concern the territory of the United States . . . with sufficient force to displace the presumption." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124–25 (2013); *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 632–34 (2021). Two features of this case bear on that question. The conduct that began the disappearance — the termination of the search and the diversion of the survivors — occurred on the high seas, 160 nautical miles from any coast, where no other sovereign's territorial jurisdiction is implicated; *Kiobel* itself explained that the presumption exists to avoid "unwarranted judicial interference in the conduct of foreign policy" by projecting United States law into the territory of another sovereign, and that the paradigm ATS tort, piracy, was actionable because pirates operated on the high seas, outside the territorial jurisdiction of any sovereign, so that applying United States law to them did not impose this country's will on conduct within another state's territory. 569 U.S. at 116–17, 121–22. And the conduct was directed at the United States — at ending a rescue in which United States forces took part, and at protecting an agreement with the United States from disclosure. (Exs. 15 & 15A to the Motion; Roberts Decl. ¶ 34.) Plaintiffs submit that this suffices. They acknowledge, however, that the TVPA claims, which Congress made expressly extraterritorial, are the surer ground, and ask the Court to enter judgment on those claims first and to reach the ATS claims only if necessary to afford complete relief.

## VII. NO OTHER FORUM EXISTS: JURISDICTION BY NECESSITY, PRESERVED IN THE ALTERNATIVE.

Plaintiffs do not ask the Court to adopt a new basis of jurisdiction as the ground of decision. The grounds set out above are sufficient. Plaintiffs set out the following for two purposes: to establish on the record the fact that drives the reasonableness inquiry under *Fuld* — that there is no other forum — and to preserve, on a complete record, a question the Supreme Court has twice reserved.

**1. The question is open, and what was missing before is present here.** In *Shaffer v. Heitner*, the Court reserved "the question whether the presence of a defendant's property in a State is a sufficient basis for jurisdiction when no other forum is available to the plaintiff." 433 U.S. 186, 211 n.37 (1977). In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, the plaintiffs asked the Court to recognize "jurisdiction by necessity." The Court declined — not because the doctrine is foreclosed, but because the plaintiffs "failed to carry their burden of showing that all three defendants could not be sued together in a single forum," and the Court would not consider "a potentially far-reaching modification of existing law . . . in the absence of a more complete record." 466 U.S. 408, 419 n.13 (1984). Several legal systems recognize a forum of necessity where no other court is available. Plaintiffs note candidly that the European Court of Human Rights has held that international law does not *require* states to provide one; it nonetheless recognized "a broad consensus within the international community on the existence of a right for victims of acts of torture to obtain appropriate and effective redress," and invited states to consider extending the jurisdiction of their courts to such claims. *Naït-Liman v. Switzerland*, App. No. 51357/07 (ECtHR Grand Chamber, 15 March 2018). The Swiss courts there declined jurisdiction because the facts, the perpetrators and the victim were all connected to Tunisia alone. Here, by contrast, the claims are tied to the United States by dollar-denominated obligations, by a rescue operation United States forces were conducting, and by a United States sanctions regime.

**2. The record establishes that no forum is available.** Plaintiffs supply the record *Helicopteros* found lacking.

*(a) The contractual forum is closed by decree.* Article 30.1 of the collective bargaining agreement designates “the competent authorities of the Islamic Republic of Iran.” Exhibit I is the Iranian state's own directive that, following the transfer of these crewmembers into IRGC custody, “no other ministry, organization, or institution will have the right to pursue this matter.” The defendant's government has ordered the designated forum shut as to this subject.

*(b) Those who sought a remedy were threatened.* Families who inquired were warned that if they wanted to see their sons they should stay quiet. (Exs. 11C–11D; Ex. 5.) The same facts establish that exhaustion under the TVPA would be futile and dangerous. *See Jean v. Dorelien*, 431 F.3d 776, 781–83 (11th Cir. 2005).

*(c) The international mechanism has produced nothing.* The agreement was drawn up on the basis of the Maritime Labour Convention, 2006 (CBA Art. 30.1), which the Islamic Republic of Iran ratified on 11 June 2014 and which entered into force for Iran on 11 June 2015. Under that Convention as amended, a seafarer is “abandoned” where the shipowner “fails to cover the cost of the seafarer's repatriation,” or “has otherwise unilaterally severed their ties with the seafarer including failure to pay contractual wages for a period of at least two months.” MLC 2006, Standard A2.5.2, para. 2. These seafarers meet that definition on both counts, and have for more than eight years. No repatriation has followed and no wages have been paid.

