UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Abdollahi, et al. v. National Iranian Tanker Co., et al.
Civil Action No. 1:19-cv-03688-ABJ

# EXHIBIT HS-3

**to the Supplemental Declaration of Ali Herischi, Esq.**

Public records of the ownership of National Iranian Tanker Company

1. Council Implementing Regulation (EU) 2015/230 and Council Decision (CFSP) 2015/236 of 12 February 2015, OJ L 39, 14.2.2015 (statement of reasons identifying NITC's shareholders)
2. Judgment of the General Court of 3 July 2014, Case T-565/12, National Iranian Tanker Company v Council, ECLI:EU:T:2014:608
3. Judgment of the Court of Justice of 29 November 2018, Case C-600/16 P, National Iranian Tanker Company v Council, ECLI:EU:C:2018:966

14.2.2015 EN Official Journal of the European Union L 39

# COUNCIL IMPLEMENTING REGULATION (EU) 2015/23

of 12 February 2015

implementing Regulation (EU) No 267/2012 concerning restrictive measures against Iran

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the

Having regard to Council Regulation (EU) No 267/2012 of 23 March 2012 concerning restrictive measures against Iran and repealing Regulation (EU) No 961/2010 [1], and in particular Article 46(2) thereof,

Whereas:

(1) On 23 March 2012, the Council adopted Regulation (EU) No 267/2012.

(2) By its judgment of 12 December 2013 in Case T-58/12, the General Court of the European Union annulled the Council's decision to include Good Luck Shipping, Ghasem Nabipour, Mansour Esmail, Mohammad Taghi, Mohammad Fadai, Ghezel Ayagh Zadeh, Mohammad Parham Ahmad Sarkandi, Seyed Reza Hasani and Ahmad Tafazoli in the list of persons and entities subject to restrictive measures set out in Annex IX to Regulation (EU) No 267/2012.

(3) Good Luck Shipping has been included in the list of persons and entities subject to restrictive measures, on the basis of a

(4) By its judgment of 3 July 2014 in Case T-565/12, the General Court of the European Union annulled the Council's decision to include National Iranian Tanker Company in the list of persons and entities subject to restrictive measures set out in Annex IX to Regulation (EU) No 267/2012.

(5) National Iranian Tanker Company has been included in the list of persons and entities subject to restrictive measures, on the

(6) Regulation (EU) No 267/2012 should therefore be am

HAS ADOPTED THIS REGULATION:

## Article 1

Annex IX to Regulation (EU) No 267/2012 is amended as set out in the Annex to thi

## Article 2

This Regulation shall enter into force on the date of its publication in the Official Journal of the European Union.

This Regulation shall be binding in its entirety and directly applicable in all Member States.

Done at Brussels, 12 February 2015.

For the Council

The President

E. RINKĒVIČS

(1) OJ L 88, 24.3.2012, p. 1.

ANNEX

I. The entity listed below is added to Annex IX to Re
No 267/2012:

I. Persons and entities involved in nuclear or ballistic missiles activities and persons and
entities providing support to the Government of

B. Entities

| | Name | Identifying information | Reasons | Date of listing |
|---|---|---|---|---|
| 140. | National Iranian Tanker Company (NITC) | 35 East Shahid Atefi Street, Africa Ave., 19177 Tehran, P.O. Box 19395-4833, Tel: +98 21 23801, Email: info@nitc-tankers.com, offices worldwide | The National Iranian Tanker Company provides financial support to the Government of Iran through its shareholders the Iranian State Retirement Fund, the Iranian Social Security Organization, and the Oil Industry Employees Retirement and Savings Fund, which are State-controlled entities. Moreover, NITC is one of the largest operators of crude oil carriers in the world and one of the main transporters of Iranian crude oil. Accordingly, NITC provides logistical support to the Government of Iran through the transport of Iranian oil. | |

II. The person listed below is added to Annex IX to R
(EU) No 267/2012:

III. Islamic Republic of Iran Shipping Lines

A. Person

| | Name | Identifying information | Reasons | Date of listing |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 8. | Gholam Hossein Golparvar | Born on 23 January 1957, Iranian. ID Card No 4207. | Mr Golparvar acts on behalf of IRISL and companies associated with it. He has been commercial director of IRISL, as well as Managing Director and shareholder of the SAPID Shipping Company, non-executive director and shareholder of HDSL, and shareholder of Rhabaran Omid Darya Ship Management Company, which are designated by the EU as acting on behalf of IRISL. | |

JUDGMENT OF THE GENERAL COURT (Seventh Chamber, Extended Composition)

3 July 2014 (*)

(Common foreign and security policy — Restrictive measures adopted against Iran with the aim of preventing nuclear proliferation — Freezing of funds — Obligation to state reasons — Error of assessment — Adjustment of the temporal effects of an annulment)

In Case T-565/12,

**National Iranian Tanker Company,** established in Tehran (Iran), represented by R. Chandrasekera, S. Ashley and C. Murphy, Solicitors, M. Lester, Barrister, and D. Wyatt QC,

applicant,

v

**Council of the European Union,** represented by S. Boelaert and M. Bishop, acting as Agents,

defendant,

APPLICATION for annulment of (i) Council Decision 2012/635/CFSP of 15 October 2012 amending Decision 2010/413/CFSP concerning restrictive measures against Iran (OJ 2012 L 282, p. 58), in that the applicant was listed in Annex II to Council Decision 2010/413/CFSP of 26 July 2010 concerning restrictive measures against Iran and repealing Common Position 2007/140/CFSP (OJ 2010 L 195, p. 39) and (ii) Council Implementing Regulation (EU) No 945/2012 of 15 October 2012 implementing Regulation (EU) No 267/2012 concerning restrictive measures against Iran (OJ 2012 L 282, p. 16), in so far as that regulation concerns the applicant,

THE GENERAL COURT (Seventh Chamber, Extended Composition)

composed of M. van der Woude (Rapporteur), President, I. Wiszniewska-Białecka, M. Kancheva, C. Wetter and I. Ulloa Rubio, Judges,

Registrar: N. Rosner, Administrator,

having regard to the written procedure and further to the hearing on 31 January 2014,

gives the following

## Judgment

### Background to the dispute

1 The applicant, National Iranian Tanker Company, is an Iranian company dedicated to the transport of cargoes of crude oil and gas. It operates one of the largest fleets in the world of double-hulled tankers.

2 The present case has been brought in connection with the restrictive measures introduced in order to apply pressure on the Islamic Republic of Iran to end proliferation-sensitive nuclear activities and the development of nuclear weapon delivery systems.

3 On 9 June 2010 the United Nations Security Council ('the Security Council') adopted Resolution 1929 (2010) ('Resolution 1929') which aimed to extend the scope of the restrictive measures imposed by Security Council Resolutions 1737 (2006), 1747 (2007) and 1803 (2008) and to introduce additional restrictive measures against the Islamic Republic of Iran.

4 On 17 June 2010 the European Council underlined its deepening concern about Iran's nuclear programme and welcomed the adoption of Resolution 1929. Recalling its declaration of 11 December 2009, the European Council invited the Council of the European Union to adopt measures implementing those contained in Resolution 1929 as well as accompanying measures, with a view to supporting, through negotiation, the resolution of all outstanding concerns regarding the development by the Islamic Republic of Iran of sensitive technologies in support of its nuclear and missile programmes. Those measures were to focus on the areas of trade, the financial sector, the Iranian transport sector and key sectors in the oil and gas industry, and on additional designations, in particular for the Islamic Revolutionary Guards Corps.

5 On 26 July 2010 the Council adopted Council Decision 2010/413/CFSP concerning restrictive measures against Iran and repealing Common Position 2007/140/CFSP (OJ

2010 L 195, p. 39), Annex II to which decision lists the persons and entities — other than those designated by the Security Council or by the Sanctions Committee created by Resolution 1737 (2006), mentioned in Annex I - whose assets are to be frozen. Recital 22 in the preamble of that decision refers to Resolution 1929 and states that that resolution notes the potential connection between the revenues derived by Iran from its energy sector and the funding of its proliferation-sensitive nuclear activities.

6 On 23 January 2012 the Council adopted Decision 2012/35/CFSP amending Decision 2010/413/CFSP (OJ 2012 L 19, p. 22). Recital 8 in the preamble of that decision notes the potential connection between Iran's revenues derived from its energy sector and the funding of Iran's proliferation-sensitive nuclear activities and the fact that chemical process equipment and materials required for the petrochemical industry have much in common with those required for certain sensitive nuclear fuel cycle activities, as underlined in Resolution 1929.

7 Article 1(7)(a)(ii) of Decision 2012/35 added the following point to Article 20(1) of Decision 2010/413, providing for the freezing of funds belonging to the following persons and entities:

'(c) other persons and entities not covered by Annex I that provide support to the Government of Iran, and persons and entities associated with them, as listed in Annex II'.

8 Consequently, under the FEU Treaty, on 23 March 2012 the Council adopted Regulation (EU) No 267/2012 concerning restrictive measures against Iran and repealing Regulation (EU) No 961/2010 (OJ 2012 L 88, p. 1). In order to implement Article 1(7)(a)(ii) of Decision 2012/35, Article 23(2) of that regulation provides for the freezing of funds of persons, entities and bodies listed in Annex IX thereto, identified as:

'(d) being other persons, entities or bodies that provide support, such as material, logistical or financial support, to the Government of Iran, and persons and entities associated with them'.

