# CERTIFIED TRANSLATION FROM FARSI (PERSIAN) INTO ENGLISH

Abdollahi v. National Iranian Tanker Co., No. 1:19-cv-03688-ABJ (D.D.C.)

---

**Source document:** "قرارداد پیمان جمعی" — Collective Bargaining Agreement for the year 2017, between the Iranian Merchant Mariners' Trade Union Association and the National Iranian Tanker Company. 22 numbered pages plus cover. Bearing on each page the seal of the "National Iranian Tanker Co. — NITC Transaction Committee" and the initials of the signatories. Reference on page 1: dated 1395/10/11, No. 13,579.

---

## TRANSLATOR'S NOTE

1. The source document is a scanned image without a machine-readable text layer. This translation was prepared from the scanned Farsi original.

2. Article 31.1 of the source document provides that the agreement was executed in both English and Farsi, and that the English version governs in the event of conflict. A closing note on the final substantive page states: "Having regard to the difficulties of conveying concepts in the translation of scientific and legal texts, if there is any discrepancy between the Farsi and English texts, the criterion for judgment shall be the original text in the English language." Counsel is advised that if the executed English counterpart can be obtained from the Company or the Association, that counterpart — not this translation — is the operative text by the agreement's own terms.

3. Annex 4 (the wage schedule) appears in the source document with English column headings and Arabic numerals. It is reproduced below rather than translated.

4. Annex 2 contains a tabular schedule of approximately 196 numbered items assigning disability percentages to specific anatomical losses, together with visual-acuity and audiometric tables. Several section-heading bars in the scan are obscured. The monetary figures and the introductory provisions of Annex 2 are legible and are translated below. The line-item percentage schedule is identified but not transcribed, because the resolution of the scan does not permit each numeric entry to be read with the certainty a numerical schedule requires. If those figures are needed, a higher-quality copy of pages 15 through 20 of the original should be obtained and the schedule transcribed separately.

5. Bracketed material is supplied by the translator for clarity and does not appear in the source. Items marked [illegible] or [verify] could not be read with certainty.

6. Personal names in the signature block are transliterated from the Farsi. Transliteration of Persian proper names admits of variants.

**[COVER PAGE]**

---

# COLLECTIVE BARGAINING AGREEMENT

**2017**

Iranian Merchant Mariners' Trade Union Association — National Iranian Tanker Company

## COLLECTIVE BARGAINING AGREEMENT — YEAR 2017 A.D.

### Article 1: Definitions

1.1 "Collective Agreement" means the present agreement, which sets out the general conditions of engagement, work and living, and the welfare affairs, of seafarers aboard a vessel.

1.2 "Seafarer" is a person who is engaged under a "Seafarer Employment Agreement" and within the framework of this Collective Agreement, and who is assigned to a specified post for work aboard a vessel.

1.3 "Vessel" is the floating craft aboard which the seafarer is assigned to work by the Company under a "Seafarer Employment Agreement."

1.4 "Company" means the owner of the vessel, or the natural or legal person who, under a bareboat charter agreement, has the vessel at its disposal, or has the management of the vessel, or bears responsibility for supplying its human resources on behalf of the vessel's owner.

1.5 "Association" is the abbreviated term for the "Iranian Merchant Mariners' Trade Union Association," which is one of the signatory parties to this Collective Agreement.

1.6 "Seafarer Employment Agreement" is a contract concluded between the seafarer and the Company, in which the conditions of engagement and work of the seafarer are set out.

1.7 "Maritime Labour Convention (MLC 2006)" is the convention adopted at the session of 23 February 2006 of the International Labour Organization (ILO).

1.8 "International Labour Organization (ILO)" refers to the organization under the auspices of the United Nations.

1.9 "International Maritime Organization (IMO)" refers to the organization under the auspices of the United Nations.

1.10 "International Safety Management (ISM)" means the Code adopted as Resolution No. A.741(18) of the Assembly of the International Maritime Organization.

1.11 "International Ship and Port Facility Security (ISPS)" means the International Code for the Security of Ships and of Port Facilities adopted by the Assembly of the International Maritime Organization.

1.12 "International Convention on Standards of Training, Certification and Watchkeeping for Seafarers (STCW)" means the Convention of 2010 of the International Maritime Organization.

1.13 "Homeland" means the place of initial employment or residence of the seafarer, which is specified in the Seafarer Employment Agreement as the place of commencement of service.

1.14 "Engagement" means the seafarer's employment aboard the vessel, the period of which runs from the day he departs his homeland in order to join the vessel until the day he returns to his homeland.

1.15 “Service to the vessel” means the seafarer's employment aboard the vessel and likewise movement ashore with the master's permission, within the framework of the current and customary laws governing this agreement.

1.16 “Basic wage” is the amount which, in accordance with the “Seafarer Employment Agreement” (in rials or in foreign currency), is paid in respect of the seafarer's normal working hours.

