UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Abdollahi, et al. v. National Iranian Tanker Co., et al.
Civil Action No. 1:19-cv-03688-ABJ

# EXHIBIT S-13

**to Plaintiffs' Response to the Court's Order of September 2, 2026 and Supplemental Brief in Support of Motion for Default Judgment**

Public law materials

1. S.C. Res. 1718 (14 October 2006), U.N. Doc. S/RES/1718 (2006)
2. Executive Order 13810, Imposing Additional Sanctions With Respect to North Korea, 82 Fed. Reg. 44705 (25 September 2017)
3. Executive Order 13382, Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters, 70 Fed. Reg. 38567 (1 July 2005)
4. Iran, North Korea, and Syria Nonproliferation Act, Pub. L. 106-178, 114 Stat. 38 (2000), as amended, 50 U.S.C. § 1701 note

(Herischi Supp. Decl. ¶ 11; Supplemental Brief, Part IV.B)

United Nations S/RES/1718 (2006)

Security Council

Distr.: General
14 October 2006

# Resolution 1718 (2006)

## Adopted by the Security Council at its 5551st meeting, on 14 October 2006

*The Security Council*,

*Recalling* its previous relevant resolutions, including resolution 825 (1993), resolution 1540 (2004) and, in particular, resolution 1695 (2006), as well as the statement of its President of 6 October 2006 (S/PRST/2006/41),

*Reaffirming* that proliferation of nuclear, chemical and biological weapons, as well as their means of delivery, constitutes a threat to international peace and security,

*Expressing the gravest concern* at the claim by the Democratic People's Republic of Korea (DPRK) that it has conducted a test of a nuclear weapon on 9 October 2006, and at the challenge such a test constitutes to the Treaty on the Non-Proliferation of Nuclear Weapons and to international efforts aimed at strengthening the global regime of non-proliferation of nuclear weapons, and the danger it poses to peace and stability in the region and beyond,

*Expressing* its firm conviction that the international regime on the non-proliferation of nuclear weapons should be maintained and recalling that the DPRK cannot have the status of a nuclear-weapon state in accordance with the Treaty on the Non-Proliferation of Nuclear Weapons,

*Deploring* the DPRK's announcement of withdrawal from the Treaty on the Non-Proliferation of Nuclear Weapons and its pursuit of nuclear weapons,

*Deploring further* that the DPRK has refused to return to the Six-Party talks without precondition,

*Endorsing* the Joint Statement issued on 19 September 2005 by China, the DPRK, Japan, the Republic of Korea, the Russian Federation and the United States,

*Underlining* the importance that the DPRK respond to other security and humanitarian concerns of the international community,

*Expressing* profound concern that the test claimed by the DPRK has generated increased tension in the region and beyond, and *determining* therefore that there is a clear threat to international peace and security,

*Acting* under Chapter VII of the Charter of the United Nations, and taking measures under its Article 41,

1. *Condemns* the nuclear test proclaimed by the DPRK on 9 October 2006 in flagrant disregard of its relevant resolutions, in particular resolution 1695 (2006), as well as of the statement of its President of 6 October 2006 (S/PRST/2006/41), including that such a test would bring universal condemnation of the international community and would represent a clear threat to international peace and security;

2. *Demands* that the DPRK not conduct any further nuclear test or launch of a ballistic missile;

3. *Demands* that the DPRK immediately retract its announcement of withdrawal from the Treaty on the Non-Proliferation of Nuclear Weapons;

4. *Demands* further that the DPRK return to the Treaty on the Non-Proliferation of Nuclear Weapons and International Atomic Energy Agency (IAEA) safeguards, and *underlines* the need for all States Parties to the Treaty on the Non-Proliferation of Nuclear Weapons to continue to comply with their Treaty obligations;

5. *Decides* that the DPRK shall suspend all activities related to its ballistic missile programme and in this context re-establish its pre-existing commitments to a moratorium on missile launching;

6. *Decides* that the DPRK shall abandon all nuclear weapons and existing nuclear programmes in a complete, verifiable and irreversible manner, shall act strictly in accordance with the obligations applicable to parties under the Treaty on the Non-Proliferation of Nuclear Weapons and the terms and conditions of its International Atomic Energy Agency (IAEA) Safeguards Agreement (IAEA INFCIRC/403) and shall provide the IAEA transparency measures extending beyond these requirements, including such access to individuals, documentation, equipments and facilities as may be required and deemed necessary by the IAEA;

7. *Decides* also that the DPRK shall abandon all other existing weapons of mass destruction and ballistic missile programme in a complete, verifiable and irreversible manner;

8. *Decides* that:

(a) All Member States shall prevent the direct or indirect supply, sale or transfer to the DPRK, through their territories or by their nationals, or using their flag vessels or aircraft, and whether or not originating in their territories, of:

(i) Any battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems as defined for the purpose of the United Nations Register on Conventional Arms, or related materiel including spare parts, or items as determined by the Security Council or the Committee established by paragraph 12 below (the Committee);