*(d) No other state's courts could hear these claims together.* The Sanchi flew the flag of Panama and was registered to a Hong Kong company that is not a defendant; the collision occurred off the coast of the People's Republic of China; the other vessel flew the flag of Hong Kong. None of those facts gives the courts of Panama, China or Hong Kong jurisdiction over the claims actually pleaded: an Iranian employer's failure to repatriate and pay its Iranian crew, and the acts of two Iranian officials, in Iran, in concealing that crew. Even if some court in one of those places could entertain a fragment of the case against NITC, none could reach Rabiei and Boroujerdi for their conduct in Iran, and none could offer these families a proceeding in which the whole of what was done to them is adjudicated. Plaintiffs have not burdened the record with declarations of foreign-law counsel on the point, and will supply them if the Court considers them necessary.

No Defendant has appeared to identify an alternative forum. Under this Circuit's approach to Rule 4(k)(2), that silence is itself significant. *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005).

**3. The consequence.** At a minimum, the absence of any alternative forum is entitled to decisive weight in the reasonableness inquiry *Fuld* describes, as the measure of "the plaintiff's interest in obtaining relief." In the alternative, and to preserve the question, Plaintiffs submit that where the record affirmatively establishes that no court anywhere can hear a claim, and the defendant's own government has decreed that no institution may pursue it, the Fifth Amendment permits a federal court exercising jurisdiction Congress has authorized to hear it. That is the question *Shaffer* and *Helicopteros* reserved, presented on the record *Helicopteros* said was needed.

## VIII. THE EVIDENCE.

Because NITC is not a foreign state, the requirement of 28 U.S.C. § 1608(e) that a claimant establish its claim "by evidence satisfactory to the court" does not apply to it, and the ordinary rule that a defaulting defendant admits the well-pleaded allegations governs. *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001). The Court must nonetheless satisfy itself that the allegations state a claim, *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011), and must find jurisdiction on evidence. Plaintiffs have supported every material allegation with sworn evidence, so that the judgment rests on a record and not on the default alone; and should the Court apply § 1608(e) in the alternative, that standard is met for the reasons that follow.

Section 1608(e) permits default judgment against a foreign state only where "the claimant establishes his claim or right to relief by evidence satisfactory to the court." The D.C. Circuit has explained what that requires. In *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), the court held that § 1608(e) imposes no heightened burden: "the quantum and quality of evidence that might satisfy a court can be less than that normally required." Id. at 785 (quoting Alameda v. Secretary of Health, Education & Welfare, 622 F.2d 1044, 1048 (1st Cir. 1980)). District courts may accept evidence "that might not be admissible in a trial," and expert testimony is not to be excluded "merely because the factual bases for an expert's opinion are weak" — because in cases of this kind "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.* at 785. Reversal follows only where a court relies on evidence "both clearly inadmissible and essential to the outcome." *Id.* at 786. The standard remains evidence "satisfactory to the court"; Owens relaxes the form of the proof, not the requirement that it be reliable.

More directly, in *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014), the D.C. Circuit *reversed* a district court's denial of default judgment in a disappearance

case, holding that where "a plaintiff has produced compelling, admissible evidence that the regime abducted the victim and that it routinely tortures and kills the people it abducts, the courts can assume that the defendant probably tortured and killed the victim." *Id.* at 1047–50. A regime that "has made all but certain that th[e] evidence does not exist" cannot thereby defeat the claim. *Id.* That is the posture here, with the difference that Plaintiffs possess the abducting state's own internal records identifying the detainees by name.

**Authentication of Exhibits H and I.**

Exhibits H and I to the Roberts Declaration are the documents on which Plaintiffs' central factual contention depends, and the Motion described them as "authenticated" without establishing how. The Supplemental Declaration of Jack Roberts supplies that foundation. It establishes the identity and access of the document source, as a person with direct firsthand access to Ministry of Intelligence records; the date and secure channel of transmission; Roberts's personal examination of the documents against his professional knowledge of Iranian governmental correspondence formats, classification markings, ministerial seal formats and internal reference-numbering conventions; unbroken custody from receipt through transmission to counsel; the absence of alteration; and certified English translations prepared by ImmiTranslate, LLC under Translation Order No. 553137-730345, dated 23 August 2024, verified against the Farsi originals. (Roberts Supp. Decl. ¶¶ 5–18.) That showing satisfies Federal Rule of Evidence 901(b)(4).