9 By letters of 10 August, 14 September and 10 October 2010 to the High Representative of the Union for Foreign Affairs and Security Policy, the applicant made known, inter alia, its concerns as to the effects on its fleet of the prohibition on the provision of insurance or re-insurance to the Government of Iran, laid down in Article 12 of Decision 2010/413.

In the abovementioned letter of 10 August 2010 the applicant stated that it had been privatised in 2000.

10 Further, in a letter of 19 January 2012 to the High Representative of the Union for Foreign Affairs and Security Policy, the applicant challenged the information reported in an article in the specialised journal of the shipping industry, *Lloyd's List*, disseminated on the internet the day before, headed 'NITC to be targeted by sanctions'. In that regard, the applicant denied any connection with the Iranian nuclear programme. The applicant claimed that its tankers were not used for the transport of materials which are prohibited in relation to that programme. Moreover, neither the applicant nor its Chairman nor its shareholders had any links with the Iranian Revolutionary Guard Corps.

11 On 15 October 2012 the Council adopted Decision 2012/635/CFSP amending Decision 2010/413 (OJ 2012 L 282, p. 58; 'the contested decision'). According to recital 16 in the preamble to that decision, additional persons and entities were to be included in the list of persons and entities subject to restrictive measures as set out in Annex II to Decision 2010/413, in particular Iranian State-owned entities engaged in the oil and gas sector, since they provide a substantial source of revenue for the Iranian Government.

12 Article 1(8)(a) of Decision 2012/635 amended Article 20(1)(c) of Decision 2010/413, which consequently provides that restrictive measures are to be imposed on:

'other persons and entities not covered by Annex I that provide support to the Government of Iran and entities owned or controlled by them or persons and entities associated with them, as listed in Annex II'.

13 Article 2 of Decision 2012/635 listed the applicant in the table in Annex II to Decision 2010/413 containing the list of 'Persons and entities involved in nuclear or ballistic missile activities and persons and entities providing support to the Government of Iran'.

14 Consequently, on the same day, the Council adopted Implementing Regulation (EU) No 945/2012 implementing Regulation No 267/2012 (OJ 2012 L 282, p. 16; 'the contested regulation'). Article 1 of that regulation listed the applicant in the table in Annex IX containing the list of 'Persons and entities involved in nuclear or ballistic missile activities and persons and entities providing support to the Government of Iran'.

15 The applicant was listed for the following reasons: 'Effectively controlled by the Iranian Government. Provides financial support to the Government of Iran through its

shareholders which maintain ties with the Government.'

16 The contested decision and regulation were notified to the applicant by letter of 16 October 2012, in which the Council drew the applicant's attention to the possibility of submitting observations and of requesting that the Council reconsider its position.

17 By letter of 13 December 2012 the applicant challenged its listing by means of the contested decision and regulation, and asked the Council to send to it more specific information on the reasons for that listing, and the evidence on which the listing was based.

18 The Council replied in a letter of 12 March 2013, to which copies of documents from its file were annexed. In that letter, the Council stated that there were no other documents or information concerning the applicant in the Council's possession.

**Procedure and forms of order sought by the parties**

19 By application lodged at the Registry of the General Court on 27 December 2012, the applicant brought this action.

20 Following a change in the composition of the Chambers of the Court, the Judge-Rapporteur was assigned to the Seventh Chamber, to which the present case was accordingly allocated. On the proposal of the Seventh Chamber, the Court decided to refer the case to an extended formation.

21 The applicant claims, in essence, that the Court should:

– annul the contested decision and regulation with immediate effect, in so far as they concern the applicant;

– order the Council to pay the costs.

22 The Council contends that the Court should:

– dismiss the action as inadmissible or, in the alternative, as unfounded;

– order the applicant to pay the costs.

23 By document lodged at the Court Registry on 23 July 2013, the applicant applied for the

adoption of measures of organisation of procedure or measures of inquiry. By document lodged at the Court Registry on 19 September 2013, the Council submitted its observations on that application.

## Law

*Admissibility*

24 The Council, although it does not formally submit a plea of inadmissibility, argues that this action is inadmissible. The Council claims that, since the applicant is entirely controlled by the Iranian State, it must be regarded as a governmental entity. As an emanation of the Iranian State, the applicant does not have *locus standi* to bring an action claiming a violation of the right to protection of property or other fundamental rights. In that regard, the Council distinguishes, on the one hand, certain procedural rights, which States are accepted as having, and, on the other, fundamental rights, which States cannot enjoy.

25 According to the Council, that plea of inadmissibility applies to all the pleas in law relied on by the applicant, because the aim of this action is in reality to obtain the annulment of the freezing of funds, which is an interference — albeit justified — in the right to property. It is therefore immaterial that not all the pleas in law specifically refer to that right.

26 In support of that plea of inadmissibility, the Council refers inter alia to Article 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms, signed at Rome on 4 November 1950 ('ECHR'), which defines the persons who may bring an application before the European Court of Human Rights, and which excludes governmental organisations from the protection of that court. According to the Council, the *ratio legis* of Article 34 of the ECHR resides in the very nature of fundamental rights; a State must respect the fundamental rights of natural and legal persons under its jurisdiction for the purposes of the ECHR. A State, or an emanation of a State, cannot therefore enjoy fundamental rights, since a sovereign State is not subject to the jurisdiction of another State.

27 The applicant considers that its action and all the pleas in law on which it relies are admissible.

28 In that regard, suffice it to observe that the Council's argument that the applicant, as an emanation of the Iranian State, cannot rely on the right to property falls to be examined in relation to the question of whether the fourth plea in law, claiming inter alia an infringement of the right to property, is well founded, and not in relation to the admissibility of this action, or the admissibility of that plea in law (see, to that effect, Case C-348/12 P *Council* v *Manufacturing Support & Procurement Kala Naft* [2013] ECR, paragraph 51).

29 Accordingly, this action must be declared to be admissible.

**Substance**

30 The applicant puts forward four pleas in law in support of its action. The first plea is a claim of a manifest error of assessment. The second plea is a claim of infringement of the obligation to state reasons. The third plea is a claim of infringement of the rights of the defence and of the right to effective judicial protection. The fourth plea is a claim of a breach of the principle of proportionality, and of the applicant's fundamental rights, including its right to the protection of its property, its business and its reputation.

31 The Court considers that it is appropriate first to examine the second plea.

*The second plea in law: infringement of the obligation to state reasons*

32 The applicant claims that insufficient reasons were stated for its listing. It claims that the reasons stated in the contested decision and regulation are vague and do not satisfy the requirement that the reasons stated must be specific and concrete. Further, the applicant criticises the Council's reliance, in its defence, on new grounds for listing which have no connection to the legal criterion of provision of financial support.

33 The Council contends, for its part, that, in a general context which was well known to the applicant, the grounds stated in the contested decision and regulation enabled the applicant to understand the specific and concrete reasons for its listing, and therefore met the requirements of the obligation to state reasons. Since 1 July 2012 it has been no secret that the European Union authorities were scrutinising the applicant's activities, following the ban on the import of Iranian oil into European Union Member States and on providing maritime insurance, particularly in relation to the transport of Iranian crude oil, introduced by Decision 2012/35. In the months preceding the applicant being listed, a

series of press articles brought to light the links between the Government of Iran and the applicant, and the applicant's activities designed to circumvent the restrictive measures, inter alia by obtaining, from third-country companies, insurance services, by means of registering its tankers under the flags of third countries.

34 The letters which the applicant sent, before its listing, to the High Representative of the Union for Foreign Affairs and Security Policy, in particular the letter of 19 January 2012 (see paragraph 10 above), confirm that the applicant was aware of that general context.

35 First of all, it must be borne in mind that, according to settled case-law, the purpose of the obligation to state the reasons on which an act adversely affecting an individual is based, which is a corollary of the principle of respect for the rights of the defence, is, first, to provide the person concerned with sufficient information to make it possible to ascertain whether the act is well founded or whether it is vitiated by a defect which may permit its legality to be contested before the Courts of the European Union and, secondly, to enable those Courts to review the legality of that act (see Case C-417/11 P *Council* v *Bamba* [2012] ECR, paragraph 49 and case-law cited).

36 The statement of reasons required by Article 296 TFEU must disclose in a clear and unequivocal fashion the reasoning followed by the institution which adopted the measure in such a way as to enable the persons concerned to ascertain the reasons for the measure and to enable the court with jurisdiction to exercise its power of review (*Council* v *Bamba*, paragraph 50).

37 Further, as regards restrictive measures adopted as part of the common foreign and security policy, it must be emphasised that, where the person concerned is not afforded the opportunity to be heard before the adoption of an initial listing decision, compliance with the obligation to state reasons is all the more important because it constitutes the sole safeguard enabling the person concerned, at least after the adoption of that decision, to make effective use of the legal remedies available to him in order to challenge the lawfulness of that decision (*Council* v *Bamba*, paragraph 51, and Case T-228/02 *Organisation des Modjahedines du peuple d'Iran* v *Council* ('*OMPI I*') [2006] ECR II-4665, paragraph 140).