**Article 2: Application**

2.1 This agreement determines the conditions and standards applicable to seafarers serving aboard vessels which belong to the Company, or whose manpower is supplied by the Company (per Annex 3).

2.2 This agreement sets out the conditions and standards of engagement and employment of all seafarers covered by this agreement and is deemed part of their engagement documents, irrespective of whether those seafarers have concluded a “Seafarer Employment Agreement” with the Company or not. Where the provisions of the “Seafarer Employment Agreement” afford more favourable benefits than the provisions of this agreement, the relevant provisions of the “Seafarer Employment Agreement” shall govern.

2.3 The Company shall deal with the seafarer in accordance with the regulations of the International Labour Organization (ILO), in furtherance of the lawful objectives of the Association.

2.4 The Company recognizes the right of seafarers to elect a liaison representative from among the vessel's workers.

2.5 The Company must keep signed Farsi and English copies of this agreement aboard the vessels covered by this agreement.

2.6 The provisions of this agreement do not limit the authority of the master of the vessel in implementing the International Safety Management Code (ISM) and the International Ship and Port Facility Security Code (ISPS).

**Article 3: Conditions of Engagement**

3.1 The seafarer must hold valid certificates of competency, skill and medical fitness, and likewise the ability necessary for the performance of the duties for which he has been engaged, and must perform his duty competently in the service of the Company. Verification of the validity and authenticity of the seafarer's certificates and abilities, at the commencement of engagement and throughout the period of service, rests with the Company.

3.2 The Company is entitled to require the seafarer, at the Company's expense, to undergo a “pre-engagement medical examination” under the supervision of its approved physician. The seafarer is obliged to answer truthfully, as to his state of health, the questions set out in the questionnaire. In the event of failure to observe truthfulness in his answers, the seafarer shall be deprived of receiving the compensation set out in Articles 18, 19, 20 and 21 of this agreement. A copy of the result of the said medical examination must also be given to the seafarer.

3.3 Where the Company makes use of the services of manning agencies, it must satisfy itself that all of the standards set out in Regulation 1.4 of the Maritime Labour Convention — including the regulations relating to the engagement of the seafarer without receiving from him any cost in respect of engagement, travel and visa; the right to review the employment contract by the seafarer before engagement; and the prohibition on the use of a blacklist — are observed.

3.4 The seafarer is entitled to hold a copy of the Seafarer Employment Agreement which he has concluded with the Company.

3.5 At the conclusion of the seafarer's work aboard the vessel, the Company must issue and deliver to him a certificate relating to his record of service. The said certificate must not contain any indication of the quality of work or of the amount of the seafarer's wages. The seafarer's discharge book may be used for the purpose of this clause.

**Article 4: Performance of Work Outside the Seafarer's Duties**

4.1 The Company is not permitted to make use of the vessel's personnel or of its other workers (whether under permanent or temporary contract) for the performance of work connected with cargo, or other work which is traditionally and customarily performed by port service workers ashore, unless the prior agreement of the Association has been obtained; and where the seafarer, at the Company's request, volunteers to perform such work, his effort must be compensated in an appropriate manner.

4.2 At such time as the vessel is at a port at which a dispute is in progress between dock workers affiliated with the workers' union and the official authorities, the Company is permitted to make use of the vessel's personnel or of its other workers (whether under permanent or temporary contract) for the performance of the work of moving goods and other work which is traditionally and customarily performed by port service workers ashore, where there is no likelihood of influencing the process of resolution of their dispute. Furthermore, the Company shall not take any disciplinary measure in respect of seafarers who respect the request of the dock workers and do not act, and such conduct shall not be regarded as a breach of their employment contract, provided that this is the customary and lawful course in the country concerned.

4.3 For those seafarers who, subject to the conditions stated in clause 4.1, volunteer to perform work during the weekly working hours in accordance with Article 6 of this agreement, payment to them shall be made in accordance with the provisions of Annex 1 on the basis of one (1) hour of overtime in addition to the basic wage. Any work performed outside the ordinary weekly working hours shall be calculated at the rate of two (2) times the overtime rate.

**Article 5: Period of Engagement**

5.1 The period of the seafarer's employment aboard the vessel is that period which is stated in the "Seafarer Employment Agreement," and is as set out in Annex 1 of this agreement. Upon the expiry of the determined period, the seafarer's employment terminates automatically, and on the basis of the conditions set out in this agreement, at the first port at which the vessel calls.

**Article 6: Normal Working Hours and Entitled Leave**

6.1 Normal working hours and entitled leave shall be in accordance with the provisions of Annex 1 of this agreement.

**Article 7: Overtime**

7.1 The seafarer is entitled to receive remuneration in respect of overtime work aboard the vessel, in accordance with the provisions of Annex 1 of this agreement.

7.2 The documents relating to the seafarer's overtime work must be prepared in two copies and signed by the master of the vessel or by the relevant supervisor. The overtime documents must be confirmed by the seafarer at intervals of one month or shorter. One copy of the said documents must be delivered to him at the conclusion of the seafarer's employment aboard the vessel.