(ii) All items, materials, equipment, goods and technology as set out in the lists in documents S/2006/814 and S/2006/815, unless within 14 days of adoption of this resolution the Committee has amended or completed their provisions also taking into account the list in document S/2006/816, as well as other items, materials, equipment, goods and technology, determined by the

Security Council or the Committee, which could contribute to DPRK's nuclear-related, ballistic missile-related or other weapons of mass destruction-related programmes;

(iii) Luxury goods;

(b) The DPRK shall cease the export of all items covered in subparagraphs (a) (i) and (a) (ii) above and that all Member States shall prohibit the procurement of such items from the DPRK by their nationals, or using their flagged vessels or aircraft, and whether or not originating in the territory of the DPRK;

(c) All Member States shall prevent any transfers to the DPRK by their nationals or from their territories, or from the DPRK by its nationals or from its territory, of technical training, advice, services or assistance related to the provision, manufacture, maintenance or use of the items in subparagraphs (a) (i) and (a) (ii) above;

(d) All Member States shall, in accordance with their respective legal processes, freeze immediately the funds, other financial assets and economic resources which are on their territories at the date of the adoption of this resolution or at any time thereafter, that are owned or controlled, directly or indirectly, by the persons or entities designated by the Committee or by the Security Council as being engaged in or providing support for, including through other illicit means, DPRK's nuclear-related, other weapons of mass destruction-related and ballistic missile-related programmes, or by persons or entities acting on their behalf or at their direction, and ensure that any funds, financial assets or economic resources are prevented from being made available by their nationals or by any persons or entities within their territories, to or for the benefit of such persons or entities;

(e) All Member States shall take the necessary steps to prevent the entry into or transit through their territories of the persons designated by the Committee or by the Security Council as being responsible for, including through supporting or promoting, DPRK policies in relation to the DPRK's nuclear-related, ballistic missile-related and other weapons of mass destruction-related programmes, together with their family members, provided that nothing in this paragraph shall oblige a state to refuse its own nationals entry into its territory;

(f) In order to ensure compliance with the requirements of this paragraph, and thereby preventing illicit trafficking in nuclear, chemical or biological weapons, their means of delivery and related materials, all Member States are called upon to take, in accordance with their national authorities and legislation, and consistent with international law, cooperative action including through inspection of cargo to and from the DPRK, as necessary;

9. *Decides* that the provisions of paragraph 8 (d) above do not apply to financial or other assets or resources that have been determined by relevant States:

(a) To be necessary for basic expenses, including payment for foodstuffs, rent or mortgage, medicines and medical treatment, taxes, insurance premiums, and public utility charges, or exclusively for payment of reasonable professional fees and reimbursement of incurred expenses associated with the provision of legal services, or fees or service charges, in accordance with national laws, for routine holding or maintenance of frozen funds, other financial assets and economic resources, after notification by the relevant States to the Committee of the intention

to authorize, where appropriate, access to such funds, other financial assets and economic resources and in the absence of a negative decision by the Committee within five working days of such notification;

(b) To be necessary for extraordinary expenses, provided that such determination has been notified by the relevant States to the Committee and has been approved by the Committee; or

(c) To be subject of a judicial, administrative or arbitral lien or judgement, in which case the funds, other financial assets and economic resources may be used to satisfy that lien or judgement provided that the lien or judgement was entered prior to the date of the present resolution, is not for the benefit of a person referred to in paragraph 8 (d) above or an individual or entity identified by the Security Council or the Committee, and has been notified by the relevant States to the Committee;

10. *Decides* that the measures imposed by paragraph 8 (e) above shall not apply where the Committee determines on a case-by-case basis that such travel is justified on the grounds of humanitarian need, including religious obligations, or where the Committee concludes that an exemption would otherwise further the objectives of the present resolution;

11. *Calls upon* all Member States to report to the Security Council within thirty days of the adoption of this resolution on the steps they have taken with a view to implementing effectively the provisions of paragraph 8 above;

12. *Decides* to establish, in accordance with rule 28 of its provisional rules of procedure, a Committee of the Security Council consisting of all the members of the Council, to undertake the following tasks:

(a) To seek from all States, in particular those producing or possessing the items, materials, equipment, goods and technology referred to in paragraph 8 (a) above, information regarding the actions taken by them to implement effectively the measures imposed by paragraph 8 above of this resolution and whatever further information it may consider useful in this regard;

(b) To examine and take appropriate action on information regarding alleged violations of measures imposed by paragraph 8 of this resolution;

(c) To consider and decide upon requests for exemptions set out in paragraphs 9 and 10 above;

(d) To determine additional items, materials, equipment, goods and technology to be specified for the purpose of paragraphs 8 (a) (i) and 8 (a) (ii) above;

(e) To designate additional individuals and entities subject to the measures imposed by paragraphs 8 (d) and 8 (e) above;

(f) To promulgate guidelines as may be necessary to facilitate the implementation of the measures imposed by this resolution;

(g) To report at least every 90 days to the Security Council on its work, with its observations and recommendations, in particular on ways to strengthen the effectiveness of the measures imposed by paragraph 8 above;