The documents are specific in ways that bear on their reliability. Exhibit I (Agreement No. VAJA/96/1/2793, dated 27 January 2018) directs that thirteen named Sanchi crewmembers be held under maximum-security IRGC conditions on an isolated Persian Gulf island pursuant to detention protocol SAS 11/979, and provides that after transfer "no other ministry, organization, or

institution will have the right to pursue this matter." Exhibit H (Agreement No. VAJA/96/1/2881, dated 3 June 2018) records the transfer of eight named members of the final group to the IRGC Intelligence Organization representative, Code 1703, on 3 March 2018. Both bear the signature of the Minister of Intelligence and a Top Secret classification, and cross-reference one another by agreement number — sequential recordkeeping characteristics that support an inference of authenticity. (Roberts Supp. Decl. ¶¶ 10, 17.)

## IX. DAMAGES.

Plaintiffs do not ask the Court to measure their injury by a wage schedule. The crewmembers have now been held incommunicado for more than eight years. Their families have spent those years not knowing whether their sons and husbands are alive — having been told they were dead, handed death certificates that were later revoked, offered money in exchange for releases, and warned to stop asking. That injury, to the crewmembers, whom Plaintiffs represent as next friends, and to Plaintiffs in their own right, is compensable against the individual Defendants under the TVPA and the ATS and against NITC under general maritime law. It has not ended. It continues for as long as the detention continues.

Rule 55(b)(2) leaves to the Court whether a hearing is needed to determine the amount of damages, and none is needed here: the facts are documentary and sworn, and no Defendant will appear to contest them. Plaintiffs respectfully request that the Court determine damages on written submissions, and propose to file a damages brief with supporting declarations within thirty days of the Court's ruling on liability, or on such schedule as the Court directs.

The collective bargaining agreement bears on damages only as evidence. Plaintiffs plead no contract claim and rely on the agreement for the jurisdictional purposes set out in Parts IV and

V; but what NITC itself undertook to pay a crew whose ship was lost — basic wages from disembarkation until repatriation, the costs of repatriation, and compensation for lost personal effects (CBA Arts. 13.1, 16.2), in United States dollars — is evidence the Court may consider in assessing the maritime-law damages against NITC. It is not a measure of the injury these families have suffered, and Plaintiffs do not offer it as one.

## X. CANDOR TO THE COURT.

Undersigned counsel appreciates that the Court's Order afforded Plaintiffs the opportunity to supply authority rather than simply striking the assertion, and has treated it as an obligation to answer the question directly rather than to defend an untenable position. In a posture where no Defendant is present to test Plaintiffs' submissions, that obligation carries particular weight. Counsel has undertaken a further review of the Motion and the Complaint and has corrected in this brief the statements concerning the FSIA, § 1608 and the automatic character of personal jurisdiction, has identified the two errant sentences in the Tenth and Eleventh Claims, has acknowledged the limits *Jesner*, *Mohamad*, *Kiobel* and *Goodman Holdings* place on the case, and will promptly file a notice of errata as to any additional matter requiring correction.

## XI. THE RELIEF THE FAMILIES ASK.

The Complaint asks for damages, for declaratory relief "determining that the actions of the Defendants constituted violations of international law," and "[f]or affirmative action by the Defendants to secure the release of the detainees if possible." (FAC ¶¶ 135–138.) Plaintiffs ask for each, and they explain why the second and third matter as much as the first.

### A. A declaration that these men survived and are held.

Under 28 U.S.C. § 2201 and the Complaint's prayer, Plaintiffs ask the Court to declare, on the record before it, that the crewmembers named in Exhibits H and I survived the casualty of 6 January 2018, were taken into the custody of the Islamic Republic of Iran, and have been held incommunicado since 2018 in violation of the law of nations; and that each Defendant participated in concealing that fact. A declaratory judgment is relief the Court may grant on default where the well-pleaded facts and the record support it, and nothing in the FSIA, which does not apply, or in the TVPA or ATS, limits it.