38 Consequently, the statement of reasons for an act of the Council which imposes a restrictive measure must not only identify the legal basis for that measure but also the actual and specific reasons why the Council considers, in the exercise of its discretion,

that such a measure must be adopted in respect of the person concerned (see, to that effect, *Council* v *Bamba*, paragraph 52; *OMPI I*, paragraph 146; and Case T-390/08 *Bank Melli Iran* v *Council* [2009] ECR II-3967, paragraph 83).

39 However, the statement of reasons must be appropriate to the nature of the measure at issue and the context in which it was adopted. The requirements to be satisfied by the statement of reasons depend on the circumstances of each case, in particular the content of the measure in question, the nature of the reasons given and the interest which the addressees of the measure, or other parties to whom it is of direct and individual concern, may have in obtaining explanations. It is not necessary for the statement of reasons to specify all the relevant matters of fact and law, since the question whether the statement of reasons is adequate must be assessed with regard not only to its wording but also to its context and to all the legal rules governing the matter in question. In particular, the reasons given for a decision adversely affecting a person are sufficient if it was adopted in circumstances known to the party concerned which enable him to understand the scope of the measure concerning him (*Council* v *Bamba*, paragraphs 53 and 54; *OMPI I*, paragraph 141; and *Bank Melli Iran* v *Council*, paragraph 82).

40 In this case, the listing of the applicant is based on the following two reasons. The applicant is said to be 'effectively controlled by the Government of Iran'. The applicant is said to provide 'financial support to the Government of Iran through its shareholders which maintain ties with the Government'.

41 As regards whether that statement of reasons identifies the legal basis for the measure adopted by the Council against the applicant, in accordance with the case-law cited in paragraph 38 above, it is clear from the second of the two grounds relied on by the Council that the Council based its decision on the legal criterion of provision of financial support to the Government of Iran, set out in Article 20(1)(c) of Decision 2010/413, and clarified in Article 23(2)(d) of Regulation No 267/2012 (see paragraphs 7 and 8 above). Further, that ground indicates clearly that, according to the Council, such financial support is the result of the ties maintained by the applicant's shareholders with the Government of Iran.

42 On the other hand, as stated by the applicant, it is not possible to identify in the first ground, that the applicant is actually controlled by the Government of Iran, considered in isolation, the legal criterion on which it is based. That ground must therefore be

examined together with the second ground.

43 As regards whether the joint examination of the two grounds discloses to the requisite legal standard the reasons adopted by the Council, first, it must be observed that those grounds must be assessed in the general context of measures taken by the Council against the Islamic Republic of Iran (see paragraph 39 above). In that regard, both recital 22 in the preamble to Decision 2010/413 (paragraph 5 above) and recital 16 in the preamble to Decision 2012/635 (paragraph 11 above) reveal that the Council established a link between revenue from the oil and gas sector, on the one hand, and the funding of nuclear proliferation activities, on the other. Since the applicant is active in that sector as a transporter of oil and gas, the applicant was in a position to appreciate that the financial support referred to in the statement of reasons for the contested decision and regulation concerned that particular link.

44 As correctly observed by the Council, the applicant was fully aware of the Council's intention to include its name in the list of persons and entities subject to restrictive measures. Before the adoption of the contested decision and regulation, the applicant wrote to the Council in order to inform it of the applicant's concerns as to the effects of a possible listing (see paragraphs 9 and 10 above). It is therefore evident that the applicant was closely following the policy pursued by the Council against the Islamic Republic of Iran and that it must accordingly have been aware of the link which the Council had established between revenue from the oil and gas sector, on the one hand, and the funding of the Iranian nuclear programme, on the other.

45 Secondly, while it is true that the specific reasons given by the Council to justify the applicant's listing are succinct in that they do not specify either the type of financial support which the applicant is supposed to have provided to the Government of Iran or the nature of the ties maintained between the Government of Iran and its shareholders, it remains the case that those explanations enabled the applicant to appreciate that the support at issue was support implemented through its shareholders.

46 Admittedly, the applicant claims that, by reason of its privatisation in 2000, its shareholders no longer maintained any ties with the Government of Iran. That argument however concerns the assessment of whether the grounds advanced by the Council are well founded and not the question whether those grounds meet the requirements of Article 296 TFEU. The question of whether reasons are stated, which concerns an essential procedural requirement, is separate from that of the evidence of the alleged

conduct, which concerns the substantive legality of the act at issue and involves assessing the truth of the facts set out in that act and the characterisation of those facts as evidence justifying the use of restrictive measures against the person concerned (*Council* v *Bamba*, paragraph 60).

47 It must therefore be concluded that, having regard to the general context in which the contested decision and regulation were adopted, the grounds relied on by the Council to justify the inclusion of the applicant in the lists of persons and entities subject to restrictive measures are compatible with the requirements of Article 296 TFEU and, accordingly, that the second plea in law must be rejected.

*The first plea in law: manifest error of assessment*

48 The applicant claims that it is not controlled by the Government of Iran and that it does not provide financial support to the Government of Iran. The applicant claims that its shareholders, which are private pension funds, and which moreover were not listed at the time of its own listing, do not have, to its knowledge, any link with the Government of Iran. The applicant was privatised in 2000, and its beneficial owners are five million Iranians in receipt of pensions. In any event, it has made losses and has not paid any dividend to its shareholders since 2010.

49 As regards the press articles which the Council relies on as ‘open source material’, they may not be taken into consideration by the Court, since, according to the applicant, it is clear from the Council’s letter of 12 March 2013 that they were not taken into consideration by the Council when the applicant was listed.

50 The Council considers, for its part, that the applicant meets the criterion of provision of support to the Government of Iran. First, the Council states that the decision of the European Union to ban the import of Iranian oil is designed to deprive the Islamic Republic of Iran of oil revenue, which represents 70% of that State’s revenue, in order to exert pressure on it to rein in its nuclear programme. According to the Council, the applicant transported almost half of the crude oil produced in Iran in 2011, as attested in particular by an article of the Institute for the Study of War of 16 April 2012, and a report of 10 January 2013 drawn up by the Congressional Research Service (United States of America) (Annexes 3 and 18 to the defence).

51 Second, as regards the applicant’s ownership structure, the Council explains that it

relied on information provided by Member States, confirmed by open source data, according to which 33% of the applicant's capital was held by the State Pension Fund; 33% by the Social Security Retirement Fund, and 33% by the NIOC Pension and Savings Fund. The explanations provided by the applicant, inter alia in the expert statement attached to the application (Annex 3), fail, according to the Council, to rebut the claim that the applicant is actually controlled by the Iranian State. That statement merely indicates that 66% of the applicant's capital was transferred to two private entities in 2000, and that, since then, the applicant has been entirely privatised, while failing to provide the names of the purchasers. The applicant's true ownership structure is therefore deliberately opaque. In any event, the applicant's shareholders are State pension funds, so that the State thereby controls the applicant and derives financial benefit from the applicant through its shareholders.

52 Further, in January 2012 the applicant's Chairman, Mr S., was suddenly replaced by Mr B., a former Iranian road and transportation minister with close links to Iran's President. In addition, the applicant has, according to the Council, attempted to conceal the ownership of the ships in its fleet by renaming them and reflagging them.

53 As regards the evidence, the Council states that its claims are supported to the requisite legal standard by the documents in its file, copies of which were sent to the applicant on its request, and by the open source information, known to the applicant, consisting in the reports and press articles annexed to the defence.

54 In that regard, first, it must be recalled that, in accordance with the case-law, the Council has a degree of discretion to determine on a case-by-case basis whether the legal criteria on which the restrictive measures at issue are based are met (see, to that effect, judgment of 13 March 2012 in Case C-380/09 P *Melli Bank* v *Council*, not published in the ECR, paragraph 41, and Joined Cases T-42/12 and T-181/12 *Bateni* v *Council* [2013] ECR, paragraph 45).

55 However, the Courts of the European Union must ensure the review, in principle the full review, of the lawfulness of all Union acts in the light of the fundamental rights forming an integral part of the European Union legal order, including review of such measures as are designed to give effect to resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations (Joined Cases C-584/10 P, C-593/10 P and C-595/10 P *Commission* v *Kadi* ('*Kadi II*') [2013] ECR, paragraph 97).

56 The effectiveness of the judicial review guaranteed by Article 47 of the Charter of Fundamental Rights of the European Union also requires that, as part of the review of the lawfulness of the grounds which are the basis of the decision to list or to maintain the listing of a given person, the Courts of the European Union are to ensure that that decision is taken on a sufficiently solid factual basis. That entails a verification of the factual allegations in the summary of reasons underpinning that decision, with the consequence that judicial review cannot be restricted to an assessment of the cogency in the abstract of the reasons relied on, but must concern whether those reasons, or, at the very least, one of those reasons, deemed sufficient in itself to support that decision, is substantiated (*Kadi II*, paragraph 119).

57 It is the task of the competent European Union authority to establish, in the event of challenge, that the reasons relied on against the person concerned are well founded, and not the task of that person to adduce evidence of the negative, that those reasons are not well founded. It is necessary that the information or evidence produced should support the reasons relied on against the person concerned (*Kadi II*, paragraphs 121 and 122).