7.3 Work performed in emergency conditions which directly threaten the safety, security, passengers, workers or cargo of the vessel, or in conditions in which the vessel is rendering assistance to other vessels or to persons who are in danger, and likewise at the time of the conduct of safety, security and environmental drills, shall not be subject to the payment of overtime remuneration. Determination of emergency conditions rests with the master of the vessel.

**Article 8: Official Holidays**

8.1 Official holidays shall be in accordance with the official calendar of the Islamic Republic of Iran, whether the vessel be at sea or in port. Where, at the discretion of the master of the vessel, the seafarer is assigned to work on official holidays, the rest lost must be compensated in an appropriate manner.

**Article 9: Hours of Rest**

9.1 The seafarer must have a minimum of 10 hours of rest in every 24 hours, and 77 hours in every 7 consecutive days.

9.2 The hours of rest may be divided into two separate periods of time, on condition that one of them be a minimum of 6 consecutive hours and that the interval between the two periods of rest not exceed 14 hours.

9.3 The Company must prepare the vessel's work programme at sea and in port, and the minimum hours of rest for each post, in the English language and the language commonly in use aboard the vessel, and must post it in a suitable place aboard the vessel which is accessible to the seafarer.

9.4 Where, in emergency conditions at the determination of the master, the seafarer is obliged to perform work during the hours of rest, his hours of rest must be compensated in the requisite manner at the first opportunity after the return to normal conditions.

9.5 Emergency drills and exercises which are prescribed on the basis of national laws and regulations, or international standards, must be conducted in such manner as to have the least interference with the seafarer's hours of rest and not to cause him fatigue.

9.6 The manner of allocating the seafarer's watchkeeping hours aboard UMS vessels (those lacking a continuously manned engine room) must be carried out in such manner as to have the least interference

with his hours of rest and not to cause him fatigue. Where, in this connection, the seafarer's hours of rest are reduced, they must be compensated in the requisite manner.

9.7 The documents relating to the seafarer's daily working and rest hours must be kept aboard the vessel, and one copy of them, after the signature of the seafarer and the confirmation of the master or the responsible officer, shall be placed at the seafarer's disposal.

**Article 10: Wages**

10.1 The seafarer's wage must not be less than the amounts set out in Annex 4 of this agreement, and only lawful deductions, the deductions set out in this agreement, and other deductions approved by the seafarer, are applicable.

10.2 The seafarer's wage shall be calculated on a monthly basis in accordance with the provisions of the "Seafarer Employment Agreement," and, in the event of his request, an advance may also be paid to him aboard the vessel. The seafarer's monthly wage statement shall be placed at his disposal.

10.3 The Company, having regard to the current laws and regulations, is obliged to provide the facilities necessary for the seafarer for the payment of part of his monthly wage to other persons.

10.4 Any cost in respect of the services referred to in clause 10.3 must be customary. It is evident that the costs arising in this connection are borne by the seafarer.

10.5 Part of the wage of those seafarers who are in the permanent employment of the Company is paid on the basis of Iranian rials, which the Company is obliged to deposit into the seafarer's account on a monthly basis. The Company guarantees that this portion of the wage shall not be less than [one] thousand United States dollars [figure to be verified against a clearer copy], at the currency conversion rate for the month and at the rate announced by the Central Bank of the Islamic Republic of Iran. The other portion of the wage is paid in United States dollar currency and on the basis of the amounts set out in the Seafarer Employment Agreement aboard the vessel, and on a monthly basis. The Company guarantees that the aggregate of the aforesaid amounts shall not be less than the aggregate of the amounts in the table of Annex 4 for any post.

**Article 11: "Ship's Crew Shortage" Allowance**

11.1 In circumstances in which the number of the vessel's crew is, for any reason, less than the number specified in the Company's manning table for the vessel, the basic wage of the absent seafarer must be divided among those seafarers who perform his duty. In any event, the Company shall use its utmost endeavour to supply the necessary manpower before departure from the first port. The provisions of this Article shall not limit the payment of overtime remuneration under Article 7 of this agreement.

**Article 12: Transit in Warlike Areas / High-Risk Areas**

12.1 The Company must make available aboard the vessel to the seafarers the up-to-date list of warlike/high-risk areas determined by the "International Bargaining Forum (IBF)."

12.2 Where the vessel intends, and it is possible for it, to transit warlike/high-risk areas, the Company must inform the seafarer at the commencement of engagement. Where such information is obtained during

the period of the seafarer's employment aboard the vessel, the seafarer must be informed at the earliest opportunity.

12.3 The seafarer shall not be under compulsion to be present aboard a vessel bound for warlike areas, and the Company has no right to threaten dismissal of, or to reprimand, the seafarer by reason of his declining to be present in warlike areas. In that event the cost of returning the seafarer to his homeland is borne by the Company.

12.4 The allowance for transit in warlike/high-risk areas for those seafarers who transit those areas shall be in accordance with the provisions of Annex 1 of this agreement.