13. *Welcomes and encourages further* the efforts by all States concerned to intensify their diplomatic efforts, to refrain from any actions that might aggravate

tension and to facilitate the early resumption of the Six-Party Talks, with a view to the expeditious implementation of the Joint Statement issued on 19 September 2005 by China, the DPRK, Japan, the Republic of Korea, the Russian Federation and the United States, to achieve the verifiable denuclearization of the Korean Peninsula and to maintain peace and stability on the Korean Peninsula and in north-east Asia;

14. *Calls upon* the DPRK to return immediately to the Six-Party Talks without precondition and to work towards the expeditious implementation of the Joint Statement issued on 19 September 2005 by China, the DPRK, Japan, the Republic of Korea, the Russian Federation and the United States;

15. *Affirms* that it shall keep DPRK's actions under continuous review and that it shall be prepared to review the appropriateness of the measures contained in paragraph 8 above, including the strengthening, modification, suspension or lifting of the measures, as may be needed at that time in light of the DPRK's compliance with the provisions of the resolution;

16. *Underlines* that further decisions will be required, should additional measures be necessary;

17. *Decides* to remain actively seized of the matter.

Federal Register
Vol. 82, No. 184
Monday, September 25, 2017

# Presidential Documents

Title 3—

The President

**Executive Order 13810 of September 20, 2017**

## Imposing Additional Sanctions With Respect to North Korea

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), the United Nations Participation Act of 1945 (22 U.S.C. 287c) (UNPA), section 1 of title II of Public Law 65–24, ch. 30, June 15, 1917, as amended (50 U.S.C. 191), sections 212(f) and 215(a) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f) and 1185(a)), and section 301 of title 3, United States Code; and in view of United Nations Security Council Resolution (UNSCR) 2321 of November 30, 2016, UNSCR 2356 of June 2, 2017, UNSCR 2371 of August 5, 2017, and UNSCR 2375 of September 11, 2017, I, DONALD J. TRUMP, President of the United States of America, find that:

The provocative, destabilizing, and repressive actions and policies of the Government of North Korea, including its intercontinental ballistic missile launches of July 3 and July 28, 2017, and its nuclear test of September 2, 2017, each of which violated its obligations under numerous UNSCRs and contravened its commitments under the September 19, 2005, Joint Statement of the Six-Party Talks; its commission of serious human rights abuses; and its use of funds generated through international trade to support its nuclear and missile programs and weapons proliferation, constitute a continuing threat to the national security, foreign policy, and economy of the United States, and a disturbance of the international relations of the United States.

In order to take further steps with respect to the national emergency declared in Executive Order 13466 of June 26, 2008, as modified in scope by and relied upon for additional steps in subsequent Executive Orders, I hereby find, determine, and order:

**Section 1**. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

Any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to operate in the construction, energy, financial services, fishing, information technology, manufacturing, medical, mining, textiles, or transportation industries in North Korea;

(ii) to own, control, or operate any port in North Korea, including any seaport, airport, or land port of entry;

(iii) to have engaged in at least one significant importation from or exportation to North Korea of any goods, services, or technology;

(iv) to be a North Korean person, including a North Korean person that has engaged in commercial activity that generates revenue for the Government of North Korea or the Workers' Party of Korea;

(v) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person whose property and interests in property are blocked pursuant to this order; or

(vi) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the effective date of this order. The prohibitions in subsection (a) of this section are in addition to export control authorities implemented by the Department of Commerce.

(c) I hereby determine that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to subsection (a) of this section would seriously impair my ability to deal with the national emergency declared in Executive Order 13466, and I hereby prohibit such donations as provided by subsection (a) of this section.

(d) The prohibitions in subsection (a) of this section include:

(i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to subsection (a) of this section; and

(ii) the receipt of any contribution or provision of funds, goods, or services from any such person.

**Sec. 2**. (a) No aircraft in which a foreign person has an interest that has landed at a place in North Korea may land at a place in the United States within 180 days after departure from North Korea.

(b) No vessel in which a foreign person has an interest that has called at a port in North Korea within the previous 180 days, and no vessel in which a foreign person has an interest that has engaged in a ship-to-ship transfer with such a vessel within the previous 180 days, may call at a port in the United States.

(c) The prohibitions in subsections (a) and (b) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the effective date of this order.

**Sec. 3**. (a) All funds that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person and that originate from, are destined for, or pass through a foreign bank account that has been determined by the Secretary of the Treasury to be owned or controlled by a North Korean person, or to have been used to transfer funds in which any North Korean person has an interest, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

(b) No United States person, wherever located, may approve, finance, facilitate, or guarantee a transaction by a foreign person where the transaction by that foreign person would be prohibited by subsection (a) of this section if performed by a United States person or within the United States.

(c) The prohibitions in subsections (a) and (b) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the effective date of this order.

**Sec. 4**. (a) The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to impose on a foreign financial institution the sanctions described in subsection (b) of this section upon determining that the foreign financial institution has, on or after the effective date of this order:

(i) knowingly conducted or facilitated any significant transaction on behalf of any person whose property and interests in property are blocked pursuant to Executive Order 13551 of August 30, 2010, Executive Order 13687 of January 2, 2015, Executive Order 13722 of March 15, 2016, or this order, or of any person whose property and interests in property are blocked pursuant to Executive Order 13382 in connection with North Korea-related activities; or

(ii) knowingly conducted or facilitated any significant transaction in connection with trade with North Korea.