Plaintiffs are candid that this Court cannot open the doors of an IRGC detention facility. But a finding by a United States court, made on Iran's own documents after the Defendants were given every opportunity to contest them and chose not to, is not nothing. For eight years the families have lived under an official fiction, enforced by death certificates, by money offered for silence, and by threats. A judicial finding that the fiction is false is the first relief they have asked for and the one they most need. It is what they will carry to every other door.

**B. An order directed to the Defendants.**

Equitable relief against the Defendants personally is within the Complaint's prayer (FAC ¶ 138) and within the Court's power over parties before it. Plaintiffs ask for an order directing each Defendant, within sixty days: (i) to disclose to Plaintiffs, through counsel, the location, condition and legal status of each crewmember named in Exhibits H and I; (ii) to permit each such crewmember to communicate with his family; (iii) as to NITC, to perform its obligation under Article 16 of its collective agreement to repatriate its crew; and (iv) as to each Defendant, to take every step within his or its authority to secure the crewmembers' release and return. An order of that kind binds the Defendants, not the Islamic Republic; it asks of them only what their own

positions make possible. Plaintiffs recognize that compliance cannot be compelled abroad. They ask for the order because the duty it states is real, because its violation will be a matter of record, and because the Defendants should not be permitted to let this case end without ever having been told, by a court, what they are required to do.

### C. Findings that can be carried to those who can act.

The institutions that can act on an enforced disappearance exist, and they act on findings. The United Nations Working Group on Enforced or Involuntary Disappearances and the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran receive cases from families and transmit them to the state for response; the Executive Branch of the United States has designated persons for serious human-rights abuses against persons in Iran under Executive Order 13553 and, on this record, has an interest of its own. None of them has had before it what this Court has: the Ministry's letters, authenticated and translated, tested against a default. Plaintiffs therefore ask that the Court's findings of fact be set out in its order with the particularity of the record — the names, the dates, the custodial authority — and that the Court authorize the Clerk to furnish certified copies of the order and findings to Plaintiffs for transmission to the Special Rapporteur, to the Working Group, and to the Department of State. Plaintiffs will make those transmissions themselves; they ask the Court for findings specific enough to be acted upon.

Plaintiffs filed this action in 2019 to find and to free the men, and to hold accountable those who hid them. (FAC ¶ 2.) Seven years on, the second object is before the Court on a complete record. The first depends on others, but it depends first on a finding of fact that only a court can make. Plaintiffs ask the Court to make it.

## CONCLUSION

Plaintiffs are aware of no authority supporting invocation of 28 U.S.C. § 1605(a)(5) and withdraw their reliance on it, and on the FSIA. Plaintiffs ask the Court to proceed in this order: first, to find that NITC is not a foreign state and that jurisdiction over the claims pleaded against it rests on 28 U.S.C. §§ 1333 and 1367 and Rule 4(k)(2); and only if the Court concludes that NITC is an instrumentality, to find jurisdiction under §§ 1605(a)(2) and 1330(b). Plaintiffs sue NITC for its own conduct as the operator of the Sanchi and the employer of her crew, not for the detention carried out by the Islamic Republic. As to the individual Defendants, the showing against Rabiei is the stronger; should the Court find personal jurisdiction over Boroujerdi lacking, Plaintiffs ask that the claims against him be dismissed without prejudice and that the ruling not delay judgment against NITC and Rabiei. Plaintiffs respectfully request that the Court grant the relief requested in Parts III.A and VI.B under 28 U.S.C. § 1653 and Rule 17(a)(3), accept this brief and the accompanying declarations and exhibits, consider the Motion for Default Judgment on the record as supplemented, enter judgment on liability against NITC on the Ninth, Tenth and Eleventh Claims and against Rabiei and Boroujerdi on the Fourth, Fifth and Sixth Claims, enter the declaratory judgment and the order described in Part XI, and set a schedule for Plaintiffs' written submission on damages under Rule 55(b)(2).

Respectfully submitted,

Dated: September 30, 2026

/s/ Ali Herischi
Ali Herischi, Esq.
HERISCHI & ASSOCIATES LLC
11300 Rockville Pike, Suite 712
North Bethesda, Maryland 20852
Tel: (301) 363-4540 | Fax: (301) 363-4538
ali.herischi@ibhlaw.com
Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

/s/ Ali Herischi
Ali Herischi, Esq.