58 Secondly, as regards the argument advanced by the Council at the hearing, that the involvement of the applicant in the Iranian oil and gas sector, through its business in transporting crude oil and gas produced in Iran, is sufficient evidence in itself that the applicant provided financial support to the Government of Iran, it must be recalled that the listing of the applicant is based on the provision of financial support to the government of Iran, as a consequence of the ties maintained by the applicant's shareholders with the Government of Iran. Yet the transport of oil is unrelated to the alleged existence of links between the applicant's shareholders and that Government. According to the case-law, the legality of contested acts may be assessed only on the basis of the elements of fact and law on the basis of which they were adopted. The Court cannot accede to what is, in short, an invitation by the Council to replace the grounds on which those acts are based (see judgment of 12 November 2013 in Case T-55/12 *North Drilling* v *Council*, not published in the ECR, paragraph 25 and case-law cited).

59 The Court must also disregard the explanations given by the Council at the hearing, to the effect that the applicant, which is a former subsidiary of the National Iranian Oil Company ('NIOC'), remained after its privatisation under the control of that public undertaking, which is wholly owned by the Iranian State and is listed among the bodies

subject to restrictive measures by reason of the provision of financial support to the Government of Iran. That argument, which amounts to the assertion that the financial support provided to the Government of Iran by the applicant is effected through a third company, namely NIOC, cannot be accepted. The grounds for the applicant's listing do not refer to any indirect financial support resulting from links between the applicant and NIOC, but to financial support by the applicant to the Government of Iran by means of links between the applicant's shareholders and the Government of Iran.

60 Further, and in any event, in so far as the aim of the abovementioned arguments of the Council is to establish that the applicant provides indirect financial support to Government of Iran, as a consequence of its business in transporting oil and gas by sea, it is clear that the applicable legislation lays down the criterion of the provision of financial support to the Government of Iran, not the criterion of the provision of indirect financial support. Contrary to what is claimed by the Council, the mere fact that, through its transport business, the applicant is involved in the Iranian oil and gas sector, which represents one of the Government of Iran's main sources of revenue, cannot be regarded as being covered by the legal criterion of provision of financial support to the Government of Iran.

61 Thirdly, as regards its ownership structure, the applicant correctly states that the Council's file does not contain any evidence. In particular, neither the proposals for its listing submitted by three Member States, dated 19, 24 and 28 September 2012, nor the other documents in that file identify the applicant's shareholders or contain the slightest evidence capable of supporting the claims that the applicant is controlled by the Government of Iran or provided financial support to the Government of Iran through its shareholders, which are said to maintain ties with the government. The only material in the file which concerns the applicant consists in the claims which are essentially produced in the contested decision and regulation.

62 Consequently, the Council cannot, to support those claims, produced as the reasons for the listing of the applicant, validly invoke before the Court the factual arguments summarised in paragraphs 51 and 52 above, since those arguments were not part of its file and since, as a result, they were also not disclosed to the applicant, on its request, in the Council's reply of 12 March 2013. If such arguments were to be taken into consideration, that would be contrary, first, to the principle that the legality of contested acts may be assessed only on the basis of the elements of fact and law on which they

were adopted and, secondly, to the applicant's rights of defence (*Bateni* v *Council*, paragraph 57). Since the new reasons were not disclosed to the applicant in good time, the applicant would be deprived of the opportunity effectively to state its point of view on those reasons within the administrative procedure. Further, the applicant would not be in a position to assess whether its listing was well founded and whether it was appropriate to bring an action. The principle of equality of arms before the Courts of the European Union would thereby be affected (see *North Drilling* v *Council*, paragraph 26 and case-law cited).

63 Likewise, the Council's argument that the recent replacement, in March 2013, of the applicant's Chairman confirms the close links between the applicant's shareholders and Government of Iran is ineffective, since it is based on events which are subsequent to the adoption of the contested decision and regulation.

64 Consequently, the material which can be taken into consideration by the Court contains no evidence capable of supporting the Council's claims that the applicant was controlled by the Government of Iran and provided financial support to the Government of Iran.

65 It follows that there is no justification for the listing of the applicant.

66 The first plea in law must therefore be upheld.

67 In the light of all the foregoing, without it being necessary to examine the third and fourth pleas in law, the contested decision and regulation must be annulled, in so far as they concern the applicant.

**The temporal effects of the annulment of the contested decision and regulation**

68 The applicant claims that the annulment of the contested decision and regulation should take effect immediately. It claims that the Council's decision to list it has the nature of an individual decision, and not a regulation, as is demonstrated by the fact that the Council is obliged to communicate the restrictive measures individually to the persons or entities concerned. The applicant relies on *Bank Melli Iran* v *Council* (paragraphs 86 and 87), where the Court held that a decision implementing Article 7 of Council Regulation (EC) No 423/2007 of 19 April 2007 concerning the adoption of restrictive measures against Iran (OJ 2007 L 103, p. 1) was not of an exclusively general nature but had the nature of an individual measure addressed to the persons or entities

listed by means of that decision in Annex V to that regulation.

69 According to the applicant, the second paragraph of Article 60 of the Statute of the Court of Justice of the European Union provides solely that a regulation — and not a decision — is to remain in force following the decision of the General Court declaring it to be void, until the expiry of the period for bringing an appeal or, if an appeal has been brought within that period, until the dismissal of that appeal by the Court of Justice, in order to limit the disruptive effects of the annulment by the General Court of general rules applicable throughout the European Union, where those rules may ultimately be upheld on appeal.

70 The Council contends that Article 60 of the Statute of the Court of Justice precludes the annulment with immediate effect of the contested regulation. The Council considers accordingly that the General Court should also order that the effects of any annulment of the contested decision should be suspended for the same period.

71 The Council refers to settled case-law, according to which the second paragraph of Article 60 of the Statute of the Court of Justice is applicable as regards the temporal effects of the annulment by the General Court of a regulation, such as Regulation No 267/2012, which imposes restrictive measures. The Courts of the European Union have, to date, held that Regulation No 267/2012, including Annex IX thereto, has the nature of a regulation, since the second paragraph of Article 51 thereof provides that it is to be binding in its entirety and directly applicable in all Member States, which corresponds to the effects of a regulation as provided for in Article 288 TFEU (*Bateni* v *Council*, paragraph 83, and Case T-110/12 *Iranian Offshore Engineering & Constructions* v *Council* [2013] ECR, paragraph 74; see also, by analogy, Case C-548/09 P *Bank Melli Iran* v *Council* [2011] ECR I-11381, paragraph 45).

72 The applicant's argument cannot be accepted.

73 There is no need to examine whether the decision to include the name of the applicant in the lists at issue has the nature of a regulation for the purposes of the second paragraph of Article 60 of the Statute, since it is sufficient to observe that under the second paragraph of Article 264 TFEU the Courts of the European Union may, in any event, state, where it is considered necessary, which of the effects of the act which it has declared void are to be considered as definitive. In that regard, it follows from the case-law that the General Court may decide, on the basis of that provision, the date when its

annulling judgments are to take effect (see, to that effect, judgment of 12 December 2013 in Case T-58/12 *Nabipour and Others* v *Council*, not published in the ECR, paragraphs 250 and 251).

74 In the circumstances of this case, the Court considers, for the reasons set out below, that it is necessary to suspend the taking effect of this judgment until the date of expiry of the period for bringing an appeal stated in the first paragraph of Article 56 of the Statute of the Court of Justice or, if an appeal has been brought within that period, until the dismissal of the appeal.

75 The nuclear programme pursued by the Islamic Republic of Iran is a source of serious concerns at both the international and European levels. That is the background to the Council's gradual extension of the number of restrictive measures adopted against that State, in order to hinder the development of activities which jeopardise peace and international security, in the context of implementation of Security Council resolutions.

76 Consequently, the applicant's interest in ensuring that this annulling judgment should take effect immediately must be weighed against the objective of general interest pursued by the European Union's policy in relation to restrictive measures against the Islamic Republic of Iran. The adjustment of the temporal effects of the annulment of a restrictive measure may thus be justified by the need to ensure that the restrictive measures are effective and, in short, by overriding considerations to do with security or the conduct of the international relations of the European Union and of its Member States (see, by analogy with there being no obligation to inform the person or entity concerned beforehand of the grounds for an initial listing, Case C-27/09 P *France* v *People's Mojahedin Organization of Iran* [2011] ECR I-13427, paragraph 67).

77 The annulment with immediate effect of the contested acts in so far as they concern the applicant would enable the applicant to transfer all or part of its assets outside the European Union, without the Council being able if appropriate to apply in good time Article 266 TFEU, with a view to correcting the irregularities identified in this judgment, and consequently the effectiveness of any freezing of assets in relation to the applicant which might, in the future, be decided on by the Council might be seriously and irreversibly prejudiced. As regards the application of Article 266 TFEU in this case, it must be observed that the annulment by this judgment of the applicant's listing stems from the fact that the reasons stated for that listing are not supported by sufficient evidence (see paragraph 65 above). Although it is for the Council to decide on what measures to

adopt to comply with this judgment, a further listing of the applicant cannot automatically be ruled out. In the course of a further review, the Council has the possibility of again listing the applicant on the basis of reasons which are supported to the requisite legal standard.

78 It follows that the effects of the contested decision and regulation must be maintained as regards the applicant until the date of expiry of the period for bringing an appeal or, if an appeal is brought within that period, until the dismissal of the appeal.

**Costs**

79 Under Article 87(2) of the Court's Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been asked for in the successful party's pleadings. Since the Council has essentially been unsuccessful, it must be ordered to pay the costs of the present proceedings, in accordance with the form of order sought by the applicant.