12.5 Where the seafarer, by reason of an attack by pirates upon the vessel, is taken captive, or [by reason of] the hijacking of the vessel, or by reason of the occurrence of such acts, whether within or outside the declared areas, is prevented from continuing the sea voyage, his status of employment, wages and benefits shall, until the last day of his return to his homeland, remain in full force in accordance with this agreement. The Company must exert its utmost endeavour in support of the captive seafarer.

**Article 13: The Seafarer's Personal Effects and Compensation for Lost Personal Effects**

13.1 Whenever the seafarer's personal effects aboard the vessel are lost, in whole or in part, by reason of the occurrence of casualties such as fire, grounding, or the sinking of the vessel, the Company must compensate the damage sustained to his customary property, up to the maximum ceiling determined in Annex 1 of this agreement. Damage arising from the default, fault or negligence of the seafarer, and likewise the loss of the seafarer's property by reason of an unlawful act or theft on his part, is excluded from the scope of this clause.

13.2 Where the seafarer aboard the vessel becomes ill, is injured, or dies, the Company must, while safeguarding his personal effects, take the requisite measures for sending them to the seafarer's own address, or to his family, or to his lawful heirs.

**Article 14: Handling of "Complaints Aboard the Vessel"**

14.1 The Company must have an appropriate procedure for the fair, effective and prompt handling of the complaints of seafarers aboard the vessel concerning non-observance of the provisions of this agreement.

14.2 In the said procedure, the right of the seafarer to have a witness or a representative in the process of the handling of his complaint must be provided for, and likewise the measures necessary for the protection of the seafarer from any threat or reprimand by reason of the lodging of the complaint must be taken into account.

**Article 15: Termination of Employment**

15.1 The seafarer's employment terminates upon the following conditions:

(a) the expiry of the period of the contract in accordance with the provisions of the "Seafarer Employment Agreement"; or

(b) in the event of his being landed from the vessel by reason of illness or injury, conditional upon the performance of the medical examinations provided for in Article 18, or for the reason set out in Article 20 of this agreement.

(c) by reason of the sinking or loss of the vessel.

15.2 The Company may, under the following conditions, after 15 days' written notice to the seafarer, terminate the seafarer's employment:

(a) in the event of proof of serious default or fault of the seafarer in the performance of duties as provided in Article 17 of this agreement; or

(b) by reason of the sale of the vessel, or the vessel's being out of service for a period of at least one consecutive month.

15.3 The seafarer may, upon the following conditions and after 15 days' written notice to the Company, terminate his employment:

(a) at such time as it becomes apparent that the spouse, children, or one of the parents of the seafarer has been afflicted with a dangerous illness; or

(b) where, as described in clause 12.3 below, the vessel is bound for a warlike and high-risk area.

15.4 The transfer of the seafarer, during the term of the Seafarer Employment Agreement, from one vessel to another vessel under the ownership or management of the Company (per Annex 3), on condition that no change be created in his post and wage, is not equivalent to the termination of the seafarer's employment. All costs of transfer and of subsistence during the days of transfer are borne by the Company.

15.5 A seafarer who has been employed on a temporary basis is entitled to receive the amount set out in Annex 1 of this agreement as wages for the period of unemployment arising from the termination of employment on the basis of the provisions of clauses 15.1(c) and 15.2(b) above.

**Article 16: Repatriation to the Homeland**

16.1 In accordance with Article 15 of this agreement, and in the event of the termination of the seafarer's employment, the Company must provide the cost of return to the homeland (the place of signature of the contract, or the place of residence at the seafarer's choice). Where the termination of employment is under clause 15.2(a) of Article 15, or at the request of the seafarer for the early termination of the employment contract, for reasons outside the conditions set out in clause 15.3, the cost of repatriation to the homeland shall be borne by the seafarer.

16.2 The Company, in the process of returning the seafarer to his homeland (the place of signature of the contract, or the place of residence at the seafarer's choice), while taking into account customary considerations for his welfare, shall be responsible for the payment of the following costs:

(a) basic wages from the day of disembarkation from the vessel until the day of the seafarer's arrival in his homeland;

(b) the costs of accommodation and food;

(c) customary costs of travel; and

(d) the cost of carriage of the seafarer's personal effects up to the amount of 30 [kilograms].

**Article 17: Default or Fault**

17.1 The Company may terminate the "Seafarer Employment Agreement" by reason of the default or fault of the seafarer. The Company must, in the event of the seafarer's request, state in writing to him the reasons for the termination of the contract.

17.2 In the event of the termination of the "Seafarer Employment Agreement" within the framework of the provisions of this Article, the Company may deduct from his receivables the loss sustained on the part of the seafarer, including the cost of repatriation to the homeland. The cost of replacing the dismissed seafarer, the subject of clause 17.1, is not included within the said losses.

**Article 18: Medical Care**

18.1 The Company must provide the medical care necessary at the time of need, particularly in emergency conditions, and dental cases in the event of affliction with severe pain, at the earliest possible opportunity.