(b) With respect to any foreign financial institution determined by the Secretary of the Treasury, in consultation with the Secretary of State, in accordance with this section to meet the criteria set forth in subsection (a)(i) or (a)(ii) of this section, the Secretary of the Treasury may:

(i) prohibit the opening and prohibit or impose strict conditions on the maintenance of correspondent accounts or payable-through accounts in the United States; or

(ii) block all property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of such foreign financial institution, and provide that such property and interests in property may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

(c) The prohibitions in subsection (b) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the effective date of this order.

(d) I hereby determine that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to subsection (b)(ii) of this section would seriously impair my ability to deal with the national emergency declared in Executive Order 13466, and I hereby prohibit such donations as provided by subsection (b)(ii) of this section.

(e) The prohibitions in subsection (b)(ii) of this section include:

(i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to subsection (b)(ii) of this section; and

(ii) the receipt of any contribution or provision of funds, goods, or services from any such person.

**Sec. 5**. The unrestricted immigrant and nonimmigrant entry into the United States of aliens determined to meet one or more of the criteria in section 1(a) of this order would be detrimental to the interests of the United States, and the entry of such persons into the United States, as immigrants or nonimmigrants, is therefore hereby suspended. Such persons shall be treated as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

**Sec. 6**. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 7**. Nothing in this order shall prohibit transactions for the conduct of the official business of the Federal Government or the United Nations (including its specialized agencies, programmes, funds, and related organizations) by employees, grantees, or contractors thereof.

**Sec. 8**. For the purposes of this order:

(a) the term ''person'' means an individual or entity;

(b) the term ''entity'' means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term ''United States person'' means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States;

(d) the term ''North Korean person'' means any North Korean citizen, North Korean permanent resident alien, or entity organized under the laws of North Korea or any jurisdiction within North Korea (including foreign branches). For the purposes of section 1 of this order, the term ''North Korean person'' shall not include any United States citizen, any permanent resident alien of the United States, any alien lawfully admitted to the United States, or any alien holding a valid United States visa;

(e) the term ''foreign financial institution'' means any foreign entity that is engaged in the business of accepting deposits, making, granting, transferring, holding, or brokering loans or credits, or purchasing or selling foreign exchange, securities, commodity futures or options, or procuring purchasers and sellers thereof, as principal or agent. The term includes, among other entities, depository institutions; banks; savings banks; money service businesses; trust companies; securities brokers and dealers; commodity futures and options brokers and dealers; forward contract and foreign exchange merchants; securities and commodities exchanges; clearing corporations; investment companies; employee benefit plans; dealers in precious metals, stones, or jewels; and holding companies, affiliates, or subsidiaries of any of the foregoing. The term does not include the international financial institutions identified in 22 U.S.C. 262r(c)(2), the International Fund for Agricultural Development, the North American Development Bank, or any other international financial institution so notified by the Secretary of the Treasury; and

(f) the term ''knowingly,'' with respect to conduct, a circumstance, or a result, means that a person has actual knowledge, or should have known, of the conduct, the circumstance, or the result.

**Sec. 9**. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13466, there need be no prior notice of a listing or determination made pursuant to this order.

**Sec. 10**. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA and UNPA as may be necessary to implement this order. The Secretary of the Treasury may, consistent with applicable law, redelegate any of these functions to other officers and agencies of the United States. All agencies shall take all appropriate measures within their authority to implement this order.

**Sec. 11**. This order is effective at 12:01 a.m., Eastern Daylight Time, September 21, 2017.

**Sec. 12**. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*September 20, 2017.*

[FR Doc. 2017–20647
Filed 9–22–17; 11:15 am]
Billing code 3295–F7–P

**Federal Register**
Vol. 70, No. 126
Friday, July 1, 2005

# Presidential Documents

**Title 3—**

**The President**

**Executive Order 13382 of June 28, 2005**

## Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), and section 301 of title 3, United States Code,

I, George W. Bush, President of the United States of America, in order to take additional steps with respect to the national emergency described and declared in Executive Order 12938 of November 14, 1994, regarding the proliferation of weapons of mass destruction and the means of delivering them, and the measures imposed by that order, as expanded by Executive Order 13094 of July 28, 1998, hereby order:

**Section 1.** (a) Except to the extent provided in section 203(b)(1), (3), and (4) of IEEPA (50 U.S.C. 1702(b)(1), (3), and (4)), or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property of the following persons, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(i) the persons listed in the Annex to this order;

(ii) any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury, the Attorney General, and other relevant agencies, to have engaged, or attempted to engage, in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means of delivery (including missiles capable of delivering such weapons), including any efforts to manufacture, acquire, possess, develop, transport, transfer or use such items, by any person or foreign country of proliferation concern;

(iii) any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, and other relevant agencies, to have provided, or attempted to provide, financial, material, technological or other support for, or goods or services in support of, any activity or transaction described in paragraph (a)(ii) of this section, or any person whose property and interests in property are blocked pursuant to this order; and

(iv) any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, and other relevant agencies, to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

(b) Any transaction or dealing by a United States person or within the United States in property or interests in property blocked pursuant to this order is prohibited, including, but not limited to, (i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of, any person whose property and interests in property are blocked

pursuant to this order, and (ii) the receipt of any contribution or provision of funds, goods, or services from any such person.