On those grounds,

THE GENERAL COURT (Seventh Chamber, Extended Composition)

hereby:

1. **Annuls Council Decision 2012/635/CFSP of 15 October 2012 amending Decision 2010/413/CFSP concerning restrictive measures against Iran, in so far as it listed National Iranian Tanker Company in Annex II to Council Decision 2010/413/CFSP of 26 July 2010 concerning restrictive measures against Iran and repealing Common Position 2007/140/CFSP;**

2. **Annuls Council Implementing Regulation (EU) No 945/2012 of 15 October 2012 implementing Regulation (EU) No 267/2012 concerning restrictive measures against Iran, in so far as it listed National Iranian Tanker Company in Annex IX to Council Regulation (EU) No 267/2012 of 23 March 2012 concerning restrictive measures against Iran and repealing Regulation (EU) No 961/2010;**

3. **Orders the effects of Decision 2012/635 and Implementing Regulation No 945/2012 to be maintained as regards National Iranian Tanker Company until the date of expiry of the period for bringing an appeal stated in the first paragraph of Article 56 of the Statute of the Court of Justice of the European**

**Union or, if an appeal has been brought within that period, until the dismissal of the appeal;**

**4. Orders the Council of the European Union to bear its own costs and to pay the costs of National Iranian Tanker Company.**

| | | |
|---|---|---|
| Van der Woude | Wiszniewska-Białecka | Kancheva |
| Wetter | | Ulloa Rubio |

Delivered in open court in Luxembourg on 3 July 2014.

[Signatures]

---

* Language of the case: English.

JUDGMENT OF THE COURT (Fourth Chamber)

29 November 2018 (*1)

(Appeal — Common foreign and security policy — Restrictive measures of ... — Freezing of funds — Annulment of measures ... — Re-listing — Evidence dating from before the first listing — Res judicata — Principle of legal certainty — Principle of effective judicial protection — Reasons for the listing relating to ... — Scope — Activity of transporting cr...

In Case C‑600/16 P,

APPEAL under Article 56 of the Statute of the Court of Justice of the European Union, brought on 24 November 2016,

National Iranian Tanker Company, established in Tehran (Iran), represented by T. de la Mare QC, M. Lester QC, J. Pobjoy, Barrister, and R. Chandrasekera, S. Ashley and C. Murphy, Solici...

appell...

the other party to the proceedings being:

Council of the European Union, represented by M. Bishop and A. Vitro, acting as Agents, ...

defendant at ...

THE COURT (Fourth Chamber),

composed of T. von Danwitz, President of the Seventh Chamber, acting as President of the Fourth Chamber, K. Jürimäe, C. Lycourgos, E. Juhász and C. Vajda, Judges,

Advocate General: E. Tanchev,

Registrar: R. Şereş, Administrator,

having regard to the written procedure and further to the hearing on 18 January 2018,

after hearing the Opinion of the Advocate General at the sitting on 12 April 2018,

gives the following

Judgment

1 By its appeal, National Iranian Tanker Company (NITC) seeks to have set aside the judgment of the General Court of the European Union of 14 September 2016, National Iranian Tanker Company v Council (T‑207/15, not published, 'the judgment under appeal', EU:T:2016:47...), by which the General Court dismissed its act...

– annulment of Council Decision (CFSP) 2015/236 of 12 February 2015 amending Council Decision 2010/413/CFSP concerning restrictive measures against Iran (OJ 2015 L 39, p. 18), and Council Implementing Regulation (EU) 2015/230 of 12 February 2015 impleme... Regulation (EU) No 267/2012 concerning restrictive measures against Iran (OJ 2015 L 39, p. 3), in so far as those acts concern NIT...

– in the alternative, a declaration that Article 20(1)(c) of Council Decision 2010/413/CFSP of 26 July 2010 concerning restrictive measures against Iran and repealing Common Position 2007/140/CFSP (OJ 2010 L 195, p. 39) and Article 23(2)(d) of Council Regulation (EU) No 267/2012 of 23 March 2012 concerning restrictive measures against Iran and repea... Regulation (EU) No 961/2010 (OJ 2012 L 88, p. 1) do not apply to N...

Legal context

United Nations Security Council Resolutio

2 On 9 June 2010, the United Nations Security Council adopted Resolution 1929 (2010) ('Resolution 1929 (2010)'), which extended the scope of the restrictive measures imposed by Security Council Resolutions 1737 (2006), 1747 (2007) and 1803 (2008), and introduced additional restrictive measures against the Islamic Republic of Iran. In that resolution, the Security Council referred, in particular, to the potential connection between revenues derived by Iran from its energy sector and the funding of Iran's proliferation-sensitive nuclear activities

3 On 24 November 2013, the Islamic Republic of Iran, on the one hand, and the Federal Republic of Germany, the People's Republic of China, the French Republic, the Russian Federation, the United Kingdom of Great Britain and Northern Ireland and the United States of America, with the support of the High Representative of the European Union for Foreign Affairs and Security Policy, on the other hand, concluded in Geneva (Switzerland) a Joint Plan of Action ('the Joint Plan of Action') which set out an approach towards reaching a long-term comprehensive solution to the Iranian nuclear issue.

4 On 14 July 2015, the Islamic Republic of Iran, on the one hand, and the Federal Republic of Germany, the People's Republic of China, the French Republic, the Russian Federation, the United Kingdom of Great Britain and Northern Ireland, the United States of America and the High Representative of the European Union for Foreign Affairs and Security Policy, on the other hand, adopted in Vienna (Austria) a Joint Comprehensive Plan of Action, which constitutes a long-term comprehensive solution to the Iranian nuclear issue ('the Joint Comprehensive Plan of Action').

5 On 20 July 2015, the United Nations Security Council adopted Resolution 2231 (2015), endorsing the Joint Comprehensive Plan of Action and urging its full implementation in accordance with the timetable established in that plan and providing for action to be taken in accordance with that plan.

EU law

6 On 17 June 2010, the European Council adopted a declaration in which it called on the Council of the European Union to adopt measures implementing those contained in Resolution 1929 (2010), as well as accompanying measures, with a view to supporting the resolution of all outstanding concerns regarding the Islamic Republic of Iran's development of sensitive technologies in support of its nuclear and missile programmes, through negotiation. Those measures were to focus on, inter alia, the trade sector, the financial sector, the Iranian transport sector and key sect

7 On 26 July 2010, the Council of the European Union adopted Decision 2010/413/CFSP, to which the same persons and entities are subject as referred to in Annex II thereto. Recital 22 of that decision refers to UNSC Resolution 1929 (2010) and to the potential connection between revenues derived by the Islamic Republic of Iran from its energy sector and the funding of its proliferation-sensitive nu

8 On 23 January 2012, the Council adopted Decision 2012/35/CFSP amending Decision 2010/413 ([OJ 2012 L 19, p. 22](OJ 2012 L 19, p. 22)). According to recital 13 of that decision, the restrictions on admission and the freezing of funds and economic resources should be applied to additional persons and entities providing support to the Government of Iran allowing it to pursue proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems, in particular persons and entities providing financial, logistical or material support

9 That decision inserted Article 3c into Decision 2010/413, which prohibits the purchase, import or transport of Iranian crude oil and petrol

10 Decision 2012/35 also amended Article 20(1) of Decision 2010/413, which provides for the freezing of funds belonging to the follow

'other persons and entities not covered by Annex I that provide support to the Government of Iran and persons and entities associated with

11 On 23 March 2012, the Council adopted Regulation No 267/2012 implementing, at the level of the European Union, the restrictive measures

12 Article 11 of that regulation contains restrictions similar to those in Article 3c of Decision 2010/413 concerning the import, purchase or transport of crude oil and petrol products.

13 Article 23(2)(d) of that regulation provides for the freezing of the funds and economic resources of the persons, entities and bodies listed in Annex IX which, in accordance with Article 20(1)(c) of Decision 2010/413, are identified as 'being other persons, entities or bodies that provide support, such as material, logistical or financial support, to the Government of Iran and persons and entities associated with them'.

14 Council Decision 2012/635/CFSP of 15 October 2012 amending Decision 2010/413 (OJ 2012 L 282, p. 58) amended Article 20(1)(c) of Decision 20

'other persons and entities not covered by Annex I that provide support to the Government of Iran and entities owned or controlled by them or persons and entities associated with them, as listed in Annex II.'

15 By Regulation (EU) No 1263/2012 of 21 December 2012 amending Regulation No 267/2012 (OJ 2012 L 356, p. 34), the Council amended the wording of Article 23(2)(d) of Regulation No 267/2012 as follows:

'being other persons, entities or bodies that provide support, such as material, logistical or financial support, to the Government of Iran and entities owned or controlled by them, or persons and entities associated with them.'