18.2 In the event of the illness or injury of the seafarer during the period of engagement, the costs of medical treatment of the seafarer, including hospitalization, and likewise the costs of repatriation to the homeland on the basis of Article 16 of this agreement, until his recovery of health or the confirmation of his disability, having regard to the provisions of Article 19 of this agreement, are borne by the Company.

18.3 For the purposes of this Article, the Company shall not be responsible for the compensation of damage under the following conditions:

(a) injury in conditions in which the seafarer was not in service to the vessel;

(b) illness or injury which arises from an intentional act of the seafarer; or

(c) illness or disability which has been deliberately kept concealed by the seafarer at the commencement of engagement.

**Article 19: Sick Pay**

19.1 In the event that the seafarer is landed from the vessel by reason of illness or injury arising from "work aboard the vessel," the Company must pay his basic wages until the day of his return to his homeland.

19.2 In the event of the continuation of illness, the seafarer is entitled to receive basic wages during the days of illness.

19.3 In the event that the seafarer is injured by reason of the occurrence of an accident, his basic wages shall be paid during the course of his treatment, or until the issuance of the opinion of the competent medical authorities concerning permanent disability, having regard to the provisions of Article 20.

19.4 The ceiling for the payment of sick pay is 16 weeks from the day of injury or of the commencement of illness, and is conditional upon the presentation of valid medical documents at the earliest possible time.

19.5 For the purposes of this Article, the Company shall not be responsible for the compensation of damage under the following conditions: (a) injury in conditions in which the seafarer was not in service to the vessel; (b) illness or injury which arises from an intentional act of the seafarer; or (c) illness or disability which has been deliberately kept concealed by the seafarer at the commencement of engagement.

**Article 20: Loss of Limb or Permanent Disability**

20.1 In the event that the seafarer, during the period of engagement, suffers loss of limb or permanent disability as the effect of an accident, he is entitled, in addition to sick pay, to receive compensation for loss of limb or permanent disability within the framework of this Article.

20.2 Determination of loss of limb or permanent disability of the seafarer rests with the Company's approved physician. Where the opinion of the physician in whom the seafarer has confidence is at variance with the opinion of the Company's approved physician, the opinion of the forensic medicine specialist introduced by the Legal Medicine Organization of the country shall govern.

20.3 The Company is obliged to pay to the seafarer compensation for loss of limb or permanent disability on the basis of the table of Annex 2 of this agreement.

20.4 The Company must make the arrangements necessary for the payment of compensation to the injured party. Where the process of payment of compensation for permanent disability arising from the injury takes longer than is customary, the Company may pay an amount to the seafarer on account by way of advance and thereafter deduct the said amount from the final payment.

20.5 For the purposes of this Article, the Company shall not be responsible for the compensation of damage under the following conditions: (a) injury in conditions in which the seafarer was not in service to the vessel; (b) illness or injury which arises from an intentional act of the seafarer; or (c) illness or disability which has been deliberately kept concealed by the seafarer at the commencement of engagement.

**Article 21: Death in Service**

21.1 In the event that the seafarer dies during the period of engagement, or from an illness arising from work aboard the vessel as described in Article 19 of this agreement, for reasons other than the cases set out in clause 21.2, the Company is obliged to pay the amount set out in Annex 1 of this agreement to his lawful heirs. In addition, the Company, observing the current laws of the country of the place of death, shall, while repatriating the body of the deceased to the homeland, pay burial assistance costs in accordance with the amount set out in Annex 1 of this agreement.

21.2 For the purposes of this Article, the Company shall not be obliged to pay compensation under the following conditions:

(a) where the death has occurred at a time other than that of service to the vessel;

(b) where the death arises from an intentional act of the seafarer (suicide);

(c) where an illness or disability resulting in death has been deliberately kept concealed by the seafarer at the commencement of employment; or

(d) where the death arises from an illness or injury unconnected with service to the vessel.

**Article 22: Food, Accommodation and Welfare Facilities**

22.1 The Company must provide suitable facilities for the accommodation, food and welfare amenities of the seafarer in accordance with the Maritime Labour Convention.

22.2 All seafarers shall enjoy the right of free communication in emergency conditions similar to that which has been mentioned in clause 15.3(a).

**Article 23: Personal Safety Equipment**

23.1 The Company must provide the facilities and personal safety equipment necessary for the seafarer in accordance with the Safety Management System (ISM Code).

23.2 The Company must make the seafarer aware of the hazardous nature and the probable risks connected with work aboard the vessel, and likewise of the precautionary measures necessary, and must train him in the manner of the use of personal safety equipment.

23.3 In the event of the absence of tools and personal safety equipment, the seafarer shall not be obliged to perform the work.

23.4 The seafarer is obliged to use and to maintain his personal safety equipment. Likewise these items are deemed part of the vessel's equipment and shall remain aboard the vessel.