(c) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(d) Any conspiracy formed to violate the prohibitions set forth in this order is prohibited.

**Sec. 2.** For purposes of this order:

(a) the term ''person'' means an individual or entity;

(b) the term ''entity'' means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization; and

(c) the term ''United States person'' means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

**Sec. 3.** I hereby determine that the making of donations of the type of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of, any person whose property and interests in property are blocked pursuant to this order would seriously impair my ability to deal with the national emergency declared in Executive Order 12938, and I hereby prohibit such donations as provided by section 1 of this order.

**Sec. 4.** Section 4(a) of Executive Order 12938, as amended, is further amended to read as follows:

''**Sec. 4.** *Measures Against Foreign Persons.*

(a) Determination by Secretary of State; Imposition of Measures. Except to the extent provided in section 203(b) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b)), where applicable, if the Secretary of State, in consultation with the Secretary of the Treasury, determines that a foreign person, on or after November 16, 1990, the effective date of Executive Order 12735, the predecessor order to Executive Order 12938, has engaged, or attempted to engage, in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means of delivery (including missiles capable of delivering such weapons), including any efforts to manufacture, acquire, possess, develop, transport, transfer, or use such items, by any person or foreign country of proliferation concern, the measures set forth in subsections (b), (c), and (d) of this section shall be imposed on that foreign person to the extent determined by the Secretary of State, in consultation with the implementing agency and other relevant agencies. Nothing in this section is intended to preclude the imposition on that foreign person of other measures or sanctions available under this order or under other authorities.''

**Sec. 5.** For those persons whose property and interests in property are blocked pursuant to section 1 of this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 12938, as amended, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

**Sec. 6.** The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government, consistent with applicable law. All agencies of the United States Government are

hereby directed to take all appropriate measures within their authority to carry out the provisions of this order and, where appropriate, to advise the Secretary of the Treasury in a timely manner of the measures taken.

**Sec. 7.** The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to determine, subsequent to the issuance of this order, that circumstances no longer warrant the inclusion of a person in the Annex to this order and that the property and interests in property of that person are therefore no longer blocked pursuant to section 1 of this order.

**Sec. 8.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

**Sec. 9.** (a) This order is effective at 12:01 a.m. eastern daylight time on June 29, 2005.

(b) This order shall be transmitted to the Congress and published in the **Federal Register**.



THE WHITE HOUSE,
*June 28, 2005.*

Billing code 3195–01–P

**ANNEX**

Korea Mining Development Trading Corporation

Tanchon Commercial Bank

Korea Ryonbong General Corporation

Aerospace Industries Organization

Shahid Hemmat Industrial Group

Shahid Bakeri Industrial Group

Atomic Energy Organization of Iran

Scientific Studies and Research Center

[FR Doc. 05–13214
Filed 6–30–05; 9:31 am]
Billing code 4810–25–P

PUBLIC LAW 106–178—MAR. 14, 2000

# IRAN NONPROLIFERATION ACT OF 2000

Public Law 106–178
106th Congress

# An Act

Mar. 14, 2000
[H.R. 1883]

To provide for the application of measures to foreign persons who transfer to Iran certain goods, services, or technology, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

Iran Nonproliferation Act of 2000. Arms and munitions. Weapons. 50 USC 1701 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Iran Nonproliferation Act of 2000".

President.

**SEC. 2. REPORTS ON PROLIFERATION TO IRAN.**

(a) REPORTS.—The President shall, at the times specified in subsection (b), submit to the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate a report identifying every foreign person with respect to whom there is credible information indicating that that person, on or after January 1, 1999, transferred to Iran—

(1) goods, services, or technology listed on—

(A) the Nuclear Suppliers Group Guidelines for the Export of Nuclear Material, Equipment and Technology (published by the International Atomic Energy Agency as Information Circular INFCIRC/254/Rev.3/Part 1, and subsequent revisions) and Guidelines for Transfers of Nuclear-Related Dual-Use Equipment, Material, and Related Technology (published by the International Atomic Energy Agency as Information Circular INFCIRC/254/Rev.3/Part 2, and subsequent revisions);

(B) the Missile Technology Control Regime Equipment and Technology Annex of June 11, 1996, and subsequent revisions;

(C) the lists of items and substances relating to biological and chemical weapons the export of which is controlled by the Australia Group;

(D) the Schedule One or Schedule Two list of toxic chemicals and precursors the export of which is controlled pursuant to the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction; or

(E) the Wassenaar Arrangement list of Dual Use Goods and Technologies and Munitions list of July 12, 1996, and subsequent revisions; or

(2) goods, services, or technology not listed on any list identified in paragraph (1) but which nevertheless would be,

if they were United States goods, services, or technology, prohibited for export to Iran because of their potential to make a material contribution to the development of nuclear, biological, or chemical weapons, or of ballistic or cruise missile systems.