16 On 20 January 2014, in order to implement the Joint Plan of Action, the Council adopted Decision 2014/21/CFSP amending Decision 2010/413 (OJ 2014 L 15, p. 22). According to recital 3 of Decision 2014/21, the first step of the Joint Plan of Action, the Islamic Republic of Iran would take voluntary measures, in return for which the European Union would take a certain number of voluntary measures, including the suspension of restrictive measures concerning the prohibition of the provision of insurance and transport of Iranian crude oil. By that decision, the Council suspended, inter alia, the prohibition in Article 3c of Decision 2010/413 relating to the transport of Iranian crude oil. The suspension of that prohibition was later

17 On the same date, the Council adopted Regulation (EU) No 42/2014 amending Regulation No 267/2012 (OJ 2014 L 15, p. 18, and corrigendum OJ 2014 L 49, p. 7) by which it suspended for six months the prohibition in Article 11(1)(c) of Regulation No 267/2012 on the transport of crude oil or petroleum products originating in Iran or exported from Iran to any other country. The suspension of that prohibition was extended by a number of successive decisions of the Council, then that prohibition was finally lifted by Council Regulation (EU) 2015/1861 of 18 October 2015 amending Regulation No 267/2012 (OJ 2015 L 274, p. 1).

## Background to the Decision

18 NITC is an Iranian company specialising in the transport of crude oil and gas. It operates one of the largest fleets of double-hulled tankers

19 On 15 October 2012, by Decision 2012/635 and Implementing Regulation (EU) No 945/2012 implementing Regulation No 267/2012 (OJ 2012 L 282, p. 16), the Council included the name of NITC in the list of persons and entities in Annex II to Decision 2010/413 and Annex IX to Regulation No 267/2012. The grounds for its inclusion on those lists were identical a

'Effectively controlled by the Government of Iran. Provides financial support to the Government of Iran through its shareholders which ma

20 By judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608), the General Court annulled Decision 2012/635 and Implementing Regulation No 945/2012 in so far as those measures concerned NITC, the General Court having held that the

name on the lists of persons and entities whose assets were to be frozen was annulled, on the ground that the Council's claim that the appellant was controlled by or provided financial support to the Government of Iran were not substantiated. The General Court maintained the effects of those acts as regards NITC until the expiry of the period for bringing an appeal referred to in the first paragraph of Article 56 of the Statute of the Court of Justice of the European Union, or, if an appeal was brought within that period, until the dismissal of the appeal. No appeal was lodged against that judgment.

21 On 12 February 2015, the Council once again entered NITC's name in, first, the list of persons and entities whose assets are to be frozen in Annex II to Decision 2010/413 and, second, the list in Annex IX to Regulation No 267/2012 ('the contested acts'), for the following reasons:

'[NITC] provides financial support to the Government of Iran through its shareholders which are the State Retirement Fund, the Social Security Organization and the Iranian Employees Retirement Fund, which are state-controlled. [NITC] is one of the largest operators of crude oil transport. [NITC] provides logistical support to the Government of Iran through the transport of Iranian oil.'

22 On 18 October 2015, as part of implementation of the Joint Comprehensive Plan of Action, the Council adopted Decision (CFSP) 2015/1863 amending Decision 2010/413 (OJ 2015 L 274, p. 174), which suspends, among other things, the restrictive measures imposed on NITC in Decision 2010/413, and Implementing Regulation (EU) 2015/1862 implementing Regulation No 267/2012 (OJ 2015 L 274, p. 161), which removed NITC's name from the list in Annex IX to the latter regulation.

23 Decision 2015/1863 and Implementing Regulation 2015/1862 became applicable on 16 January 2016, as specified by Council Decision (CFSP) 2016/37 of 16 January 2016 concerning the date of application of Decision 2015/1863 (OJ 2016 L 11 I, p. 1), and information concerning the date of application of Implementing Regulation 2015/1862 (OJ 2016 C 15 I, p. 1).

## The procedure before the General Court and the judgment under appeal …

24 By application lodged at the Registry of the General Court on 24 April 2015, NITC brought an action for the annulment of the contested acts and, alternatively, for a declaration that, on the basis of Article 277 TFEU, Article 20(1)(c) of Decision 2010/413 and Article 23(2)(d) of Regulation No 267/2012 do not apply to it.

25 Concurrently with that action, NITC filed an application for interim measures seeking suspension of the operation of the contested acts. That application was dismissed by order of the President of the General Court of 16 July 2015, National Iranian Tanker Company v Council (T‑207/15 R, EU:T:2015:535).

26 In support of its action, NITC relied on pleas alleging (i) infringement of the principle of res judicata, the principle of legal certainty and the right to an effective judicial remedy; (ii) errors of assessment; (iii) misuse of powers; (iv) infringement of the rights of the defence, the principle of sound administration and the principle of effective judicial protection (rectification); (v) infringement of the rights to property and to reputation, and to conduct a business. It further put forward in the alternative the plea that Article 20(1)(c) of Decision 2010/413 and Article 23(2)(d) of Regulation No 267/2012 were unlawful.

27 The General Court rejected those pleas and consequently dismissed the action in its entirety.

## Forms of order sought by the parties before the Court of Jus…

28 NITC claims that the Court should:

– set aside the judgment under appeal;

– grant the form of order sought before t[he General Court]:

– annul the contested acts in so far as [they concern NITC];

– in the alternative, declare that Article 20(1)(c) of Decision 2010/413 and Article 23(2) of Regulation No 267/2012 do not apply to NITC;

– order the Council to pay the costs of the appeal and of the proceedings before the General Court.

29 The Council contends that the Court shoul[d]:

– dismiss the appeal lodged by NITC as inadmiss[ible];

– in the alternative, if the Court decides to set aside the judgment under appeal and to give final judgment itself, dismiss the action for annulment and the plea of inapplicability; and

– order NITC to pay the costs of the appe[al].

## The appeal

### Admissibility of the appeal

#### Arguments of the parties

30 The Council submits that the appellant has no interest in the outcome of the appeal and that the appeal is therefore inadmissible, since its name was removed from the lists by Decision 2015/1863 and Implementing Regulation 2015/1862, and the contested acts cause no harm to its reputation.

31 NITC maintains that it has an interest in bringing proceedings, since setting aside the judgment under appeal and annulling the contested acts would enable it to obtain a declaration that its reinstatement on the lists was unlawful, in particular with a view to obtaining compensation for damages for the harm caused by its reinst[atement].

#### Findings of the Court

32 It is settled case-law that an appellant's interest in bringing proceedings must be capable of procuring an advantage for the party bringing it (judgment of 21 December 2011, France v People's Mojahedin Organization of Iran, C‑27/09 P, EU:C:2011:853, paragraph 43 and case-law cited).

33 The Court has held that an appellant retains an interest in bringing proceedings where, in the case of a person whose name has been removed from the lists, the recognition by the EU Courts that it had been unlawfully included in those lists is such as to contribute to the rehabilitation of that person or to constitute a form of reparation for the non-material harm suffered (see, to that effect, judgment of 28 May 2013, Abdulrahim v Council and Commission, C‑239/12 P, EU:C:2013:331, paragraphs 70 to 72; of 8 September 2016, Iranian Offshore Engineering & Construction v Council, C‑459/15 P, not published, EU:C:2016:646, paragraph 12; and of 15 June 2017, Al-Faqih and Others v Commission, C‑19/16 P, EU:C:2017:466, paragraph 36).

34 It follows that the appellant has an interest in bringing proceedings despite the removal of its name from the lists set out in the Annex to Decision 2010/413 and in Annex IX to Regulation No 267/2012 by Decision 2015/1863 and Implementing Regulation 2015/1862, respectively.

35 The appeal is therefore admissible.

### Substance

36 NITC relies on four grounds in support of [illegible]

The first ground of appeal

– Arguments of the parties

37 By its first ground of appeal, NITC claims that the General Court erred in law by holding in paragraphs 45 to 65 and 68 of the judgment under appeal [illegible] the principle of res judicata [illegible] General Court [illegible] initial listing.

38 NITC [illegible] General Court [illegible] 2015, *National Iranian Tanker Company* v *Council* (T‑207/15 [illegible], EU:T:2015:[illegible]) [illegible] the principle of res judicata [illegible] Article 47 of the Charter of Fundamental Rights of the European Union [illegible] Convention for the Protection of Human Rights and Fundamental Freedoms, signed in Rome on 4 November 1950 [illegible] General Court [illegible] would be contrary to the principle of pro[illegible]

39 NITC [illegible] General Court [illegible] paragraph 51 [illegible] 58 of the judgment under appeal [illegible] three [illegible] General Court [illegible] paragraph 53 of the judgment under appeal [illegible] General Court [illegible] judgment of 3 July 2014, *National Iranian Tanker Company* v *Council* (T‑565/12, EU:T:2014:608) [illegible] paragraph 60 of that judgment under another cla[illegible]

40 The Council [illegible] NITC [illegible] General Court [illegible] submitted to the General Court for consid[illegible]

– Findings of the Court

41 In the first ground of appeal [illegible] NITC [illegible] General Court [illegible] there was no significant change in the fa[illegible]

42 First of all [illegible] res judicata [illegible] EU Courts [illegible] applies [illegible]

not only to the period prior to the adoption of the judgment under appeal, but also to the period after the adoption of the judgment under discussion, where there arises a separate ground (see, to that effect, judgment of 15 November 2012, Al-Aqsa v Council and Netherlands v Al-Aqsa, C‑539/10 P and C‑550/10 P, EU:C:2012:711, paragraph 149 and the case-law cited).

43 It is settled case-law that the force of res judicata extends only to the matters of fact and law actually or necessarily settled by the judicial decision (judgment of 29 March 2011, ThyssenKrupp Nirosta v Commission, C‑352/09 P, EU:C:2011:191, paragraph 123, and of 13 September 2017, Pappalardo and Others v Commission, C‑350/16 P, EU:C:2017:672, paragraph 37).