**Article 24: Objection and Assignment of Rights**

24.1 The Company or its lawful representative shall not compel the seafarer to sign any document by virtue of which the seafarer is deprived of receiving his rights as set out in this agreement, or is constrained to restore to the Company rights and benefits received, or his deferred rights and benefits.

**Article 25: Engagement of the Seafarer**

25.1 The engagement of the seafarer through companies which, on the basis of the provisions of Regulation 1.4 of the Maritime Labour Convention, hold the licences/certificates necessary for the provision of recruitment services and the supply of seafarers, is unrestricted.

**Article 26: Social Security**

26.1 The Company is obliged to provide suitable social security coverage for the seafarer and the persons who are his dependants, on the basis of the laws and regulations within the country. It must likewise satisfy itself that the recruitment or manning centres which are party to the seafarer's contract have also provided the said services in relation to him.

**Article 27: Seafarers' Welfare Fund**

27.1 The Company shall pay annually to the Association, in respect of the Seafarers' Welfare Fund, the amount set out in Annex 1 of this agreement in proportion to each seafarer, in accordance with the "minimum manpower tables" of the vessels covered by this agreement as set out in Annex 3.

**Article 28: Probationary Period**

28.1 The first six weeks of the first period of employment under the contract as between the seafarer and the Company shall be considered as a probationary period, and each of the two parties is permitted, during that period and before the expiry date set out in the Seafarer Employment Agreement, to terminate the contract. In such case the costs of return to the homeland are borne by the party terminating the contract. However, the conditions set out in clause 15.5 of this agreement, in respect of the payment of wages to the seafarer, are not subject to this type of termination.

**Article 29: Insurance Coverage**

29.1 The Company is obliged to obtain for itself appropriate insurance against the liabilities referred to in Articles 15.5, 16, and 18 to 21 of this agreement.

**Article 30: Governing Law and Resolution of Disputes**

30.1 This agreement has been drawn up on the basis of the Maritime Labour Convention and is subject to the laws of the Islamic Republic of Iran, and any dispute arising from it shall be dealt with before the competent authorities of the Islamic Republic of Iran.

**Article 31: Language of the Collective Agreement**

31.1 This Collective Agreement has been written in both the English and Farsi languages, and in the event of the existence of any deficiency or conflict between the two versions of the contract, the English version shall govern in determining the spirit, the intent and the meaning of this Collective Agreement.

**Article 32: Term of Validity of the Agreement**

32.1 This agreement, containing 32 Articles and 4 Annexes, was drawn up in three original copies, each of equal validity, on the date 1395/10/11 [31 December 2016] and was signed by the parties, and shall be valid until the date 1396/10/10 [31 December 2017].

**[Signature block]**

National Iranian Tanker Company: Sirous Kian Ersi [transliteration to be verified], Managing Director and Member of the Board of Directors; Seyed Ahmad Kalimi [transliteration to be verified], Vice-Chairman and Member of the Board of Directors.

Iranian Merchant Mariners' Trade Union Association: Arman Jahan Beigloo [transliteration to be verified], Chairman of the Board of Directors; Mehran Hedayati [transliteration to be verified], Treasurer.

[Each page of the source document bears the seal of the “National Iranian Tanker Co. — NITC Transaction Committee,” the emblem of the Iranian Merchant Mariners' association, the page number in the form “page __ of 22,” and the initials of the signatories.]

## ANNEX 1

**Period of Engagement.** Having regard to the provisions of Article 5 of this agreement, the period of engagement is on the basis of the period set out in the Seafarer Employment Agreement, which shall be subject to change according to the operational conditions of the vessel. In any event the seafarer may, in the event of the Company's agreement, extend the period of his contract up to a ceiling of 12 months.

**Normal Working Hours.** Having regard to the provisions of Article 6 of this agreement, the normal working hours must not exceed 8 hours in a 24-hour period. Saturday afternoon and Sunday are the weekend holiday times. The determination of the weekend holiday times is subject to change according to the operational conditions of the vessel and national custom, at the view of the master of the vessel.

**Entitled Leave.** Having regard to the provisions of Article 6 of this agreement, the entitled leave of the seafarer is as set out in the “Seafarer Employment Agreement,” which in any event shall not be less than 2.5 days per month.

**Overtime.** Having regard to the provisions of Article 7 of this agreement: (a) working hours in excess of the “normal working hours” are counted as overtime; and (b) the rate of each hour of overtime is 1.40 times the rate of each hour of the seafarer's normal work.

**Transit in Warlike / High-Risk Areas.** Having regard to the provisions of Article 12 of this agreement, where the seafarer transits warlike/high-risk areas with the vessel, the following benefits accrue to him: (a) compensation for disability and for death is doubled; and (b) an allowance equal to 100% of basic wages for the period of transit in warlike/high-risk areas. The allowance payable for warlike/high-risk areas is for a minimum period of 5 days.

**Compensation for Lost Personal Effects.** The maximum compensation payable to workers in respect of their lost effects on the basis of Article 13 of this agreement shall be 3,300 (three thousand three hundred) United States dollars, declared according to the type and quantity of the effects.