(b) TIMING OF REPORTS.—The reports under subsection (a) shall be submitted not later than 90 days after the date of the enactment of this Act, not later than 6 months after such date of enactment, and not later than the end of each 6-month period thereafter. Deadline.

(c) EXCEPTIONS.—Any foreign person who—

(1) was identified in a previous report submitted under subsection (a) on account of a particular transfer; or

(2) has engaged in a transfer on behalf of, or in concert with, the Government of the United States,

is not required to be identified on account of that same transfer in any report submitted thereafter under this section, except to the degree that new information has emerged indicating that the particular transfer may have continued, or been larger, more significant, or different in nature than previously reported under this section.

(d) SUBMISSION IN CLASSIFIED FORM.—When the President considers it appropriate, reports submitted under subsection (a), or appropriate parts thereof, may be submitted in classified form.

**SEC. 3. APPLICATION OF MEASURES TO CERTAIN FOREIGN PERSONS.**

(a) APPLICATION OF MEASURES.—Subject to sections 4 and 5, the President is authorized to apply with respect to each foreign person identified in a report submitted pursuant to section 2(a), for such period of time as he may determine, any or all of the measures described in subsection (b).

(b) DESCRIPTION OF MEASURES.—The measures referred to in subsection (a) are the following:

(1) EXECUTIVE ORDER NO. 12938 PROHIBITIONS.—The measures set forth in subsections (b) and (c) of section 4 of Executive Order No. 12938.

(2) ARMS EXPORT PROHIBITION.—Prohibition on United States Government sales to that foreign person of any item on the United States Munitions List as in effect on August 8, 1995, and termination of sales to that person of any defense articles, defense services, or design and construction services under the Arms Export Control Act.

(3) DUAL USE EXPORT PROHIBITION.—Denial of licenses and suspension of existing licenses for the transfer to that person of items the export of which is controlled under the Export Administration Act of 1979 or the Export Administration Regulations.

(c) EFFECTIVE DATE OF MEASURES.—Measures applied pursuant to subsection (a) shall be effective with respect to a foreign person no later than—

(1) 90 days after the report identifying the foreign person is submitted, if the report is submitted on or before the date required by section 2(b);

(2) 90 days after the date required by section 2(b) for submitting the report, if the report identifying the foreign person is submitted within 60 days after that date; or

(3) on the date that the report identifying the foreign person is submitted, if that report is submitted more than 60 days after the date required by section 2(b).

(d) PUBLICATION IN FEDERAL REGISTER.—The application of measures to a foreign person pursuant to subsection (a) shall be announced by notice published in the Federal Register.

**SEC. 4. PROCEDURES IF MEASURES ARE NOT APPLIED.**

(a) REQUIREMENT TO NOTIFY CONGRESS.—Should the President not exercise the authority of section 3(a) to apply any or all of the measures described in section 3(b) with respect to a foreign person identified in a report submitted pursuant to section 2(a), he shall so notify the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate no later than the effective date under section 3(c) for measures with respect to that person.

(b) WRITTEN JUSTIFICATION.—Any notification submitted by the President under subsection (a) shall include a written justification describing in detail the facts and circumstances relating specifically to the foreign person identified in a report submitted pursuant to section 2(a) that support the President's decision not to exercise the authority of section 3(a) with respect to that person.

(c) SUBMISSION IN CLASSIFIED FORM.—When the President considers it appropriate, the notification of the President under subsection (a), and the written justification under subsection (b), or appropriate parts thereof, may be submitted in classified form.

**SEC. 5. DETERMINATION EXEMPTING FOREIGN PERSON FROM SECTIONS 3 AND 4.**

(a) IN GENERAL.—Sections 3 and 4 shall not apply to a foreign person 15 days after the President reports to the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate that the President has determined, on the basis of information provided by that person, or otherwise obtained by the President, that—

(1) the person did not, on or after January 1, 1999, knowingly transfer to Iran the goods, services, or technology the apparent transfer of which caused that person to be identified in a report submitted pursuant to section 2(a);

(2) the goods, services, or technology the transfer of which caused that person to be identified in a report submitted pursuant to section 2(a) did not materially contribute to Iran's efforts to develop nuclear, biological, or chemical weapons, or ballistic or cruise missile systems;

(3) the person is subject to the primary jurisdiction of a government that is an adherent to one or more relevant nonproliferation regimes, the person was identified in a report submitted pursuant to section 2(a) with respect to a transfer of goods, services, or technology described in section 2(a)(1), and such transfer was made consistent with the guidelines and parameters of all such relevant regimes of which such government is an adherent; or

(4) the government with primary jurisdiction over the person has imposed meaningful penalties on that person on account of the transfer of the goods, services, or technology which caused that person to be identified in a report submitted pursuant to section 2(a).