44 In the present case, it should be pointed out that, in the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608), the General Court annulled NITC's initial listing, having ruled, in paragraph 64 of that judgment, that the information before it did not allow it to consider that the evidence put forward by the Council to establish that NITC is controlled by the Government and provides financial support for it was sufficiently credible. It also appears from paragraph 61 of that judgment, first, that the reasons for the inclusion on the basis that NITC's financial support to the Government was sufficiently established, and, secondly, that NITC's shareholding of the Government or public bodies had not been relied upon in support of NITC's activity in the transport of oil, in order to establish that NITC's activities provided financial support to the Government of Iran. In paragraph 58 of that judgment, the General Court pointed out that the statement of reasons for NITC's initial listing did not establish any link between NITC's activities and the financial support to the Government of Iran.

45 It was therefore solely the lack of information provided by the Council in support of the fact that, as stated by the General Court in the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608), it could be inferred from the transport of oil that NITC provided financial support to the Government, and as is clear from the case-law cited in paragraph 43 above, that conclusion did not cover the evidence of the existence of financial support for the Government in order to rebut as such that type of support to that government.

46 It should be pointed out that NITC's reinstatement in the contested acts is based on the criterion of the association with the Government, as is apparent from paragraph 48 of the judgment under appeal, NITC's financial support to the Government being established by the fact that the Government has a shareholding in NITC's capital and NITC's oil transport activity. As the General Court stated in paragraph 50 of the judgment under appeal, those reasons are related to the financial support for the Government, which was not the subject of the examination carried out by the General Court in the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608). Consequently, contrary to what is claimed by NITC, paragraph 51 of the judgment under appeal, the General Court did not err in law in holding that, in the judgment under appeal, the same evidence, which had been submitted for the proceedings relating to its initial listing in the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608).

47 NITC's claims, however, are based on the assertion that the claims in the initial listing concerning those same facts that the General Court could not use that information as the basis of a legal classification, where it was not possible in that case to attach to NITC's transport activities, the classification of financial support to the Government. That was not an established fact, upon which the General Court is required to rule. NITC maintained, in the proceedings before it, that such an obligation follows from a combined analysis of that ...

48 Suffice it to state, however, that such a legal classification, where it is not required to have been examined by the General Court in the proceedings at issue, is not an element that falls within the force of res judicata, as the requirement of such an analysis, in conformity with the case-law cited in paragraph 43 above.

49 It should be added that, as NITC stated, the present case is not one which concerns the same type of situation as that in the case-law relied on by NITC in that regard ...

protection that the persons concerned derive from the principle of res judicata, a person or entity which has secured the annulment of its inclusion in the lists of persons and entities whose assets are to be frozen against the adoption of new restrictive measures based on the reasons or evidence.

50 With regard to the principle of legitimate expectations, it should be noted that, according to the settled case-law of the Court, the right to rely on that principle applies to any individual in a situation in which an institution of the European Union, by giving that person precise assurances, has led him to entertain well-founded expectations. However, a person may not plead infringement of the principle unless he has been given precise assurances by the administration (see, to that effect, judgment of 13 September 2017, Pappalardo and Others v Commission, C‑350/16 P, EU:C:2017:672, paragraph 39, and judgment of 21 February 2018, Kreuzmayr, C‑628/16, EU:C:2018:84, paragraph 46).

51 A decision annulling the inclusion of an entity in the lists of persons and entities whose assets are to be frozen does not provide that entity with precise assurance that the Council does not have any reasons concerning that entity other than those in the statement of reasons for that decision or the evidence capable of justifying the imposition of restrictive measures. In addition, the General Court rightly held, in paragraph 59 of the judgment under appeal, that the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608), could not give rise to a legitimate expectation on the part of NITC that the Council would be bound by that judgment and would not be able to take re-listing decisions. Moreover, the General Court stated in paragraph 77 of that judgment that the fact that NITC's name was again included in the lists of persons and entities whose assets are to be frozen could not be ruled out, and that the Council had the possibility of re-listing it on the basis of reasons substantiated to the requisite legal standard.

52 It follows from the foregoing that the General Court did not err in law when it held that the Council did not infringe the principle of res judicata attaching to the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608), or the principle of legal certainty or the principle of legitimate expectations by adopting the contested acts on the basis of reasons relating to NITC's financial and logistical support to the Government of Iran, referred to in paragraph 46 above.

53 With regard to the right to an effective remedy laid down in Article 47 of the Charter, which is relied on by NITC, it should be recalled that that article secures in EU law the protection afforded by Article 6(1) and Article 13 of the Convention for the Protection of Human Rights and Fundamental Freedoms (judgment of 16 May 2017, Berlioz Investment Fund, C‑682/15, EU:C:2017:373, paragraph 54 and the case-law cited). The first paragraph of Article 47 of the Charter requires everyone whose rights and freedoms guaranteed by EU law are violated to have the right to an effective remedy before a tribunal in compliance with the conditions laid down in that article.

54 The principle of effective judicial protection does not prevent the Council from re-listing a person or entity in the lists of persons and entities whose assets are to be frozen on the basis of reasons other than those on which the initial listing was based, or on the same reasons based on the evidence. The purpose of that principle is that an act adversely affecting an entity may be challenged before the Court, not to prevent the adoption of a new act adversely affecting that entity, based on different reasons or evidence.

55 As the Court of Justice has already held, where a decision of an EU institution [illegible] annulled [illegible] institution may take a new decision [illegible] reasons other than those on which the annulled decision was based (see, by analogy, judgment of 6 March 2003, Interporc v Commission, C‑41/00 P, EU:C:2003:125, paragraph 25).

56 It follows that the unlawfulness of the measures, established by the General Court in the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608), of the initial inclusion of NITC's name in the lists of persons and entities whose assets are to be frozen does not prevent the Council, following a re-examination of the situation, from adopting new restrictive measures on the basis of evidence that was already in existence or available.

57 Furthermore, it must be pointed out that, in the proceedings giving rise to the judgment of 3 Jul 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608), which show became final, NITC sought the annulment of the measures at issue adopted in 2012 which have therefore been expunged from the EU legal order, following which NITC already that judgment is support for a claim for damages, as is clear from paragraph 65 of that judgm under appeal. In that, NITC has the option, which it has exercised, of bringing an acti before the courts of the European Union in order to review the legality of the decisions, with a view to being restored to its initial p

58 In the light of those considerations, the General Court rightly concluded that the Council did not infringe the principle of res judicata, legal certainty or protection of legitimate i expectations, or the right of NITC to an effective remedy

59 Therefore, the first ground of appeal mus

**The second and fourth grounds of appeal**

– Arguments of the parties

60 By its second ground of appeal, NITC claims that the General Court wrongly concluded that the listing criterion was satisfied. The General Court erred in law in paragraphs 87 and 89 of the judgment under appeal in finding that NITC provided support to the Government of Iran for the purposes of the criterion in Article 20(1)(c) of Decision 2010/413 and Article 23(2)( Regulation No 267/2012, as the logistical support to the Government of Iran that are su of NITC's transport activities and the existing link between the energy sector and nuclear proliferation activities. The notion of 'logistical support' cannot encompass c provided by [NITC]. According to the General Court's interpretation, the fact that NITC is active in the oil sector would be sufficient for it to be found to be providing support to the Government of Iran, even though it did not provide any service to the Government directly. such an interpretation amounts to automatically finding indirect support to the Government of Iran, which was rejected in the judgment of 3 July 2014, National Iranian Tanke Company v Council (T‑565/12, EU:T:2014:608, paragraph 60).

61 In addition, the reference to recital 22 of Decision 2010/413 in paragraph 86 of the judgm under appeal does not establish a link between NITC's activities, the energy sector and nucle proliferation and, in particular, it does not follow that the European Union agreed authorities' activities under the Joint Plan of Action implemented by Regula No 42/2014. Although the Joint Plan of Action made provision for a suspension of the individual restrictive measures and amendment of the criterion on the perso and entities whose assets are to be frozen, that Regulation No 42/2014 should have guided the interpretation of those criteria. It would be contradictory to take the view that the notion of 'logistical support' covers the activity of transporting crude oil, which has been authorised by the legislature and in relation to which the European Union coul have authorised the activity likely to be of sufficient quantitative importance as to encourage nuclear proliferation. The arguments which NITC presented in the light of the Joi Plan of Action in relation to the purpose of t

62 Finally, the interpretation adopted by the General Court is disproportionate in view of the objectives pursued by Decision 2010/413 and Regulation No 267/2012, as it allows the Council to adopt restrictive measures against any person or entity operating in a sector capable of generating substantial revenue for the Government of Iran. Such a broad reading of the list criterion would transform it into a sectoral sanction. Such an interpretation is contrary to the principle of legal certainty, which requires, where the legislation is ambiguous, the interpretation most favourable to NIT

63 By its fourth ground of appeal, NITC claims that the General Court erred in rejecting its alternative argument that, by its broad interpretation of the listing criterion in Article 20(1)( Decision 2010/413 and Article 23(2)(d) of Regulation No 267/2012, ... interpretation ... would make those provisions disproportionate to the objectives pursued by Decis 2010/413 and Regulation No 267/2012, and those provisions

64 The Council contends that the second part of the first ground of appeal is unfounded. The General Court did not err in law in holding that the reason relating to support for the Government was satisfied, as, although the Joint Plan of Action provided a certain degree of sanctions relief to the Islamic Republic of Iran, as stated ..., any stagnation in ... the government to put an end to its nuclear proliferation activities.