**Wages for the Period of Unemployment.** Wages for the period of unemployment, in accordance with Article 15.5 of this agreement, in proportion to the remaining days of the period of the “Seafarer Employment Agreement,” shall be a maximum of 2 months' basic wages.

**Compensation for Death in Service.** Having regard to the provisions of Article 21 of this agreement:

(a) compensation for death in service of seafarers is as follows: 96,909 United States dollars to his lawful heirs; 19,382 United States dollars to each dependent child (a maximum of up to 4 children under 18 years of age).

(b) burial assistance costs are 5,000 (five thousand) United States dollars.

**Seafarers' Welfare Fund.** Having regard to the provisions of Article 27 of this agreement, the amount of 1,700,000 (one million seven hundred thousand) rials in respect of the Seafarers' Welfare Fund, in proportion

to each seafarer, in accordance with the "minimum manpower tables" of the vessels covered by this agreement (per Annex 3), has been determined.

## ANNEX 2 — Compensation for Loss of Limb or Permanent Disability

1. In the event of loss of limb or permanent disability of a seafarer, the amount of compensation payable on the basis of Article 20 of this agreement, for 100 percent loss of limb, is as follows:

(a) Senior officers: 161,514 United States dollars

(b) Junior officers: 129,212 United States dollars

(c) Ratings: 96,909 United States dollars

Note 1: By "senior officers" is meant the Master, the Chief Engineer, the First Officer, the Second Engineer, and the Electrical Engineer.

2. The degree of loss of limb and of permanent disability (in percent) is determined in accordance with the tables below.

> *Translator's note: there follows in the source document, at pages 15 through 20 of 22, a schedule of approximately 196 numbered line items assigning percentages of disability to specified anatomical losses, organized under section headings (hand, wrist, arm, elbow, shoulder, nerves, foot, leg, hip, speech and dentition, cranium, mental capacity, vision, hearing, spine, pelvis, and internal organs), with separate percentage columns for the right and left sides and a note that for a left-handed person the left hand is evaluated as the right. The schedule includes two visual-acuity conversion tables, an audiometric table with hearing-impairment classes 0 through 5, and notes providing that hearing loss correctable by a hearing aid is not by itself a ground for payment of compensation, and that tinnitus impairing hearing is rated at 3%. The individual numeric entries of this schedule are not transcribed here; see paragraph 4 of the Translator's Note above.*

## ANNEX 3 — List of Vessels Covered by This Agreement

The heading of this annex appears in the source document in English: "CBA Validity: 1st Jan 2017 to 31st Dec 2017." The vessel names, IMO numbers and minimum manning figures likewise appear in Latin script and Arabic numerals in the source. The table is reproduced below.

| No. | Ship's name | IMO No. | Min. man. | No. | Ship's name | IMO No. | Min. man. |
|---|---|---|---|---|---|---|---|
| 1 | ARTAVIL | 9187629 | 14 | 26 | DREAM II | 9356593 | 14 |
| 2 | APAMA | 9187631 | 14 | 27 | DORE | 9357717 | 14 |
| 3 | ARNICA | 9187643 | 14 | 28 | DAN | 9357729 | 14 |
| 4 | ARK | 9187655 | 14 | 29 | SINOPA | 9172038 | 14 |
| 5 | ARGO I | 9187667 | 14 | 30 | SABITI | 9172040 | 14 |
| 6 | HEDY | 9212888 | 14 | 31 | SILVIA I | 9172052 | 14 |
| 7 | HALTI | 9212890 | 14 | 32 | STARK I | 9171450 | 14 |
| 8 | HAPPINESS I | 9212905 | 14 | 33 | SOL | 9171462 | 14 |
| 9 | HASNA | 9212917 | 14 | 34 | STARLA | 9569621 | 14 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10 | HENNA | 9212929 | 14 | 35 | SANCHI | 9356608 | 14 |
| 11 | DEVON | 9218454 | 14 | 36 | SANA | 9357353 | 14 |
| 12 | DOVER | 9218466 | 14 | 37 | SONIA I | 9357365 | 14 |
| 13 | Diamond II | 9218478 | 14 | 37 [sic] | SALINA | 9357377 | 14 |
| 14 | DOWNY | 9218480 | 14 | 39 | SEA START III | 9569205 | 14 |
| 15 | DEEP SEA | 9218492 | 14 | 40 | SNOW | 6569619 | 14 |
| 16 | DORENA | 9569669 | 14 | 41 | SERENA | 9569645 | 14 |
| 17 | HERO II | 9362073 | 14 | 42 | MARIA III | 9615092 | 14 |
| 18 | HELM | 9357391 | 14 | 43 | DINO I | 9569671 | 14 |
| 19 | HORSE | 9362061 | 14 | 44 | DANIEL | 9569683 | 14 |
| 20 | AMBER | 9357406 | 14 | 45 | DIONA | 9569695 | 14 |
| 21 | STREAM | 9569633 | 14 | 46 | DERYA | 9569700 | 14 |
| 22 | SEA CLIFF | 9569657 | 14 | 47 | DUNE | 9569712 | 14 |
| 23 | HUGE | 9357183 | 14 | 48 | FAZEL | 9283746 | 14 |
| 24 | HERBY | 9362059 | 14 | 49 | FOREST | 9283760 | 14 |
| 25 | HILDA I | 9357389 | 14 | 50 | FAXON | 9283758 | 14 |