(b) OPPORTUNITY TO PROVIDE INFORMATION.—Congress urges the President—

(1) in every appropriate case, to contact in a timely fashion each foreign person identified in each report submitted pursuant to section 2(a), or the government with primary jurisdiction over such person, in order to afford such person, or governments, the opportunity to provide explanatory, exculpatory, or other additional information with respect to the transfer that caused such person to be identified in a report submitted pursuant to section 2(a); and

(2) to exercise the authority in subsection (a) in all cases where information obtained from a foreign person identified in a report submitted pursuant to section 2(a), or from the government with primary jurisdiction over such person, establishes that the exercise of such authority is warranted.

(c) SUBMISSION IN CLASSIFIED FORM.—When the President considers it appropriate, the determination and report of the President under subsection (a), or appropriate parts thereof, may be submitted in classified form.

**SEC. 6. RESTRICTION ON EXTRAORDINARY PAYMENTS IN CONNECTION WITH THE INTERNATIONAL SPACE STATION.**

Russian Federation. President.

(a) RESTRICTION ON EXTRAORDINARY PAYMENTS IN CONNECTION WITH THE INTERNATIONAL SPACE STATION.—Notwithstanding any other provision of law, no agency of the United States Government may make extraordinary payments in connection with the International Space Station to the Russian Aviation and Space Agency, any organization or entity under the jurisdiction or control of the Russian Aviation and Space Agency, or any other organization, entity, or element of the Government of the Russian Federation, unless, during the fiscal year in which the extraordinary payments in connection with the International Space Station are to be made, the President has made the determination described in subsection (b), and reported such determination to the Committee on International Relations and the Committee on Science of the House of Representatives and the Committee on Foreign Relations and the Committee on Commerce, Science, and Transportation of the Senate.

(b) DETERMINATION REGARDING RUSSIAN COOPERATION IN PREVENTING PROLIFERATION TO IRAN.—The determination referred to in subsection (a) is a determination by the President that—

(1) it is the policy of the Government of the Russian Federation to oppose the proliferation to Iran of weapons of mass destruction and missile systems capable of delivering such weapons;

(2) the Government of the Russian Federation (including the law enforcement, export promotion, export control, and intelligence agencies of such government) has demonstrated and continues to demonstrate a sustained commitment to seek out and prevent the transfer to Iran of goods, services, and technology that could make a material contribution to the development of nuclear, biological, or chemical weapons, or of ballistic or cruise missile systems; and

(3) neither the Russian Aviation and Space Agency, nor any organization or entity under the jurisdiction or control of the Russian Aviation and Space Agency, has, during the 1-year period prior to the date of the determination pursuant to this subsection, made transfers to Iran reportable under section 2(a) of this Act (other than transfers with respect to

which a determination pursuant to section 5 has been or will be made).

Deadline.

(c) PRIOR NOTIFICATION.—Not less than 5 days before making a determination under subsection (b), the President shall notify the Committee on International Relations and the Committee on Science of the House of Representatives and the Committee on Foreign Relations and the Committee on Commerce, Science, and Transportation of the Senate of his intention to make such determination.

(d) WRITTEN JUSTIFICATION.—A determination of the President under subsection (b) shall include a written justification describing in detail the facts and circumstances supporting the President's conclusion.

(e) SUBMISSION IN CLASSIFIED FORM.—When the President considers it appropriate, a determination of the President under subsection (b), a prior notification under subsection (c), and a written justification under subsection (d), or appropriate parts thereof, may be submitted in classified form.

(f) EXCEPTION FOR CREW SAFETY.—

(1) EXCEPTION.—The National Aeronautics and Space Administration may make extraordinary payments that would otherwise be prohibited under this section to the Russian Aviation and Space Agency or any organization or entity under the jurisdiction or control of the Russian Aviation and Space Agency if the President has notified the Congress in writing that such payments are necessary to prevent the imminent loss of life by or grievous injury to individuals aboard the International Space Station.

Deadline.

(2) REPORT.—Not later than 30 days after notifying Congress that the National Aeronautics and Space Administration will make extraordinary payments under paragraph (1), the President shall submit to Congress a report describing—

(A) the extent to which the provisions of subsection (b) had been met as of the date of notification; and

(B) the measures that the National Aeronautics and Space Administration is taking to ensure that—

(i) the conditions posing a threat of imminent loss of life by or grievous injury to individuals aboard the International Space Station necessitating the extraordinary payments are not repeated; and

(ii) it is no longer necessary to make extraordinary payments in order to prevent imminent loss of life by or grievous injury to individuals aboard the International Space Station.

(g) SERVICE MODULE EXCEPTION.—(1) The National Aeronautics and Space Administration may make extraordinary payments that would otherwise be prohibited under this section to the Russian Aviation and Space Agency, any organization or entity under the jurisdiction or control of the Russian Aviation and Space Agency, or any subcontractor thereof for the construction, testing, preparation, delivery, launch, or maintenance of the Service Module, and for the purchase (at a total cost not to exceed $14,000,000) of the pressure dome for the Interim Control Module and the Androgynous Peripheral Docking Adapter and related hardware for the United States propulsion module, if—

(A) the President has notified Congress at least 5 days before making such payments;

(B) no report has been made under section 2 with respect to an activity of the entity to receive such payment, and the President has no credible information of any activity that would require such a report; and

(C) the United States will receive goods or services of value to the United States commensurate with the value of the extraordinary payments made.