– Findings of the Court

65 By its second complaint in the second part of the first ground of appeal, which should be examined first, NITC disputes the General Court's interpretation and application of the criterion set out in Article 20(1)(c) of Decision 2010/413, as amended by Decision 2012/635, and Article 23(2)(d) of Regulation No 267/2012, as amended by Regulation No 1263/2012.

66 In the first place, the appellant criticises the argument that the reason relating to supporting the Government, which the General Court declared to be well founded in paragraph 92 of the judgment under appeal, corresponds to the reason relating to financial support to the government which was the subject of the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608). In that regard, it suffices to state that, in paragraphs 84 to 87 of the judgment under appeal, the General Court set out the reasons for which the reason that NITC's logistical support to the Government was, by way of a separate statement of reasons, from the one which had been rejected in the judgment of 3 July 2014, National Iranian Tanker Company v Council (T‑565/12, EU:T:2014:608), in which the information the Council relied on in order to find that NITC provided the government with financial support. More particularly, as stated in paragraph 82 of the judgment under appeal, the General Court stated that the Council had alleged that NITC provided support to the Government through its company ... paid dividends to that government, but that, because of the significant ... second ... which ... not ... by the Government, that appellant ... provided logistical support to that government.

67 In the second place, it should be pointed out that the General Court rightly held, in paragraph 85 of the judgment under appeal, that the criterion of support for the Government in Article 20(1)(c) of Decision 2010/413, as amended by Decision 2012/635, and Article 23(2)(d) of Regulation No 267/2012, as amended by Regulation No 1263/2012, must be understood as meaning that it targets the level of ... activities which, even if they have no actual direct or indirect connection with nuclear proliferation, are capable of encouraging it, by providing the Government with resources or facilities of a material, financial or logistical nature allowing it to pursue proliferation activities (see, to that effect, judgment of 1 March 2016, National Iranian Oil Company v Council, C‑440/14 P, EU:C:2016:128, paragraphs 80 and 81, and of 7 April 2016, Central Bank of Iran v Council, C‑266/15 P, EU:C:2016:208, paragraph 44).

68 As is apparent from paragraphs 81 and 82 of the judgment of 1 March 2016, National Iranian Oil Company v Council (C‑440/14 P, EU:C:2016:128), that criterion takes into account the potential connection between the revenue derived from the energy sector and the funding of proliferation-sensitive nuclear activities, ... in recitals 19 and 22 of Decision 2010/413, ... the funding of Iran's nuclear programme by the Government. The connection between the energy sector and nuclear proliferation is thus established by the EU legislature itself.

69 In addition, it is clear from the case-law of the Court that the criterion at issue, in the light of the objective pursued by the Council, is aimed at forms of support for the Government which, by their quantity or quality, are capable of contributing to the funding of its nuclear activities (see, to that effect, judgment of 1 March 2016, National Iranian Oil Company v Council, C‑440/14 P, EU:C:2016:128, paragraph 83, and order of 4 April 2017, Sharif University of Technology v Council, C‑385/16 P, not published, EU:C:2017:258, paragraph 54).

70 With regard to the notion of 'logistical support', the Court has held that the term 'logistical' is not limited to the activities of ... companies ... but also relates to the methods and organisation of operations making ...

available [illegible] (see, to that effect, judgment of 8 September 2016, Iranian Offshore Engineering & Construction v Council, C-459/15 P, not published, EU:C:2016:646, paragraphs [illegible]).

71 In the light of that case-law, the General Court was right to hold, in paragraph 87 of the judgment under appeal, that, having regard to the importance of NITC's transport activities, [illegible] the Government of Iran [illegible] specific [illegible] which [illegible] the link between [illegible] proliferation activities [illegible] conclude that NITC provided support to the Government of Iran, [illegible] criterion in Article 20(1)(c) of Decision 2010/413, as amended by Decision 2012/635, and Article 23(2)(d) of Regulation No 267/2012, as amended by Regulation 1263/2012, was fulfilled.

72 The interpretation adopted by the General Court, as is apparent from paragraphs 67 to 70 above, forms part of a legal framework which is clearly defined by the objective pursued by the rules governing restrictive measures against the Islamic Republic of Iran and, as such, does not contravene the principle of legal certainty.

73 In the third place, it should be borne in mind that the General Court did not err in law in paragraphs 88 and 89 of the judgment under appeal in finding that the conduct in question could not be called into question by the suspension of the Joint Plan of Action by Decision 2014/21 and Regulation No 42/2014, of the ban on transporting [illegible]

74 In that regard, [illegible] the Islamic Republic of Iran [illegible] a process aimed at finding a long-term comprehensive solution to the Iranian nuclear issue, without calling into question the objective pursued by Decision 2010/413 and Regulation No 267/2012 of preventing nuclear proliferation and bringing pressure to bear on the Islamic Republic of Iran to put an end to the activities in question. In addition, [illegible] extent [illegible] temporary [illegible] Joint Plan of Action [illegible] a suspension [illegible] which [illegible] the General Court in paragraphs 89 of the judgment under appeal ar[illegible]

75 In the fourth place, NITC argues that the General Court erred in law [illegible] allegations [illegible] the Government of Iran [illegible] objective pursued by Decision 2010/413 and Regulation No 267/2012, [illegible] inapplicable to NITC.

76 In that regard, the principle of proportionality requires that measures adopted by provisions of EU law be appropriate for attaining the legitimate objectives pursued by the legislation at issue and do not go beyond what is necessary to achieve them (judgment of 15 November 2012, Al-Aqsa v Council and Netherlands v Al-Aqsa, C-539/10 P and C-550/10 P, EU:C:2012:711, paragraph 122 and the case-law cited).

77 The Court has held that the objective of Decision 2010/413 and Regulation No 267/2012, as pointed out in paragraph 74 above, is to prevent nuclear proliferation and thus to exert pressure on the Islamic Republic of Iran to end the activities concerned, which is part of a more general framework of endeavours linked to the maintenance of international peace and security (see, to that effect, judgment of 28 November 2013, Council v Manufacturing Support & Procurement Kala Naft, C-348/12 P, EU:C:2013:776, paragraph 124 and the case-law cited).

78 The General Court's interpretation of the criterion relating to support for the Government of Iran, as referred to in paragraphs 67 to 69 above, covers activities [illegible] the Government of Iran [illegible] source of financing [illegible] allowing it to pursue [illegible] proliferation-sensitive nuclear activities [illegible]

by the General Court in the present case [illegible] appropriate [illegible] is necessary to achieve that objective.

79 It follows that the second and fourth gro[illegible]

The third ground of appeal

– Arguments of the parties

80 By its third ground of appeal, NITC claims that the General Court erred in law [illegible] paragraph 138 of the judgment under appeal [illegible] NITC [illegible] the General Court [illegible] NITC [illegible] paragraph 135 of the judgment [illegible] NITC [illegible] company or companies [illegible] makes no dif[illegible]

81 The Council [illegible] the General Court [illegible] NITC [illegible] comparable scale.

– Findings of the Court

82 Article 52(1) of the Charter [illegible] the need to protect the rights and freedo[illegible]

83 With regard [illegible] Article 16 of the Charter [illegible] NITC [illegible] European Union [illegible] judgment of 28 November 2013, Council v Manufacturing Support & Procurement Kala Naft, C‑348/12 P, EU:C:2013:776, paragraph 121 and the case-law [illegible]

84 Although [illegible] NITC's fundamental [illegible] never [illegible] examination of [illegible] paragraph 132 of the judgment under appeal.

85 In addition [illegible] paragraph 132 [illegible] General Court [illegible] NITC's [illegible] Decision 2010/413 [illegible] NITC [illegible] the degree of mistrust towards it was the [illegible]

86 In the light of those factors, NITC's right to property and to conduct a business cannot be regarded as having been disproportionately infringed. That conclusion must be reached regardless of the magnitude of the damage suffered (see, to that effect, judgment of 7 April 2016, Central Bank of Iran v Council, C‑266/15 P, EU:C:2016:208, paragraph 58).

87 Finally, the General Court did not err in law in considering, in the light of all ... in question by the adoption of the Joint Plan of Action and that NITC's situation could not be compared to that of the entities in respect of which the restrictive measures were lifted ... that regard, it is sufficient to refer to the ... 65 to 79 above.

88 The third ground of appeal is therefore r

### Costs

89 Under Article 184(2) of the Rules of Procedure of the Court of Justice, where the appeal is unfounded, the Court is to make a decision as to costs. Under Article 138(1) of those Rules, which apply to appeal proceedings by virtue of Article 184(1) thereof, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings.

90 Since the Council has applied for costs and NITC has been unsuccessful, the latter must be ordered to bear its own costs and to pay

On those grounds, the Court (Fourth Chamb

1. Dismisses the appeal;

2. Orders National Iranian Tanker Company to bear its own costs and to pay those incurred by the Council of the European Union.

von Danwitz Jürimäe Lycourgos

Juhász Vajd

Delivered in open court in Luxembourg on 29 November 2018.

A. Calot Escobar K. Len

Registrar Presi

---

(*1) Language of the case: English.