*Translator's note: the numbering in the source document runs 1 through 50 but repeats the numeral 37 for two consecutive entries (SONIA I and SALINA) and omits 38. The sequence is reproduced as it appears.*

## ANNEX 4 — Minimum Wage List, Year 2017 (United States Dollars)

This annex appears in the source document in English with Arabic numerals, and is reproduced rather than translated. The Farsi caption reads: “List of minimum wages — year 2017 (United States dollars).”

| No. | Capacity (on board) | Mo. basic | Daily basic | Mo. OT* | Pub. hol.** | Leave pay*** | Leave subs. | Tanker allow. | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Master | 2364 | 78 | 1804 | 433 | 197 | 144 | 60 | 5002 |
| 2 | C/O | 1779 | 59 | 1357 | 326 | 148 | 144 | 60 | 3814 |
| 3 | 2/O | 1312 | 44 | 1007 | 240 | 109 | 144 | 60 | 2872 |
| 4 | 3/O | 1158 | 39 | 883 | 212 | 96 | 144 | 60 | 2553 |
| 5 | Cat/O | 1070 | 35 | 816 | 196 | 89 | 144 | 60 | 2375 |
| 6 | C/E | 2179 | 72 | 1662 | 400 | 181 | 144 | 60 | 4626 |
| 7 | 2nd ENG | 1779 | 59 | 1357 | 326 | 148 | 144 | 60 | 3814 |
| 8 | 3rd ENG | 1312 | 44 | 1007 | 240 | 109 | 144 | 60 | 2872 |
| 9 | 4th ENG | 1158 | 39 | 883 | 212 | 96 | 144 | 60 | 2553 |
| 10 | ETO | 1779 | 59 | 1357 | 326 | 148 | 144 | 60 | 3814 |
| 11 | Gas Engineer | 1570 | 52 | 1198 | 287 | 130 | 144 | 60 | 3389 |
| 12 | Bosun / Pump man | 725 | 24 | 553 | 133 | 60 | 144 | 30 | 1645 |
| 13 | AB / 1st Cock / Oiler | 614 | 20 | 419 | 112 | 51 | 144 | 30 | 1370 |
| 14 | OS / 2nd Cock | 458 | 15 | 348 | 84 | 38 | 144 | 30 | 1102 |
| 15 | Fitter / Repairer | 725 | 24 | 553 | 133 | 60 | 144 | 30 | 1645 |
| 16 | Wiper | 458 | 15 | 348 | 84 | 38 | 144 | 30 | 1102 |
| 17 | C/Cook | 840 | 28 | 641 | 154 | 70 | 144 | 30 | 1879 |
| 18 | Steward | 523 | 17 | 399 | 96 | 44 | 144 | 30 | 1236 |

* Overtime is calculated at 1.4 the normal hourly rate at this CBA. (Ref: MLC A2.3.5(a) and B2.2.2) hence 103 hrs OT.

** Work performed on public holidays compensation on base of over time rate (MLC B2.2.2)

*** Leave is 2.5 days per month at a rate of 1/30 the monthly basic wage (MLC A2.4)
[Source document marked "Page 22 of 22."]

**Closing note appearing in the source document:** "Note: Having regard to the difficulties of the conveyance of concepts in the translation of scientific and legal texts, should there exist any discrepancy between the Farsi and the English text, the criterion for adjudication shall be the original text in the English language."

## CERTIFICATE OF TRANSLATION

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
Abdollahi v. National Iranian Tanker Co., No. 1:19-cv-03688-ABJ

I, Mohammad Parandi, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, as follows:

1. I am over the age of eighteen and competent to make this declaration. I make it of my own personal knowledge.
2. I am fluent and literate in both the Farsi (Persian) and English languages and am competent to translate between them.
3. I have compared the foregoing English translation with the Farsi-language source document described above, namely the Collective Bargaining Agreement for the year 2017 between the Iranian Merchant Mariners' Trade Union Association and the National Iranian Tanker Company, consisting of a cover page and 22 numbered pages.
4. The foregoing is, to the best of my knowledge and ability, a true, complete and accurate English translation of that source document, subject to the limitations identified in the Translator's Note appearing at the beginning of this translation.
5. I have no interest in the outcome of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___09/29/2026__________, at ___Germantown, MD______.

______________________________________

Mohammad Parandi, Translator

Address: _Germantown, MD 20878__
Telephone / Email: _ 571-296-5660. Mparandi@a3legal.com