(2) For purposes of this subsection, the term "maintenance" means activities which cannot be performed by the National Aeronautics and Space Administration and which must be performed in order for the Service Module to provide environmental control, life support, and orbital maintenance functions which cannot be performed by an alternative means at the time of payment.

(3) This subsection shall cease to be effective 60 days after a United States propulsion module is in place at the International Space Station. Termination date.

(h) EXCEPTION.—Notwithstanding subsections (a) and (b), no agency of the United States Government may make extraordinary payments in connection with the International Space Station to any foreign person subject to measures applied pursuant to—

(1) section 3 of this Act; or

(2) section 4 of Executive Order No. 12938 (November 14, 1994), as amended by Executive Order No. 13094 (July 28, 1998).

Such payments shall also not be made to any other entity if the agency of the United States Government anticipates that such payments will be passed on to such a foreign person.

**SEC. 7. DEFINITIONS.**

For purposes of this Act, the following terms have the following meanings:

(1) EXTRAORDINARY PAYMENTS IN CONNECTION WITH THE INTERNATIONAL SPACE STATION.—The term "extraordinary payments in connection with the International Space Station" means payments in cash or in kind made or to be made by the United States Government—

(A) for work on the International Space Station which the Russian Government pledged at any time to provide at its expense; or

(B) for work on the International Space Station, or for the purchase of goods or services relating to human space flight, that are not required to be made under the terms of a contract or other agreement that was in effect on January 1, 1999, as those terms were in effect on such date.

(2) FOREIGN PERSON; PERSON.—The terms "foreign person" and "person" mean—

(A) a natural person that is an alien;

(B) a corporation, business association, partnership, society, trust, or any other nongovernmental entity, organization, or group, that is organized under the laws of a foreign country or has its principal place of business in a foreign country;

(C) any foreign governmental entity operating as a business enterprise; and

(D) any successor, subunit, or subsidiary of any entity described in subparagraph (B) or (C).

(3) EXECUTIVE ORDER NO. 12938.—The term "Executive Order No. 12938" means Executive Order No. 12938 as in effect on January 1, 1999.

(4) ADHERENT TO RELEVANT NONPROLIFERATION REGIME.—A government is an "adherent" to a "relevant nonproliferation regime" if that government—

(A) is a member of the Nuclear Suppliers Group with respect to a transfer of goods, services, or technology described in section 2(a)(1)(A);

(B) is a member of the Missile Technology Control Regime with respect to a transfer of goods, services, or technology described in section 2(a)(1)(B), or is a party to a binding international agreement with the United States that was in effect on January 1, 1999, to control the transfer of such goods, services, or technology in accordance with the criteria and standards set forth in the Missile Technology Control Regime;

(C) is a member of the Australia Group with respect to a transfer of goods, services, or technology described in section 2(a)(1)(C);

(D) is a party to the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction with respect to a transfer of goods, services, or technology described in section 2(a)(1)(D); or

(E) is a member of the Wassenaar Arrangement with respect to a transfer of goods, services, or technology described in section 2(a)(1)(E).

(5) ORGANIZATION OR ENTITY UNDER THE JURISDICTION OR CONTROL OF THE RUSSIAN AVIATION AND SPACE AGENCY.—(A) The term "organization or entity under the jurisdiction or control of the Russian Aviation and Space Agency" means an organization or entity that—

(i) was made part of the Russian Space Agency upon its establishment on February 25, 1992;

(ii) was transferred to the Russian Space Agency by decree of the Russian Government on July 25, 1994, or May 12, 1998;

(iii) was or is transferred to the Russian Aviation and Space Agency or Russian Space Agency by decree of the Russian Government at any other time before, on, or after the date of the enactment of this Act; or

(iv) is a joint stock company in which the Russian Aviation and Space Agency or Russian Space Agency has at any time held controlling interest.

(B) Any organization or entity described in subparagraph (A) shall be deemed to be under the jurisdiction or control of the Russian Aviation and Space Agency regardless of whether—

(i) such organization or entity, after being part of or transferred to the Russian Aviation and Space Agency or Russian Space Agency, is removed from or transferred out of the Russian Aviation and Space Agency or Russian Space Agency; or

(ii) the Russian Aviation and Space Agency or Russian Space Agency, after holding a controlling interest in such organization or entity, divests its controlling interest.

Approved March 14, 2000.

LEGISLATIVE HISTORY—H.R. 1883:

HOUSE REPORTS: No. 106–315 Pt. 1 (Comm. on International Relations).
CONGRESSIONAL RECORD:
Vol. 145 (1999): Sept. 14, considered and passed House.
Vol. 146 (2000): Feb. 22, 24, considered and passed Senate, amended.
Mar. 1, House concurred in Senate amendments.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 36 (2000):
Mar. 14, Presidential statement.